### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-0958 (ABJ) |
| ) | |
| CRAIG FOR U.S. SENATE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

### <u>MEMORANDUM OPINION</u>

On June 2, 2012, the Federal Election Commission ("FEC") filed this action against Craig for U.S. Senate, its treasurer, Kaye L. O'Riordan, and former Senator Larry Craig himself. It seeks a declaration that Senator Craig and his campaign committee violated 2 U.S.C. § 439a(b), a subsection of the Federal Election Campaign Act of 1971, when they utilized campaign funds to pay legal expenses incurred in connection with Senator Craig's efforts to withdraw the guilty plea he entered after an arrest for disorderly conduct in the Minneapolis-St. Paul International Airport. The FEC contends that the use of the funds for that purpose was an unlawful conversion of campaign funds to Senator Craig's personal use, and it seeks an order assessing civil penalties and requiring him to repay approximately $200,000. What is before the Court at this juncture is defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. In other words, defendants contend that even if one assumes the truth of all of the FEC's factual allegations, the complaint must be dismissed as a matter of law.

Defendants move to dismiss the action on two grounds.  They argue:  (1) that the use of campaign funds to satisfy Senator Craig's legal expenses was expressly permitted under the statute and not subject to the prohibition against personal use; and (2) that defendants should be immune from agency enforcement in this instance because they relied on FEC opinions approving the use of campaign funds in substantially similar situations.

The motion to dismiss will be denied.  The Court rejects defendants' assertion that the expenditures were permitted under the Act since it concludes that they cannot be characterized as ordinary and necessary expenses in connection with Senator Craig's duties as an office holder.  It also finds that the campaign funds were converted to Senator Craig's personal use as that term is defined in the Act because the expenses involved would have existed irrespective of his duties as a Senator.  Defendants' contention that the spending was not personal is not supported by the language of the statute or the FEC's implementing regulations and advisory opinions, and it is flatly inconsistent with the stance Senator Craig adopted before the Senate Ethics Committee. Defendants' second argument – that prior FEC opinions compel the dismissal of this action – misstates the holding of those opinions, minimizes the key distinctions between those cases and the one before the Court, and disregards clear admonitory language in the very opinion that defendants insist bears most directly on this case.  Therefore, the FEC has stated a valid claim that defendants violated the Federal Election Campaign Act of 1971.

## BACKGROUND

The following facts are taken from the complaint, and defendants do not dispute them for the purposes of their motion.  Defs.' Mem. in Supp. of Defs.' Mot. to Dismiss [Dkt. # 3-1] ("Defs.' Mem.") at 3 n.2.  Defendant Larry Craig was a United States Senator from Idaho from January 1991 to January 2009.  Compl. [Dkt. # 1] ¶ 6.  Craig for U.S. Senate ("Craig Committee") was authorized to receive campaign contributions and make expenditures on the

Senator's behalf.  Compl. ¶ 7.  Defendant Kaye L. O'Riordan was the committee's treasurer, and she had authority to approve its expenditures.  Compl. ¶ 8.  The FEC is a United States government agency that has exclusive jurisdiction over the Federal Election Campaign Act of 1971, 2 U.S.C. §§ 431–57.  Compl. ¶ 5.  The Commission is empowered to institute investigations of possible violations of the Act and to initiate civil actions in the U.S. district courts to obtain judicial enforcement of the Act.  Compl. ¶ 5, citing 2 U.S.C. §§ 437g(a)(1)–(2), 437d(e), 437g(a)(6).

On June 11, 2007, Senator Craig was arrested in the Minneapolis-St. Paul International Airport, where he had stopped en route to Washington, D.C.  Compl. ¶ 12.  He was charged with violating two Minnesota criminal statues:  (1) disturbing the peace-disorderly conduct, and (2) interference with privacy.  Compl. ¶ 12.  On August 8, 2007, Senator Craig pled guilty to a misdemeanor count of disorderly conduct.  Compl. ¶ 12; *see also Craig v. State*, No. A07-1949, 2008 WL 5136170, at *1 (Minn. Ct. App. Dec. 9, 2008) (stating that Senator Craig pled guilty to engaging in conduct in a restroom in the Minneapolis-St. Paul International Airport, which he "knew or should have known tended to arouse alarm or resentment or [sic] others, which conduct was physical (versus verbal) in nature").

On September 1, 2007, after Senator Craig's arrest and conviction had been the subject of national media attention, he announced his intent to resign from the Senate effective September 30, 2007.  Compl. ¶ 15.  He also retained the Washington, D.C. firm of Sutherland, Asbill & Brennan to serve as lead counsel in an effort to withdraw the guilty plea, and the Minnesota firm of Kelly & Jacobson to serve as local counsel in the matter.  Compl. ¶ 13.  On September 10, 2007, Senator Craig filed a motion in Minnesota state district court to withdraw his guilty plea.  Compl. ¶ 14.  The court denied the motion on October 4, 2007.  Compl. ¶ 14.  Craig appealed the

district court's decision to the Minnesota Court of Appeals, but that appeal was denied on December 9, 2008.  Compl. ¶ 14.  There were no further proceedings.  Compl. ¶ 14.  Between July 9, 2007 and October 5, 2008, the Craig Committee disbursed a total of over $480,000 for legal fees and other expenses.  Compl. ¶ 18.  At least $139,952 of this amount was paid to Sutherland, Asbill & Brennan, and $77,032 was paid to Kelly & Jacobson, in connection with the efforts to withdraw the guilty plea.  Compl. ¶¶ 19–20.

Eventually, the United States Senate Select Committee on Ethics ("Senate Ethics Committee") launched an investigation into Senator Craig's arrest, guilty plea, and subsequent actions.  Compl. ¶ 16.  During the course of this inquiry, Senator Craig advanced the position that his arrest and conviction were based upon "'purely personal conduct unrelated to the performance of official Senate duties.'"  Compl. ¶ 22, quoting Letter to the Honorable Barbara Boxer from Stanley M. Brand and Andrew D. Herman, Counsel to Larry Craig (Sept. 5, 2007) ("Letter to Senate Ethics Committee").  On October 4, 2007, Senator Craig announced that he would not resign from office after all:  "I will continue my effort to clear my name in the Senate Ethics Committee – something that is not possible if I am not serving in the Senate."  Compl. ¶ 17.

Senator Craig served out the remainder of his term and retired in January 2009.  Compl. ¶ 17.  On February 13, 2008, the Senate Ethics Committee issued a "Public Letter of Admonition," which stated that some portion of the Craig Committee's expenditures "may not be deemed to have been incurred in connection with our official duties, either by the [Senate Ethics] Committee or by the Federal Election Commission."  Compl. ¶ 23.

On November 10, 2008, the FEC received an administrative complaint alleging that Senator Craig had violated the Federal Election Campaign Act by spending more than $213,000

in campaign funds to pay for legal fees and expenses incurred in connection with his attempts to undo his guilty plea.  Compl. ¶ 24.  The agency investigated the matter and attempts to resolve the issue with defendants and their representatives were unsuccessful.  On June 11, 2012, the FEC filed this suit alleging that defendants violated 2 U.S.C. § 439a(b) when they disbursed more than $200,000 in campaign funds to pay legal expenses incurred in connection with efforts to withdraw Senator Craig's guilty plea in Minnesota in 2007 and 2008.  Compl. ¶¶ 25–34.[1]

The FEC contends:

> These disbursements converted the Craig Committee's funds to personal use because they were not expenditures made in connection with Mr. Craig's campaign for federal office and were not ordinary and necessary expenses incurred in connection with his duties as a Senator.  The expenses Mr. Craig incurred in his efforts to with withdraw his guilty plea would have existed irrespective of his duties as Senator.

Compl. ¶ 33.

On August 2, 2012, defendants moved to dismiss this case for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Defs.' Mot. to Dismiss [Dkt. # 3] at 1.  The FEC opposes the motion.  Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss [Dkt. # 5] ("Pl.'s Opp.").  The Court held a hearing on defendants' motion on March 11, 2013.  Tr. of Mot. Hr'g [Dkt. # 9] ("Tr.").

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*:  "First, the tenet that a court must accept as true all of the

---

1       The FEC did conclude "that the use of Craig Committee funds to pay the Brand Law Group to respond to the Senate Ethics Committee inquiry and pay Impact Strategies, a public relations firm, to respond to press inquiries regarding Craig's arrest and misdemeanor conviction was a permissible use of campaign funds."  Compl. ¶ 26.

allegations contained in a complaint is inapplicable to legal conclusions." 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

When considering a motion to dismiss under Rule 12(b)(6), the complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, and it is not required to accept a plaintiff's legal conclusions. *See id.*; *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).

## ANALYSIS

The FEC filed this action alleging that defendants violated the Federal Election Campaign Act of 1971, 2 U.S.C. 439a(b), when Senator Craig used campaign funds to pay for legal expenses incurred in connection with his attempts to withdraw a guilty plea entered in

Minnesota state court.  Compl. ¶ 1.  Defendants have moved to dismiss the action on two grounds.  First, they argue that the use of campaign funds for the legal expenses was lawful under the statutory framework because it was "permitted" under 2 U.S.C. § 439a(a)(2), and not a prohibited "personal" expenditure under 2 U.S.C. § 439a(b).  Second, they contend that they should be immune from agency enforcement in this instance because they relied on FEC advisory opinions approving the use of campaign funds in substantially similar situations. Neither of these arguments is persuasive.

I.     **The FEC Has Stated A Claim That Defendants Violated 2 U.S.C. § 439a**

A.  Statutory Framework

Section 439a(a) permits the use of campaign funds in five specific instances, including:

> (1) for otherwise authorized expenditures in connection with the campaign for Federal office of the candidate or individual; [and]
>
> (2) for ordinary and necessary expenses incurred in connection with the duties of the individual as a holder of Federal office.

2 U.S.C. § 439a(a)(1)–(2).  The statute also contains a paragraph that grants officeholders the right to use campaign funds "for any other lawful purpose unless prohibited by" section 439a(b). *Id.* § 439a(a)(6).

Section 439a(b) prohibits individuals from converting campaign funds to personal use. *Id.* § 439a(b)(1).  The statute specifies that a contribution to a campaign fund "shall be considered to be converted to personal use if the contribution . . . is used to fulfill any commitment . . . or expense of a person that would exist irrespective of the candidate's election campaign or the individual's duties as a holder of Federal office." *Id.* § 439a(b)(2).

Under a plain reading of the statute, then, in order to determine whether the use of campaign funds is lawful, the Court must first decide whether the expenditure was expressly permitted under sections 439a(1)–(5).  If not, but the campaign funds were used for what would

otherwise be a "lawful purpose" under section 439a(a)(6), the Court must determine whether that use was nonetheless prohibited as a "personal" expenditure under section 439a(b).[2]

Defendants maintain that the use of campaign funds for the legal expenses in connection with the attempts to withdraw Senator Craig's guilty plea was permitted under section 439a(a), and that it was not a prohibited "personal" expenditure under subsections (b)(1)–(2) of the statute as the FEC contends. Defs.' Mem. at 5–6. The complaint alleges that Senator Craig announced on September 1, 2007 that he would resign from the Senate effective September 30, 2007. Compl. ¶ 15. It further recounts Senator Craig's change of heart and his announcement of his decision to complete the remainder of his term. Compl. ¶ 17. So Senator Craig was not a candidate for re-election at the time the funds were used, and he retired in January of 2009. Compl. ¶ 17. Accordingly, defendants are not arguing that the expenses were permitted under section 439a(a)(1) because they were incurred in connection with a campaign, or that they were not "personal" because they would not have existed but for the candidate's election campaign. *See* Defs.' Mem. at 5–6.

Instead, the Court is being asked to determine whether these legal expenses can properly be characterized as "ordinary and necessary expenses incurred in connection with the Senator's duties" – that is, were they "permitted" under subsection (a)(2) of the statute? And, if they were not a "permitted" use of campaign funds under that provision but the legal expenses were "lawful" under subsection (a)(6), the Court must also decide whether the expenses were "personal": would they have existed irrespective of Senator Craig's duties as a holder of federal

---

2       The Court agrees with defendants' assertion that the prohibition on expenditures for "personal use" under section 439a(b) does not apply to sections 439a(a)(1)–(5) and does not act as a limit on expenditures expressly permitted under those provisions. *See* Defs.' Reply to Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss [Dkt. # 7] ("Defs.' Reply") at 17 ("Congress intended to prohibit expenditures for 'personal use' under § 439(b) only when an officeholder spends campaign funds pursuant to its authority under paragraph (a)(6) . . . .").

office?  If so, the use of campaign funds for that purpose was prohibited under subsections (b)(1)–(2).[3]

> B.  <u>The FEC has plausibly alleged that use of campaign funds for the legal expenses at issue was not permitted under 2 U.S.C. § 439a(a)(2)</u>

Defendants maintain that since it was incumbent upon a Member of Congress to travel to and from his district as part of his duties, and Senator Craig was engaged in that travel when he was in the airport bathroom on June 11, 2007, the legal expenses were incurred in connection with his official duties and they would not have existed but for those duties.  Defs.' Mem. at 5–6. But this argument ignores the series of critical events that took place between the moment that the travelling Senator stepped into the men's room and his payment of a $200,000 legal bill. While it may be that Senator Craig had cause to pass through the airport in connection with his duties as an office holder, and even to visit the restroom as a necessary incident to that trip, whether the *travel* was in connection with his duties is not the relevant inquiry.  Whether being in the men's room was in connection with his duties is not even the relevant inquiry.

The issue is whether *the expenses were incurred* in connection with the duties of the office holder – and indeed, whether they were "ordinary and necessary" expenses incurred in connection with those duties.  *See* 2 U.S.C. § 439a(a)(2).  This is several steps removed from

---

3      Both the FEC and the defendants combine these inquiries in undifferentiated discussions in their briefs, but the statute has a clear structure that requires that they be considered separately, even if the tests involve similar factors.

whether the Senator had an official reason to be in the airport.[4]  Even if a visit to one's district is assumed to fall within the scope of a Member's duties, that fact does not answer the question posed by the Act.[5]

Senator Craig was arrested for, and pled guilty to, committing a criminal violation of Minnesota state law.  One does not need to be a United States Congressman – or any sort of federal official – to be charged with this offense, and the arrest did not call into question his conduct as a legislator.  *See Craig v. State*, No. A07-1949, 2008 WL 5136170, at \*1 n.2 (Minn. Ct. App. Dec. 9, 2008).  Neither the charge nor the underlying conduct had anything to do with

---

[4]     Senator Craig has proffered documents showing that the trip was paid for with Senate funds. Ex. 1 to Defs.' Mot. to Dismiss [Dkt. # 3-2] at 3.  The Congressional Record for the 110th Congress reveals that the Senate adjourned for the weekend at 10:33 p.m. on June 7, 2007 to resume on Monday, June 11 at 2:00 p.m. Cong. R. 110th Cong. (2007–2008) at S7416.  It was called to order again at 2:00 p.m. on June 11.  *Id.* at S7417.  Senator Craig was supposed to fly from Minneapolis to Washington, D.C., and he was arrested at approximately 12:20 central daylight time, or about 40 minutes before the Senate resumed its business.  Airport Police Narrative, Ex. B to Motion to Withdraw Plea at 7–8, *State v. Craig*, No. 27-CR-07-043231 (Minn.     4th     Judicial     Dist.     Sept.     10,     2007),     *available     at* http://www.mncourts.gov/documents/4/Public/News/Larry_Craig_-_Copy_of_Motion_to_Withdraw_Plea_091007.pdf

[5]     In their memorandum, defendants cite the Senate Travel Regulations that govern the use of a government per diem during official, Congressional travel.  Defs.' Mem. at 5.  But counsel acknowledged during oral argument that those regulations do not bear directly on the questions here. Tr. 18:8–:11. Counsel also abandoned defendants' earlier reliance upon the Speech or Debate Clause, which is wholly inapplicable to the case at hand. *See* Defs.' Reply at 3; Tr. 34:11–35:3.

his performance of his official duties, so the legal expenses they generated were not incurred in connection with those duties.[6]

Moreover, the expenses were neither incurred at the time of the travel nor necessitated by the travel – they were incurred two months after the trip, after the Senator had second thoughts about his conviction, moved to withdraw his guilty plea, and appealed the denial of that motion. So the link is even more attenuated.  Defendants have not proffered any arguments for how these expenses were "connected" to his official duties beyond the mere fact that he travels for official reasons and the underlying crime was committed while he was on travel.  And they do not articulate a basis for a finding that these legal expenses were "ordinary" or "necessary."[7]  So the FEC has stated a claim that the legal expenses were not ordinary and necessary expenses in

---

6      The Act requires more than a showing that the expenditure was "connected" to the office before it can be permitted under subsection (a)(2); it only permits the use of campaign funds for "ordinary and necessary" expenses in connection with the duties of the individual as an office holder.  It is difficult for the Court to conceive of any circumstance where expenditures to fund a criminal defense would fall under subsection (a)(2) since while, as in the case of a public corruption investigation, they might be "in connection with" the office holder's duties, they do not seem to be "ordinary and necessary."  But paying one's defense attorney would certainly be "lawful" under subsection (a)(6), so the expenses could be permitted under that section as long as they were not prohibited under section (b).  This distinction explains why expenditures for legal fees may be authorized by the FEC in some circumstances, *see* Friends of Duke Cunningham Advisory Op., AO 2005-11, 2005 WL 2470825 (F.E.C. Sept. 26, 2005), but not others.

7      Defendants posit that "[t]o meet the 'ordinary and necessary' standard a Defendant must 'reasonably show that the expenses at issue resulted from campaign or officeholder activities.'" Defs.' Mem. at 5, citing 60 Fed. Reg. 7862, 7867 (Feb. 9, 1995).  The cited portion of the Federal Register addresses the definition of the term "personal" to be included in FEC regulations and does not discuss the meaning of § 439a(a).  And defendants' formulation seems to define "in connection with" and not "ordinary and necessary."  In any event, they have failed to meet their own test because they have not pointed to any facts that demonstrate that the legal expenses incurred in the effort to reopen the criminal case "resulted from" an officeholder activity.  Their entire motion is based on the claim that Craig's *travel* was connected to his officeholder activities, but the expenses did not "result from," or arise as a consequence of, the travel.

connection with the duties of the officeholder that would be permitted under subsection (a)(2) of the statute. [8]

  C. <u>The FEC has plausibly alleged that the use of campaign funds for the legal expenses at issue was prohibited under 2 U.S.C. § 439a(b)</u>

  Paying attorneys' fees is "a lawful purpose" that would be "permitted" under subsection (a)(6) unless prohibited under section (b).  The use of campaign funds to cover the particular legal fees here is prohibited under section (b) because it falls squarely within the statutory definition of a personal use:  an obligation or expense that would exist irrespective of the individual's duties as a holder of federal office.  *See* 2 U.S.C. § 439a(b)(2).

  To the extent that definition contains any ambiguity, the FEC has provided further guidance in its regulations:

> If campaign funds are used for a financial obligation that is caused by campaign activity or the activities of an officeholder, that use is not personal use.  However, if the obligation would exist even in the absence of the candidacy or even if the officeholder were not in office, then the use of funds for that obligation generally would be personal use.

Final Rule and Explanation and Justification, Personal Use of Campaign Funds, 60 Fed. Reg. 7862, 7863–64 (Feb. 9, 1995).

  It is true that the Commission has determined that there is no one-size-fits-all rule for legal expenses, and that it will assess them on a case-by-case basis.   11 C.F.R. § 113.1(g)(1)(ii)(A).  But it has explained that there are certain sorts of legal expenses that will ordinarily be deemed to be personal:

> A committee or a candidate could incur other legal expenses that arise out of campaign or officeholder activities but are not related to compliance

---

[8] This conclusion is reinforced by the Senator's own statement to the Senate Ethics Committee that his arrest and conviction was "purely personal conduct *unrelated to the performance of official Senate duties*."  *See* Compl. ¶ 22, citing Letter to Senate Ethics Committee, (emphasis added).

> with the FECA or other election laws.  For example, a committee could incur legal expenses in its capacity as the employer of the campaign staff, or in its capacity as a contracting party in its dealings with campaign vendors . . . .  However, legal expenses will not be treated as though they are campaign or officeholder related merely because the underlying legal proceedings have some impact on the campaign or the officeholder's status.  Thus, legal expenses associated with a divorce or charges of driving under the influence of alcohol will be treated as personal, rather than campaign or officeholder related.

60 Fed. Reg. 7862, 7868.

This interpretation is consistent with the statute.  Subsection (b)(2) defines an expense as personal if it would exist irrespective of the officeholder's duties, not his status.  *See* 2 U.S.C. § 439a(b)(2).  So it does not matter if the conviction may have done more harm to the Senator's reputation than it would have in the case of some less prominent individual caught under the same circumstances, or if the decision to withdraw the guilty plea was motivated by political considerations.

Here, defendants do not advance any grounds upon which the Court could conclude that there was something about Senator Craig's duties as a Member of Congress that gave rise to this financial obligation:  again, the charge did not related to his conduct as a legislator, but only actions undertaken in the privacy and anonymity of a restroom stall.  *See Craig*, 2008 WL 5136170, at *1 n.2.  Thus, the legal expenses here are analogous to the legal expenses for other personal transgressions such as driving while intoxicated that the Commission has determined will be treated as personal.  And this was precisely the analysis that Senator Craig advanced himself when he objected to the Ethics Committee investigation on the grounds that the conduct was "purely personal" and "unrelated to the performance of official Senate duties." *See* Compl. ¶ 22, citing Letter to Senate Ethics Committee.  So the complaint fairly states a claim that the campaign funds were converted to personal use in violation of section (b).

II.     **Defendants Have Failed To Demonstrate That They Are Immune From Prosecution In This Matter Based On Prior FEC Advisory Opinions**

As their second ground for dismissal of the action, defendants submit that they cannot be subject to sanctions under this statute because they relied on prior FEC advisory opinions that approved campaign expenditures for legal fees "in a matter indistinguishable from this one . . . and in numerous substantially similar matters." *See* Def.'s Mem. at 6–7, citing 2 U.S.C. § 437f(c)(1)(B).

Under the Federal Election Campaign Act, an individual who in good faith relies upon an FEC advisory opinion involving activity that "is indistinguishable in all its material aspects from" his or her own activity "shall not, as a result of any such act, be subject to any sanction provided by th[e] Act." 2 U.S.C. § 437f(c)(1)(B)–(c)(2). The safe harbor provision does not immunize these defendants from this suit, though, because the FEC advisory opinions defendants rely upon are entirely distinguishable from the case presented here, and defendants' motion is predicated upon a mischaracterization of their facts and the Commission's rulings.

A.   This case is distinguishable from the Kolbe for Congress FEC Advisory Opinion

Defendants point to the advisory opinion issued to Kolbe For Congress on January 26, 2007, and claim that this case is "indistinguishable in all its material aspects" from that opinion. The Kolbe opinion dealt with legal expenses incurred in connection with two inquiries: one being conducted by the House Ethics Committee and another by the Department of Justice. *See* Kolbe for Cong. Advisory Op., AO 2006-35, 2007 WL 268223, at *2–3 (F.E.C. Jan. 26, 2007). With respect to the legal fees for the Ethics Committee proceedings, the FEC found that the only thing the House Ethics Committee has any authority to investigate is one's conduct as a Member, so costs incurred in responding to one of its investigations would be an ordinary and necessary

expense as a Member.  *Id.* at *2.[9]  As for the Justice Department investigation, the campaign advised the FEC that the preliminary inquiry concerned, in part, information known to or obtained by Kolbe regarding the interaction between current or former pages and another Congressman.  *Id.*  The FEC concluded that to the extent Kolbe acquired that information by virtue of his status as a federal officeholder, his legal expenses in responding to the Justice Department inquiry were incurred in connection with his duty as a House Member.  *Id.*

The Advisory Opinion states that the Justice Department's preliminary inquiry also concerned "Representative Kolbe's rafting trip to the Grand Canyon in 1996."  *Id.* at *3.  Kolbe asserted that the trip was taken as part of his official duties on the House Appropriations Interior Subcommittee.  *Id.*  Based on this information, the FEC concluded that the DOJ inquiry into Kolbe's rafting trip would not exist but for his duties as a federal office holder, so the use of campaign funds to pay for legal expenses incurred in response to the inquiry into the trip was permitted under section 439a(a)(2).  *Id.*

In their brief, defendants assert that the Kolbe opinion sets forth the FEC's "only" standard for differentiating official expenses from personal ones, and they purport to recite it:

> Namely, that the event generating the expenditures occurred during the individual's execution of his or her official duties as a member of Congress.  *See e.g.,* FEC Advisory Opinion ("AO" 2006-35) at 3–4 (concluding that because Congressman Jim Kolbe's Grand Canyon trip constituted an "official Congressional visit . . . [his] legal expenses in responding to [DOJ] inquiry into his [conduct on the] trip . . . are ordinary and necessary expenses incurred in connection with his duty as a House member.") . . . .

---

9       Accordingly, legal fees that were attributable to the Senate Ethics Committee investigation of Senator Craig received similar treatment.  Compl. ¶ 26.

Defs.' Mem. at 1–2 (alterations in original).[10]  But the opinion doesn't say that at all.  It does not articulate a test that turns upon where or when the event or conduct giving rise to the legal expenses occurred.  In making that claim, defendants have altered the language of the opinion in a way that renders what is supposed to be a quotation inaccurate and misleading.

In the opinion, the FEC noted that the Kolbe committee had submitted documents showing that the trip was part of an official Congressional visit supported by the National Park Service and Grand Canyon National Park.  It then held:

> Accordingly, the Commission concludes that Representative Kolbe's legal expenses in responding to the inquiry *into his trip* to the Grand Canyon are ordinary and necessary expenses incurred in connection with his duty as a House member.

Kolbe, 2007 WL 268223, at *3 (emphasis added).  The FEC did not decide – as defendants told the Court – that all legal expenses related to any *conduct on the trip* would be covered simply because Kolbe embarked on the trip under an official banner.  Indeed, it specifically went on to say just the opposite:

> The Commission notes that the details of the preliminary inquiry by the Department of Justice are not public at this time, and it is possible that the scope of the inquiry could involve allegations not related to Representative Kolbe's duties as a Federal officeholder.  Thus, the Committee may not use campaign funds to pay for Representative Kolbe's legal expenses in the preliminary inquiry regarding other allegations . . . that do not concern the candidate's campaign activities or duties as a Federal officeholder.

---

10      During oral argument, defendants reiterated their position that the Kolbe opinion "just says:  You show the trip is official, accordingly, it's ordinary and necessary."  Tr. 10:17–:19. This claim is simply not supported by a reading of the opinion.

*Id.*, citing Cunningham, 2005 WL 2470825.[11]

So the Kolbe opinion is distinguishable, and it stands for the proposition that one must analyze the nature and subject matter of the inquiry giving rise to the expenses.  The FEC did not describe the test as whether the expenses can be traced in some way to official travel, but whether the particular subject of the legal inquiry that calls for the payment of legal fees "relates to" or "concerns" the Member's campaign activities or duties as a federal office holder.  *See* Kolbe, 2007 WL 268223, at *2 (explaining that it "has previously concluded that legal fees and expenses incurred in legal proceedings *involving allegations concerning the candidate's campaign activities or duties as a Federal officeholder* would not exist irrespective of the candidate's campaign or duties as a Federal officeholder and therefore are not an improper personal use of campaign funds" (emphasis added)).

Putting aside the express language of the Advisory Opinion, defendants insist that when the FEC authorized the payment for legal fees for an investigation into the Grand Canyon trip, it was tacitly authorizing payment for the defense of an investigation into Kolbe's personal conduct on that trip.  They argue that in its opinion, the FEC carved out any use of campaign funds to address "other allegations" that the FEC was not aware of at the time, but that: "[t]he inquiry into [Kolbe's] conduct with former pages is not an other allegation.  It is the only allegation that the DOJ was investigating at the time that this opinion was issued.  The only one."  Tr. 29:7–:11.  They further contend that since the FEC supposedly knew that Kolbe's own alleged conduct with

---

11      Defendants try to brush this language away by arguing that it "is not 'critical'; it is merely Commission boilerplate that serves as *dicta* to the opinion."  Defs.' Reply at 9.  But the fact that FEC saw fit to reiterate the point in the Kolbe opinion, and that it has included a similar statement in other opinions when campaigns were seeking advice about ongoing criminal investigations, *see id.* at 9–10, citing Cunningham, 2005 WL 2470825, at *1, underscores the importance of the caveat and reflects the FEC's intention that it be heeded by readers seeking guidance in the future.

pages was the focus of the DOJ investigation into the rafting trip, the opinion was sanctioning the use of campaign funds to defend this allegation.  Tr. 11:10–12:1.

One cannot glean any of these facts from the FEC's Advisory Opinion.  So to support their argument, defendants point to materials in the record underlying the Kolbe Advisory Opinion – specifically the communications between Kolbe for Congress and the FEC – that described the Justice Department inquiry.  Tr. 6:19–:25; 8:20–9:1.

The Court notes at the outset that 2 U.S.C. § 437f(c)(1)(B) only grants immunity for reliance upon an advisory *opinion*, and the Kolbe opinion explicitly carves out legal expenses incurred defending  "allegations not related" to official duties.  So the Court should not have to probe the record behind the FEC's decision to determine whether the immunity provision applies.

But even if the Court accepts the proposition that the entire set of underlying materials are part of the opinion, Tr. 23:11–:15, those materials do not support defendants' characterization of the precedential effect of the opinion.

The record begins with the Kolbe Committee's October 27, 2006 request to the FEC, seeking an opinion on whether the Committee could use campaign funds to pay legal fees incurred in connection with a preliminary inquiry by the Department of Justice.  *See* Letter from William H. Kelley, Treasurer, Kolbe for Congress to FEC (Oct. 27, 2006), *available at* http://saos.nictusa.com/aodocs/569946.pdf.  The request states that the details of the inquiry were unknown, but explained that "[a]ccording to press reports, the Department of Justice has opened a preliminary inquiry in connection with current and former Members of Congress and their interactions with current and former House pages."  *Id.*  A number of news articles were attached to the request for the advisory opinion:

- An October 9, 2006 article from the Washington Post reports that Kolbe had been made aware of Representative Foley's inappropriate communications with a former page and that he had confronted Foley about them. *See* Supporting Documents Attached to Letter from William H. Kelley, Treasurer, Kolbe for Congress to FEC (Oct. 27, 2006), *available at* http://saos.nictusa.com/aodocs/569946.pdf.

- A clip from MSNBC reports that Kolbe had been "dragged into the controversy" surrounding Foley, and it discussed Kolbe's failure to inform House leadership of the complaint he had received from the page. That article also states that Kolbe took two male pages with him on a three-day camping trip. *Id.*

- A Wall Street Journal article reiterates the information about Kolbe's receipt of a complaint and his transmittal of that complaint to Foley's office and the House Clerk. *Id.*

- CNN.com reported that according to two unnamed federal law enforcement officials, the U.S. Attorney for Arizona had launched a preliminary inquiry into the 1996 camping trip that included Kolbe and the pages, and that "the initial assessment stems from a single allegation regarding Kolbe's behavior on the trip." *Id.*

- A New York Times article also indicates that "an allegation related to the trip was given to the U.S. attorney's office in Phoenix," but states that "[i]t was not immediately clear whether it concerned any contention of improper activity by the retiring Kolbe." *Id.*

- Finally, there is an excerpt from washingtonpost.com on October 18, 2006 that reports that the camping trip was "under review" by the Justice Department. One law enforcement official cautioned that the inquiry is "based on allegations from an unidentified source that have not been substantiated. The allegations involve Kolbe's behavior toward one of the former pages." *Id.*

After the FEC asked for more information about the DOJ inquiry – including the inquiry into the rafting trip – representatives for Kolbe for Congress submitted another newspaper article that included a statement from the U.S. Attorney's office in Phoenix confirming the existence of a "preliminary assessment" of the Kolbe trip. *See* Letter from Kolbe for Congress to FEC (Nov. 6, 2006) and Supporting Documents, *available at* http://saos.nictusa.com/aodocs/569946.pdf.    The letter also set out information concerning the official nature of the trip. *Id.*

On November 17, 2006, the FEC wrote to Kolbe for Congress and expressed a need for further detail. Letter from Rosemary C. Smith, Assoc. Gen. Counsel, FEC to Katherine McCarron, counsel for Kolbe for Congress (Nov. 17, 2006), *available at* http://saos.nictusa.com/aodocs/569946.pdf. It asked: "Please either confirm that the Department of Justice's preliminary inquiry concerns a 1996 trip to the Grand Canyon involving Representative Kolbe and two former Pages (among others), or, in the alternative, describe the preliminary inquiry by the Department of Justice as it pertains to Representative Kolbe's duties as an officeholder." *Id.* The letter also asked the Kolbe team to clarify inconsistencies in the news articles about who paid for the trip and whether it was official in nature. *Id.*

The treasurer of Kolbe for Congress supplemented the record on November 27, 2006. He stated: "The specific details of the Justice Department's preliminary inquiry are largely confidential. However, it concerns, among other things, the 1996 rafting trip to the Grand Canyon . . . and information known to or obtained by Congressman Kolbe and his staff, in an official capacity, relating to the interaction between Congressman Mark Foley and current or former pages." Letter from William H. Kelley, Treasurer, Kolbe for Congress to J. Duane Pugh, Acting Asst. Gen. Counsel, FEC (Nov. 27, 2006), *available at* http://saos.nictusa.com/aodocs/569946.pdf. Notably, he added, "Congressman Kolbe is cooperating with the preliminary inquiry and has not been identified as a 'target' by the Department." *Id.* Additional material depicting the official nature of the trip – which had occurred ten years before – was provided on January 16, 2007. Letter from William H. Kelley, Treasurer, Kolbe for Congress to J. Duane Pugh, Acting Asst. Gen. Counsel, FEC (Jan. 16, 2007), *available at* http://saos.nictusa.com/aodocs/569946.pdf.

At most, then, a review of the record underlying the Kolbe Advisory Opinion reflects that as far as the FEC knew, the U.S. Attorney in Arizona had opened an initial assessment or preliminary inquiry into the rafting trip.  One possible – and unconfirmed – subject of the inquiry could have been Kolbe's own interactions with a page or former page during the trip, but it also could have been Kolbe's receipt of information about another Congressman.  In any event, none of that made its way into the opinion.  What the FEC did know was that the matter was still confidential, that it was in its early stages, and that prosecutors had not designated Kolbe as a "target."  This fact undermines defendants' assertion that the only matter the FEC understood to be under investigation in connection with the rafting trip involved personal sexual conduct by Kolbe, and that the opinion therefore sanctioned the use of campaign funds to pay for the legal expenses arising from any personal conduct occurring on an official trip.  To the contrary, the FEC went out of its way to hedge its opinion given the uncertainties and confidentiality involved, and defendants' suggestion that the Advisory Opinion stands for something other than what it said is unsupported.

   B.   This case is distinguishable from other FEC Advisory Opinions

In their memorandum, defendants maintain that there are other opinions in addition to Kolbe that justify their position:  "In sanctioning the use of official funds for legal expenses in similar matters, the Commission has likewise ignored the substance of members' underlying conduct and focused simply on whether the allegations occurred during the course of official activity."  Defs.' Mem. at 9.  This assertion also falls when one reviews the Advisory Opinions themselves.

In all of the cases cited by the defendants, the FEC decided whether the officeholder could use campaign funds to cover the legal expenses at issue based on an express consideration of whether the underlying allegations were related to officeholder duties.  In FEC Advisory

Opinion 1997-27, Representative John Boehner incurred legal expenses arising from a civil suit he filed against Representative Jim McDermott for allegedly disclosing an intercepted telephone conference call between Boehner and other Congressmen, which "pertained specifically to the business of the House."  Boehner Advisory Opinion, AO 1997-27, 1998 WL 108616, at *2 (F.E.C. Feb. 23, 1998).  The FEC concluded that because the telephone conversation itself "resulted directly from the pursuit of [Boehner's] duties as a Federal officeholder . . . the legal expenses at issue would not exist irrespective of Mr. Boehner's duties as a Federal officeholder, and . . . he may use [campaign] funds . . . to pay the legal expenses incurred in evaluating and pursuing the lawsuit."  *Id.*

Similarly, in FEC Advisory Opinion 2000-40, the FEC allowed McDermott to use campaign funds to defend against the Boehner suit because the conduct at issue in the suit "resulted directly from activities that [McDermott] engaged in because of [his] position at the time as Ranking Minority Member of the Ethics Committee."  McDermott Advisory Opinion, AO 2000-40, 2001 WL 136013, at *3 (F.E.C. Feb 7, 2001).  Specifically, the Commission explained that McDermott received and disclosed the tape recording to the media and other members of Congress because of that position.  *Id.*  It also added that the litigation "implicates a dispute between Members of Congress concerning the propriety of actions that were taken with respect to a matter of concern in the House of Representatives.  This litigation may present matters of institutional concern for all Members of the House and may pertain to the conduct of each Member, in his or her capacity as a Member of the House."  *Id.* at *5.

Finally, in Advisory Opinion 2005-11, the FEC approved Representative Randall Cunningham's use of campaign funds to pay legal fees in connection with a grand jury investigation involving "allegations that Representative Cunningham obtained benefits (*i.e.*, the

sale of his house at an above-market price and a rent-free stay on a yacht) from [a federal defense contractor] because of his . . . position on . . . the House Appropriations Defense Subcommittee." Cunningham Advisory Opinion, AO 2005-11, 2005 WL 2470825 at *3 (F.E.C. Sept. 26, 2005). The Commission concluded that these allegations would not have existed irrespective of Cunningham's officeholder duties. *Id.*

Nonetheless, defendants argue that "Senator Craig's expenses, incurred while on official travel, are more closely connected to his official duties than those incurred in the Boehner, McDermott and Cunningham matters." Defs.' Mem. at 10. But defendants can only get around these precedents by pretending that they are about something other than what they are. Specifically, defendants submit that the conduct at issue in Cunningham – "selling one's house, [and] renting a yacht" – was "wholly unrelated to Congressman Cunningham's officeholder duties." Defs.' Mem. at 9. This is not a serious attempt to grapple with the Cunningham opinion, which specifically turned upon the fact that the Member was under investigation for receiving favorable treatment in these transactions *because he sat on a Congressional committee*. And as noted above, the Boehner and McDermott opinions relied upon the fact that the activities underlying the lawsuit arose out of their performance of their official duties. That simply cannot be said of Senator Craig's action to withdraw his guilty plea.[12]

Since all the cases defendants rely on are distinguishable from the case at hand, those cases do not immunize them as a matter of law from agency enforcement in this case.

---

12      The Court also notes that unlike Senator Craig, neither Kolbe nor Cunningham nor Boehner nor McDermott staked out a public position in which they insisted that the conduct at issue was entirely personal and had nothing whatsoever to do with their official duties.

## CONCLUSION

For the reasons stated above, the Court will deny defendants' motion to dismiss the action because the FEC has plausibly stated a claim that defendants violated the Federal Election Campaign Act of 1971.  A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE: March 28, 2013