## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
                            )

FEDERAL ELECTION COMMISSION,    )
                            )    Civ. No. 12-958 (ABJ)

       Plaintiff,         )
                            )

        v.             )
                            )    MOTION FOR

CRAIG FOR U.S. SENATE, *et al.*,   )    SUMMARY JUDGMENT
                            )

       Defendants.      )
———————————————————————)

## PLAINTIFF FEDERAL ELECTION COMMISSION'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Federal Election Commission respectfully moves this Court for an order granting summary judgment to the Commission pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7(h). In support of its motion, the Commission is filing a Memorandum in Support of Its Motion for Summary Judgment, Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue, and a Proposed Order.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

*/s/ Kevin P. Hancock*
Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650
September 30, 2013                          Fax: (202) 219-0260

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                       )
FEDERAL ELECTION COMMISSION,           )
                                       )    Civ. No. 12-958 (ABJ)
        Plaintiff,                     )
                                       )
        v.                             )
                                       )    MEMORANDUM IN SUPPORT OF
CRAIG FOR U.S. SENATE, *et al.*,       )    SUMMARY JUDGMENT
                                       )
        Defendants.                    )
_____)

**PLAINTIFF FEDERAL ELECTION COMMISSION'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650
Fax: (202) 219-0260

September 30, 2013

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................2

I.     The Parties ....................................................................................................2

II.    Craig's Arrest, Guilty Plea, and Legal Proceedings in Minnesota ..............................2

III.   The Senate Ethics Committee Proceedings .................................................................3

IV.   FEC Administrative Proceedings...................................................................................4

V.    Proceedings Before This Court.....................................................................................5

ARGUMENT ...............................................................................................................6

I.     DEFENDANTS SPENT MORE THAN $216,000 IN VIOLATION OF FECA'S
BAN ON CONVERTING CAMPAIGN FUNDS TO PERSONAL USE ...................6

       A.     Defendants Converted Campaign Funds to Craig's Personal Use....................7

       B.     No FEC Advisory Opinion Forecloses Sanctions Against Defendants
for Their Violations...........................................................................................9

              1.     The Kolbe Advisory Opinion Is Materially Distinguishable from
Defendants' Conversion of Campaign Funds to Personal Use.............9

              2.     The Other Advisory Opinions Defendants Have Cited Are Also
Materially Distinguishable from Defendants' Activities....................11

              3.     Defendants Did Not Rely in Good Faith on Kolbe or Any Other
FEC Advisory Opinion .......................................................................12

II.    DEFENDANTS SHOULD DISGORGE THE CONVERTED FUNDS AND
PAY A SIGNIFICANT CIVIL PENALTY FOR THEIR VIOLATION OF
A CRITICAL PART OF THE NATION'S CAMPAIGN FINANCE
INFRASTRUCTURE .................................................................................................14

       A.     Disgorgement Would Prevent Craig from Being Unjustly Enriched by
His Conversion of Campaign Funds to Personal Use......................................14

       B.     A Substantial Civil Penalty Would Punish Defendants' Violation, Deter
Future Violations, Promote Public Confidence in Government and the
Campaign Finance System, and Serve Other Important Interests ..................18

i

1.      The Need to Deter Future Personal Use Violations at a Time
        When Billions of Dollars Are Contributed to Federal Candidates ......18

2.      Injury to Contributors to the Craig Committee ...................................21

3.      Defendants' Violations Undermined the Public's Confidence in
        Government and the Campaign Finance System ................................21

4.      Craig Profited from Defendants' Violation .........................................23

5.      The Need to Punish Defendants' Serious Violations of Campaign
        Finance Law .........................................................................................24

6.      The Importance of Vindicating the Authority of the Commission
        and Encouraging Pre-Litigation Settlement ........................................24

7.      Defendants' Purported Good Faith Does Not Warrant Penalties
        Below $70,000 .....................................................................................25

8.      Defendants Cannot Show That Craig Would Be Unable to
        Disgorge the Converted Funds and Pay an Appropriate
        Civil Penalty .........................................................................................28

C.      This Court Should Declare that Defendants Violated the Act and Issue a
        Permanent Injunction .....................................................................................30

CONCLUSION .......................................................................................................................30

Defendant Larry Craig spent more than $216,000 that contributors gave to his U.S. Senate campaign committee on personal legal expenses he incurred in an effort to withdraw his guilty plea to a misdemeanor count of disturbing the peace in Minnesota.  In denying defendants' motion to dismiss, this Court correctly held that Craig's alleged spending "falls squarely" within the Federal Election Campaign Act's prohibition on converting campaign funds to personal use. *FEC v. Craig for U.S. Senate*, --- F. Supp. 2d ---, 2013 WL 1248271, at *1 (D.D.C. Mar. 28, 2013).  This Court also found that no advisory opinion of the Federal Election Commission would excuse defendants' misuse of campaign funds.  *Id.* at *7-12.  Defendants have now admitted the factual allegations of the Complaint and "the remaining issues are defendants' liability as a matter of law and the factual and legal determinations that enable the Court to determine the appropriate remedy."  (Joint Local Rule 16.3 Report ¶ 1(2) (Docket No. 13).)

The Commission now moves for summary judgment.  The Court should hold that defendants' misuse of funds violated 2 U.S.C. § 439a(b) and impose appropriate civil remedies. Craig should be required to disgorge the funds he converted to prevent him from being unjustly enriched by his wrongdoing.  Defendants should also be required to pay a substantial civil penalty to punish this violation and deter others.  The violation allowed Craig to profit, while injuring contributors to his committee, who were exercising their First Amendment right to support Craig's candidacy, not his wallet.  Personal use violations also injure the public by increasing the risk of corruption and the appearance of corruption among federal leaders, while undermining the public's confidence in government and the campaign finance system, which deters participation in the political process.  Finally, the Court should issue a declaration and a permanent injunction to prevent similar future threats to the nation's political system.

## BACKGROUND

### I.      The Parties

Plaintiff Federal Election Commission ("Commission" or "FEC") is an independent agency of the United States government with exclusive jurisdiction over the administration, interpretation, and civil enforcement of the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-57.  *See* 2 U.S.C. §§ 437c(b)(1), 437d(a), 437g.  The Commission is authorized to investigate possible violations of FECA, *id.* § 437g(a)(1)-(2), and to initiate civil actions in the United States district courts to obtain judicial enforcement of FECA, *id.* §§ 437d(e), 437g(a)(6).

Defendant Larry Craig was a United States Senator from Idaho from January 1991 to January 2009.  (FEC's Statement of Material Facts as to Which It Contends There Is No Genuine Issue ("FEC Facts") ¶ 4.)  In 2007, Craig was a candidate for the United States Senate in the 2008 election, and he authorized defendant Craig for U.S. Senate ("Craig Committee") to be his principal campaign committee under 2 U.S.C. § 431(5)-(6).  (FEC Facts ¶ 5.)  Accordingly, the Craig Committee was authorized to receive campaign contributions and make expenditures on Craig's behalf.  *Id.*; *see* 2 U.S.C. § 432(e)(1)-(2).  Craig is a defendant in this matter in his personal capacity and in his official capacity as treasurer of the Craig Committee.  (FEC Facts ¶ 6.)[1]

### II.     Craig's Arrest, Guilty Plea, and Legal Proceedings in Minnesota

On June 11, 2007, then-Senator Craig was arrested while using a restroom at the Minneapolis-St. Paul International Airport, where he was awaiting a scheduled flight to Washington, D.C.  (FEC Facts ¶ 7.)  Craig was charged under Minnesota law with disturbing the peace-disorderly conduct and interference with privacy.  (*Id.* ¶ 8.)  About two months later, on

---

[1]      On May 1, 2013, this Court entered a minute order granting defendants' consent motion to substitute Craig for Kaye O'Riordan as treasurer of the Craig Committee.

August 8, 2007, Craig pleaded guilty to a misdemeanor count of disorderly conduct in Minnesota state district court.  (*Id.* ¶ 9.)

Craig subsequently retained the Washington, D.C. law firm of Sutherland, Asbill & Brennan ("Sutherland") and the Minnesota law firm of Kelly & Jacobson ("Kelly") in an effort to withdraw his guilty plea.  (FEC Facts ¶ 10.)  On September 10, 2007, Craig filed a motion to withdraw the guilty plea, which was denied on October 4, 2007.  (*Id.* ¶ 13.)  Craig appealed the ruling to the Minnesota Court of Appeals, which rejected the appeal on December 9, 2008.  (*Id.*)  From October 29, 2007 through October 5, 2008, the Craig Committee paid at least $139,952 to Sutherland and $77,032 to Kelly, for a total of at least $216,984, in connection with Craig's failed efforts to withdraw his guilty plea.  (*Id.* ¶ 23.)

## III.    The Senate Ethics Committee Proceedings

The United States Senate Select Committee on Ethics ("Senate Ethics Committee") conducted an inquiry into Craig's conduct in connection with his arrest, guilty plea, and subsequent conduct.  (FEC Facts ¶ 25.)  The Brand Law Group in Washington, D.C. — which represents defendants in this matter — also represented Craig before the Senate Ethics Committee.  (*Id.* ¶ 26.)  In a September 5, 2007, letter to the Senate Ethics Committee, Craig's counsel argued that the Senate Ethics Committee should not exercise jurisdiction over the matter because Craig's arrest and guilty plea was for "*purely personal conduct unrelated to the performance of official Senate duties.*"  (*Id.* (emphasis added).)

On February 13, 2008, the Senate Ethics Committee issued a "Public Letter of Admonition" unanimously concluding that, among other matters, Craig had not complied with Senate Rule 38.2, which requires Senate Ethics Committee approval of any payments for legal expenses paid with funds of a principal campaign committee.  (FEC Facts ¶ 27.)  Specifically,

the Ethics Committee wrote:

> [T]he *Senate Ethics Manual* states that "Members, officers or employees
> may pay legal expenses incurred in connection with their official duties
> with funds of a Senator's principal campaign committee, but only if such
> payment is approved by the Committee." . . . It appears that you have
> used over $213,000 in campaign funds to pay legal (and, apparently,
> "public relations") fees in connection with your appeal of your criminal
> conviction and in connection with the preliminary inquiry before the
> Committee in this matter.  *It appears that some portion of these expenses
> may not be deemed to have been incurred in connection with your official
> duties*, either by the Committee or by the Federal Election Commission
> (which has concurrent jurisdiction with the Committee on the issue of
> conversion of a Senator's campaign funds to personal use).

(*Id.* (emphasis omitted; second emphasis added).)

## IV.    FEC Administrative Proceedings

On November 10, 2008, the Commission received an administrative complaint alleging

that Craig had violated 2 U.S.C. § 439a(b), the provision of FECA that bars the conversion of

campaign funds to personal use, by spending campaign funds to pay legal fees and expenses

incurred in connection with his arrest and conviction.  (FEC Facts ¶ 28.)  By letter dated

November 18, 2008, the Commission notified defendants that the administrative complaint had

been filed and provided defendants with a copy.  Craig responded to the Commission

on December 2, 2008.  FEC Facts ¶ 29; *see* 2 U.S.C. § 437g(a)(1).  In that response, Craig

claimed that he did not violate FECA and that he acted in good faith on the basis of a letter from

his counsel, dated October 4, 2007, which Craig attached.  (FEC Facts ¶ 29; *see also id.* ¶ 17.)

After reviewing the then-available information, on May 19, 2009, the Commission voted

5-0 (with one Commissioner recused) to find "reason to believe" that defendants had violated

2 U.S.C. § 439a(b).  FEC Facts ¶ 30; *see* 2 U.S.C. § 437g(a)(1)-(2).

Following an investigation, briefing by the Commission's General Counsel and

defendants, and a hearing, on February 7, 2012, the Commission voted 5-0 to find probable

cause to believe that defendants had violated 2 U.S.C. § 439a(b).  FEC Facts ¶ 31; *see* 2 U.S.C. § 437g(a)(4)(A).

As FECA requires, the Commission then endeavored to correct the violations through informal methods of conference, conciliation, and persuasion for a period of not less than 30 days.  FEC Facts ¶ 32; *see* 2 U.S.C. § 437g(a)(4)(A).  Unable to secure acceptable conciliation agreements, and having met each of the jurisdictional prerequisites to bringing suit, on May 3, 2012, the Commission voted 5-0 to authorize this litigation against defendants.  FEC Facts ¶ 32; *see* 2 U.S.C. § 437g(a)(6).

## V.      Proceedings Before This Court

The Commission filed this action on June 11, 2012, pursuant to its authority under 2 U.S.C. §§ 437d(a)(6), 437g(a)(6)(A).  (FEC Facts ¶ 33.)  Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) on August 8, 2012.  (*See* Defs.' Mot. to Dismiss (Docket No. 3).)  After holding a hearing, the Court denied defendants' motion on March 28, 2013.  (*See* Order (Docket No. 10).)  The Court concluded that if the factual allegations in the Complaint were assumed to be true, the Craig Committee's "campaign funds were converted to Senator Craig's personal use," and therefore the Commission had stated a valid claim that defendants violated 2 U.S.C. § 439a(b).  *Craig for U.S. Senate*, 2013 WL 1248271, at *1; *see also* Mem. Op. at 2 (Docket No. 11).

On April 11, 2013, defendants filed an Answer in which they admitted the factual allegations of the Commission's Complaint.  (Answer (Docket No. 12).).  On April 19, 2013, the parties filed a joint report pursuant to Local Civil Rule 16.3.  (Joint Local Rule 16.3 Report (Docket No. 13).)  In that joint report, the parties stated that "Defendants do not dispute any of the relevant facts regarding the violations alleged in this case," and "it appears at present that the

remaining issues are defendants' liability as a matter of law and the factual and legal

determinations that enable the Court to determine the appropriate remedy." (*Id.* ¶ 1(2) (Docket

No. 13).)

The Court issued a scheduling order on April 26, 2013, directing the parties to complete

discovery by August 30, 2013, and setting a dispositive motion briefing schedule. (Scheduling

Order at 1 (Docket No. 14).) The Commission now moves this Court for an order granting

summary judgment against defendants. *See* Fed. R. Civ. P. 56(a) (summary judgment is

appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law"). If the Court concludes that defendants violated 2 U.S.C.

§ 439a(b), the Commission also requests that the Court order appropriate civil remedies against

defendants pursuant to 2 U.S.C. § 437g(a)(6)(B).

## ARGUMENT

## I.    DEFENDANTS SPENT MORE THAN $216,000 IN VIOLATION OF FECA'S BAN ON CONVERTING CAMPAIGN FUNDS TO PERSONAL USE

Senator Craig and his campaign committee spent more than $216,000 in funds from

campaign contributors on then-Senator Craig's personal legal expenses stemming from his

attempt to withdraw a guilty plea he entered following arrest in Minnesota for disturbing the

peace. In denying defendants' motion to dismiss, this Court held that defendants' alleged

spending "falls squarely" within FECA's prohibition on converting campaign funds to personal

use. *Craig for U.S. Senate*, 2013 WL 1248271, at *6. Since defendants have now admitted the

factual allegations of the Complaint, the Court should hold that defendants violated section

439a(b), which is a key part of FECA's framework designed to prevent self-dealing by federal

office holders as well as promote confidence in government and the campaign finance system.

The defendants' violation of FECA is not excused by any FEC advisory opinion. As this Court

has held, the advisory opinions defendants have cited are all materially distinguishable.  Nor did defendants rely in good faith on any of the opinions, as would be required for the opinions to protect defendants.  This Court should therefore grant summary judgment to the Commission.

### A.    Defendants Converted Campaign Funds to Craig's Personal Use

FECA permits the use of campaign funds for six purposes.  *See* 2 U.S.C. § 439a(a)(1)-(6).  They include "ordinary and necessary expenses incurred in connection with duties of [an] individual as a holder of Federal office," *id.* § 439a(a)(2), and any "lawful purpose unless prohibited by" section 439a(b), *id.* § 439a(a)(6).  However, section 439a(b) bars any person from converting campaign funds to personal use.  2 U.S.C. § 439a(b)(1).  That occurs where campaign funds are "used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the . . . individual's duties as a holder of Federal office."  *Id.* § 439a(b)(2).  The Commission has explained that under this prohibition, campaign funds may be used for expenses "caused by . . . the activities of an officeholder," but may not be used for expenses that "would exist . . . even if the officeholder were not in office."  Expenditures; Reports by Political Committees, Personal Use of Campaign Funds, 60 Fed. Reg. 7862, 7863-64 (Feb. 9, 1995).

While some expenses, such as a home mortgage, are always deemed personal use, 2 U.S.C. § 439a(b)(2)(A), the Commission examines other expenses, such as legal expenses, on a case-by-case basis, 11 C.F.R. § 113.1(g)(1)(ii)(A).  In no case, however, are legal expenses officeholder-related "merely because the underlying legal proceedings have some impact on . . . the officeholder's status," as would be the case with charges for driving under the influence of alcohol.  60 Fed. Reg. 7862, 7868.  Campaign funds therefore may not be used for such personal legal expenses.  *Id.*

On March 28, 2013, this Court held that the now-admitted allegations of the FEC's Complaint stated a valid claim that defendants violated section 439a(b). *Craig for U.S. Senate*, 2013 WL 1248271, at *1. The Court explained that Craig's Minnesota legal expenses were personal and were not incurred in connection with his officeholder duties. *Id.* at *5-6. Craig incurred his legal expenses as a result of being arrested for and pleading guilty to disturbing the peace under Minnesota law. *Id.* at *5. "Neither the charge nor the underlying conduct had anything to do with [Craig's] performance of his official duties," the Court explained. *Id.* Indeed, Craig admitted this fact to the Senate Ethics Committee, where he contended that his conduct was "purely personal" and "unrelated to the performance of official Senate duties." *Id.* at *6 (internal quotation marks omitted).

Craig has asserted that his legal expenses were not personal because he was arrested in the midst of official travel from his home state of Idaho to Washington, D.C. *Craig for U.S. Senate*, 2013 WL 1248271, at *5. But, as this Court pointed out, his legal expenses "were neither incurred at the time of the travel nor necessitated by the travel." *Id.* Craig's legal expenses were incurred months later — after Craig pled guilty, reconsidered that decision, and then hired attorneys to help him try to undo it — making any purported link with Craig's travel "even more attenuated." *Id.*

Because Craig's duties did not cause his legal expenses, this Court explained that it was irrelevant whether Craig's decision to withdraw his plea was motivated by concern for political or reputational status. *Craig for U.S. Senate*, 2013 WL 1248271, at *6. In this respect, the Court concluded, Craig's expenses "are analogous to the legal expenses for other personal transgressions such as driving while intoxicated that the Commission has determined will be treated as personal." *Id.*

Accordingly, this Court should hold that defendants violated 2 U.S.C. § 439a(b).

**B.      No FEC Advisory Opinion Forecloses Sanctions Against Defendants for Their Violations**

In their motion to dismiss, defendants claimed that even if they were deemed to have violated section 439a(b), they would nonetheless be immune from liability because they relied on FEC advisory opinions that allegedly authorized spending materially similar to their own.  This Court rejected that argument, and it should do so again if defendants reassert it.

FECA shields certain persons from "any sanction" under FECA for "good faith reliance" upon an FEC advisory opinion.  2 U.S.C. § 437f(c).  To qualify for this immunity, however, a person must (1) "rel[y] upon any provision or finding of an advisory opinion"; (2) be "involved in any specific transaction or activity which is indistinguishable in all its material aspects from the transaction or activity with respect to which such advisory opinion [was] rendered"; and (3) "act[] in good faith in accordance with the provisions and findings of such advisory opinion."  *Id.* § 437f(c)(1)(B), (2).

**1.      The Kolbe Advisory Opinion Is Materially Distinguishable from Defendants' Conversion of Campaign Funds to Personal Use**

In this litigation defendants have relied primarily on FEC Advisory Opinion ("AO") 2006-35 (Kolbe), but as this Court has already concluded, that reliance is misplaced.  *See Craig for U.S. Senate*, 2013 WL 1248271, at *7-11.  Then-United States Representative Jim Kolbe had asked the FEC whether he could use campaign funds for legal expenses associated with a preliminary inquiry by the Justice Department.  FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *1 (Jan. 26, 2007).[2]  The preliminary inquiry concerned, in part, information Kolbe knew regarding another member of Congress's interaction with pages working at the House of

---

[2]      FEC AO 2006-35 (Kolbe) can also be found at http://saos.nictusa.com/aodocs/2006-35.pdf.

Representatives.  *Id.* at *2.  To the extent Kolbe learned this information because Kolbe was an officeholder, the FEC approved the request.  *Id.*

The preliminary inquiry also concerned a "rafting trip to the Grand Canyon" that Kolbe took in 1996.  FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *3.  Because that trip was "an official Congressional visit," the Commission concluded that Kolbe's legal expenses "in responding to the inquiry into his trip" at that preliminary stage were permissible, officeholder-related expenses under section 439a(a)(2) and not personal use under section 439a(b).  *Id.* at *3.

The Commission, however, added an important caveat.  It pointed out that the Justice Department had not yet made the "details of the preliminary inquiry" public, and that it was "possible that the scope of the inquiry could involve allegations not related to Representative Kolbe's duties as a Federal officeholder."  FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *3. The opinion warned that Kolbe would *not* be permitted to use campaign funds for the inquiry to the extent it involved "other allegations, if any, that do not concern" Kolbe's officeholder duties. *Id.*

Nevertheless, defendants claimed that the Kolbe opinion approved the use of campaign funds for an inquiry into any personal misconduct Kolbe may have engaged in during the official trip.  *Craig for U.S. Senate*, 2013 WL 1248271, at *8.  But as this Court observed, "the opinion doesn't say that at all."  *Id.*  Instead, the test the Commission articulated is "whether the particular subject of the legal inquiry that calls for the payment of legal fees 'relates to' or 'concerns' the Member's campaign activities or duties as a federal office holder."  *Id.* (citing FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *2).

Defendants also claimed that the Kolbe opinion immunized their violation of section 439a(b) because of the Commission's alleged awareness of certain underlying facts in the Kolbe

situation. *Craig for U.S. Senate*, 2013 WL 1248271, at *9.  Pointing to communications between Kolbe's representatives and FEC staff, defendants argued that the Commission "knew" when it approved the Kolbe opinion that the Department of Justice was investigating allegations that Kolbe engaged in personal misconduct with pages who accompanied him on the Grand Canyon trip.  *Id.*  This Court, however, found defendants' attempt to rely upon such pre-decisional communications unavailing.  *Id.* at *9-11.  As the Court explained, the communications between Kolbe and the FEC show, "[a]t most," that the FEC knew that there was an inquiry into the rafting trip, that the inquiry was in its early stages and its details were confidential, and "that prosecutors had not designated Kolbe as a 'target.'"  *Id.* at *11.  Kolbe's interactions with pages on the trip could have been "[o]ne possible — and unconfirmed — subject of the inquiry," the Court noted, but the inquiry also "could have been [about] Kolbe's receipt of information about another Congressman."  *Id.*

Accordingly, the Kolbe advisory opinion does not immunize defendants' conversion of campaign funds to Craig's personal use in violation of section 439a(b).

**2.      The Other Advisory Opinions Defendants Have Cited Are Also Materially Distinguishable from Defendants' Activities**

No other FEC advisory opinion immunizes defendants' violation of the personal use ban. In their motion to dismiss, defendants argued that they relied upon three advisory opinions in addition to Kolbe.  *Craig for U.S. Senate*, 2013 WL 1248271, at *11-12.  As this Court concluded, however, each of those opinions is materially distinguishable.  In FEC AO 1997-27 (Boehner), 1998 WL 108616 (Feb. 23, 1998)[3] and FEC AO 2000-40 (McDermott), 2001 WL

---

[3]      FEC AO 1997-27 (Boehner) can also be found at http://saos.nictusa.com/aodocs/1997-27.pdf.

136013 (Feb. 7, 2001),[4] the Commission approved the use of campaign funds to pay for legal

fees where "the activities underlying the lawsuit arose out of [Boehner's and McDermott's]

performance of their official duties" as members of Congress.  *Craig for U.S. Senate*, 2013 WL

1248271, at *12.

In FEC AO 2005-11 (Cunningham), 2005 WL 2470825 (Sept. 26, 2005),[5] the

Commission similarly approved the use of campaign funds for legal fees to respond to an

investigation into whether a member of Congress received benefits from a federal defense

contractor because of his position on a Congressional committee.  *Craig for U.S. Senate*, 2013

WL 1248271, at *12.  In contrast, nothing about Craig's official duties caused the legal expenses

he incurred in trying to withdraw his guilty plea.  *Id.*

### 3.     Defendants Did Not Rely in Good Faith on Kolbe or Any Other FEC Advisory Opinion

Kolbe and the other distinguishable advisory opinions that defendants have cited offer

them no protection from prosecution for an additional reason:  Defendants did not rely in good

faith upon those opinions.  Section 437f(c) offers "protection for good faith reliance" on an

advisory opinion.  A person invoking that protection must have "relie[d] upon any provision or

finding of an advisory opinion" and have "act[ed] in good faith in accordance" with those

provisions and findings.  2 U.S.C. § 437f(c)(2).

After the Commission notified Craig of the administrative complaint in this matter, Craig

maintained that he had made a "good faith effort to ascertain the legality of using campaign

funds for these expenses" based on the advice from counsel he received in a letter dated October

---

[4]     FEC AO 2000-40 (McDermott) can also be found at http://saos.nictusa.com/ aodocs/2000-40.pdf.

[5]     FEC AO 2005-11 (Cunningham) can also be found at http://saos.nictusa.com/ aodocs/2005-11.pdf.

4, 2007.  (FEC Facts ¶ 17; *see also id.* ¶ 29.)  That advice, however, did not rest upon the Kolbe,

McDermott, Boehner, or Cunningham advisory opinions.  The October 4, 2007 letter does not

even mention the McDermott, Boehner, or Cunningham advisory opinions.  (*Id.* ¶ 19.)  The letter

did advise Craig that the Kolbe opinion allowed him to legally spend campaign funds for

representation before the Senate Ethics Committee.  (*Id.* ¶ 18.)  But in its next paragraph, the

letter stated that counsel had "found no directly applicable FEC opinions" on the separate issue

of whether Craig could legally spend campaign funds on his Minnesota legal expenses.  (*Id.*)

And despite being aware of the Kolbe opinion, counsel further advised that the "FEC has

apparently never addressed legal expenses stemming from official travel."  (*Id.*)  Instead, the

letter relied upon two provisions of the Constitution to incorrectly advise that Craig's Minnesota

legal expenses were not personal use under section 439a(b).  (*Id.* ¶ 20.)  Thus, the letter reflects a

view that the Kolbe opinion and the other opinions had *no bearing* on whether Craig could spend

campaign funds on his Minnesota legal fees.

Defendants therefore did not in fact rely upon or act in good faith in accordance with the

Commission advisory opinions upon which they rely here.  Thus, defendants cannot invoke those

opinions as a safe harbor under 2 U.S.C. § 437f(c)(2).

\*       \*       \*

To pay for then-Senator Craig's personal legal expenses, defendants used more than

$216,000 that donors contributed to Craig's campaign committee.  That act violated 2 U.S.C.

§ 439a(b), and no FEC advisory opinion excuses that violation.  The Court should therefore grant

summary judgment for the Commission.

## II.   DEFENDANTS SHOULD DISGORGE THE CONVERTED FUNDS AND PAY A SIGNIFICANT CIVIL PENALTY FOR THEIR VIOLATION OF A CRITICAL PART OF THE NATION'S CAMPAIGN FINANCE INFRASTRUCTURE

If this Court concludes that defendants are liable for violating FECA's personal use ban, the Commission respectfully requests that the Court impose appropriate remedies against defendants.  Section 439a is important because it promotes ethical federal leadership as well as public faith in government and the campaign finance system in particular.

FECA authorizes this Court to grant a "permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of [$7,500] or an amount equal to any contribution or expenditure involved" in the violation.  2 U.S.C. § 437g(a)(6)(B); see 11 C.F.R. § 111.24(a)(1).[6]  The Commission requests that this Court (1) order Craig to disgorge the $216,984 he converted to his personal use and refund that amount to the Craig Committee; (2) order Craig to pay a $70,000 civil penalty; (3) order the Craig Committee to pay a $70,000 civil penalty; and (4) declare that defendants violated section 439a(b) and permanently enjoin them from violating that provision again.  As discussed below, these proposed remedies promote important interests, including preventing unjust enrichment, deterrence, and punishment for injury to contributors.

### A.   Disgorgement Would Prevent Craig from Being Unjustly Enriched by His Conversion of Campaign Funds to Personal Use

This Court should order Craig to disgorge the $216,984 he converted to his personal use. See 2 U.S.C. § 437g(a)(6)(B) (authorizing "other orders" to remedy FECA violations).  The primary purpose of disgorgement is "'to make sure that wrongdoers will not profit from their wrongdoing.'"  SEC v. Whittemore, 691 F. Supp. 2d 198, 204 (D.D.C. 2010) (quoting SEC v.

---

[6]     The first part of section 437g(a)(6)(B)'s civil penalty amount was adjusted for inflation from $5,000 to $7,500.  See 11 C.F.R. § 111.24(a)(1).

*Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987)); *see also SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994) (explaining that disgorgement "deprive[s] the wrongdoer of his ill-gotten gain" (internal quotation marks omitted)).  It achieves this goal by "remedying the effects of past conduct to restore the status quo," and it is "measured by the amount of prior unlawful gains." *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005).

Officeholders who convert campaign funds to their personal use, as Craig did, unjustly benefit since otherwise they would have had to use their personal funds or forego their purchases altogether.  Disgorgement eliminates that unjust benefit.  *See FEC v. Furgatch*, 869 F.2d 1256, 1258 n.1 (9th Cir. 1989) (suggesting that where a defendant derives a "tangible benefit" from a FECA violation, a court may consider "the desire to eliminate the benefit derived from the violation" in ordering remedies under section 437g(a)(6)(B) (internal quotation marks omitted)).  For that reason, the Commission regularly requires respondents in the administrative enforcement process to disgorge converted funds when conciliating personal use violations.  *See, e.g.*, Conciliation Agreement, Matter Under Review ("MUR") 5787 (Kalyn Free for Congress) ¶ VI.2 (requiring respondent who violated section 439a(b) to refund full amount of personally used funds);[7] Conciliation Agreement, MUR 5895 (Meeks for Congress) ¶ VI.4 (same);[8] Conciliation Agreement, MUR 5962 (Istook for Congress) ¶ XII (same);[9] Conciliation Agreement, MUR 5372 (Campbell for Senate) ¶ VII (noting that respondents who violated section 439a(b) had already refunded amount converted).[10]

---

[7]     *See* http://eqs.nictusa.com/eqsdocsMUR/28044212013.pdf.

[8]     *See* http://eqs.nictusa.com/eqsdocsMUR/000EC959.pdf.

[9]     *See* http://eqs.nictusa.com/eqsdocsMUR/28044212385.pdf.

[10]    *See* http://eqs.nictusa.com/eqsdocsMUR/000006E2.pdf.

Similarly, courts addressing criminal violations resulting from the personal use of campaign funds have ordered — in addition to imprisonment — restitution, forfeiture, and other financial penalties designed to remove any benefit the defendant may have received from the violation.  *See, e.g.*, Judgment, *United States v. Jackson*, No. 13-cr-0058 (D.D.C. Aug. 19, 2013) (Docket No. 56) (ordering former Congressman to forfeit any property derived from stolen campaign funds, to pay a money judgment of $750,000, and to serve 30 months in prison for conspiring to commit false statement, mail fraud, and wire fraud); Judgments, *United States v. Taff*, 400 F. Supp. 2d 1270 (D. Kan. 2005) (No. 2:05-cr-20086, Docket Nos. 51, 52) (federal candidate sentenced to 15 months in prison for section 439a violation and wire fraud, co-defendant sentenced to five months in prison and $50,000 fine for wire fraud, where converted campaign funds already returned to committee prior to sentencing); *United States v. Henningsen*, 387 F.3d 585, 588 (7th Cir. 2004) (explaining that the defendant was ordered to pay $7,370 in restitution and sentenced to 33 months in prison for personal use of campaign funds in violation of mail fraud statute); *United States v. Pawlinski*, 374 F.3d 536, 537 (7th Cir. 2004) (explaining that the defendant was ordered to pay restitution of $39,324.03 and serve eight months in prison for converting campaign funds to personal use in violation of mail fraud statute).[11]

Courts in this Circuit have also ordered disgorgement in other contexts where, as here, a party wrongly profited from his or her violation of the law.  *See, e.g.*, *Bilzerian*, 29 F.3d at 697 (affirming order that defendant disgorge more than $33 million derived from committing securities fraud); *Whittemore*, 691 F. Supp. 2d at 209-10 (ordering defendants to disgorge more than $1 million obtained via securities fraud); *SEC v. Levine*, 517 F. Supp. 2d 121, 128, 141

---

[11]      The Department of Justice prosecutes criminal cases involving the stealing of campaign funds either as "FECA crimes under 2 U.S.C. § 439a, or as mail or honest services frauds under 18 U.S.C. § 1341 and 1346."  Department of Justice, *Federal Prosecution of Election Offenses* at 195 (7th ed. 2007), http://www.justice.gov/criminal/pin/docs/electbook-0507.pdf.

(D.D.C. 2007) (explaining that the "court possesses power to order the defendants to disgorge

fully the ill-gotten gains of their fraudulent activities," and ordering defendants to disgorge more

than $217,000 in "unlawful profits").

Craig admits that he used at least $216,984 in campaign funds from the Craig Committee

to pay the Sutherland and Kelly law firms for services related to withdrawal of his guilty plea.

(FEC Facts ¶ 23.)  But for this violation of FECA, Craig would have had to pay for his legal

representation himself.  Instead, Craig in effect obtained hundreds of thousands of dollars in free

legal services.  This Court should order Craig to disgorge $216,984 to prevent him from profiting

from his wrongdoing and to restore the status quo, and order it refunded to the Craig

Committee.[12]

---

[12]     Alternatively, the Court could order that the converted funds be disgorged to the United
States Treasury, and there are substantial reasons for doing so given the Craig Committee's
complicity in the violations and Craig's control over Craig Committee funds.  In this case,
however, the Commission recommends that Craig instead be ordered to refund the converted
funds to the Craig Committee.  The Craig Committee has now spent virtually all its funds and
raising funds at this time is unlikely.  FEC data shows that the Craig Committee had only
$614.74 in cash on hand as of July 15, 2013.  *See* 2013 July 15 Quarterly Report for Craig for
U.S. Senate (July 15, 2013) at 2, http://images.nictusa.com/pdf/071/13020350071/
13020350071.pdf.  A refund to the Craig Committee would thus enable it to pay a significant
civil penalty in this case, which is warranted given its use of funds in violation of section
439a(b), as explained below.  *See infra* pp. 18-29.  If anything less than the full authorized civil
penalty were ordered, the remaining portion of the funds refunded by Craig would be in the
Craig Committee's control, which comes closer to restoring the status quo.  Though the personal
use violations at issue here raise questions regarding whether the funds would be used in a
manner supported by the Craig Committee's contributors, restoring the funds to the Craig
Committee at least allows for the possibility that its contributors could seek a refund from the
Craig Committee or demand that the Craig Committee contribute the funds to further candidates
and issues consistent with former-Senator Craig's policy positions while in office.  Of course, the
Craig Committee's use of the funds would remain subject to 2 U.S.C. § 439a.

**B.      A Substantial Civil Penalty Would Punish Defendants' Violation, Deter Future Violations, Promote Public Confidence in Government and the Campaign Finance System, and Serve Other Important Interests**

In addition to disgorgement, FECA authorizes this Court to impose a civil penalty in an amount equal to the $216,984 in expenditures involved in each defendant's violation (Craig and the Craig Committee), for a total potential penalty of $433,968.  *See* 2 U.S.C. § 437g(a)(6)(B). The Commission, however, requests that the Court assess a $70,000 civil penalty against Craig and a $70,000 civil penalty against the Craig Committee.  When coupled with disgorgement, civil penalties in these amounts would effectively punish defendants' violation while deterring future violations.  These civil penalties would also reflect the serious nature of defendants' violation — the theft of campaign funds for personal gain not only injures the contributors of those funds, but also undermines the public's confidence in government and the campaign finance system.  Furthermore, the requested civil penalties would vindicate the authority of the FEC, in part by creating an incentive for parties to settle during the statutorily mandated conciliation process and conserve court resources.  Finally, defendants cannot show that they attempted to comply with the law in good faith or that Craig is unable to pay a substantial civil penalty.

**1.      The Need to Deter Future Personal Use Violations at a Time When Billions of Dollars Are Contributed to Federal Candidates**

Civil penalties deter defendants and others from engaging in similar illegal activities.  *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 231-32 (1975); *SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers*, 825 F. Supp. 2d 26, 33 (D.D.C. 2010); *see also SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998) ("[S]ubstantial monetary penalties, in addition to the disgorgement of profits, [are] necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator."

18

(internal quotation marks omitted)).  To be an effective deterrent, a civil penalty must be large enough so that potential violators will not regard it as "nothing more than an acceptable cost of violation."  *ITT Continental Baking Co.*, 420 U.S. at 231; *see, e.g.*, *Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340, 1351 (7th Cir. 1994) ("There is no incentive to engage in . . . licensing negotiations when the consequence of getting caught for trade piracy is simply to pay what should have been paid earlier."); *United States v. St. Michael's Credit Union*, 880 F.2d 579, 588 (1st Cir. 1989) ("To have any real deterrent effect, the potential fine must be large enough to have some real economic impact on potential violators." (internal quotation marks omitted)).

In this case, given the large amount of campaign funds that defendants converted to Craig's personal use, it is critical that the civil penalty be substantial enough to create a real financial disincentive to violating section 439a(b).  A civil penalty that is too low would fail to deter others from violating the personal use ban in the future.  Would-be violators could reasonably determine that the *chance* that they may have to pay a minor civil penalty (if caught) is an acceptable risk to take for the immediate benefit of personally using a relatively large amount of campaign funds.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 186 (2000) ("[I]t is reasonable for Congress to conclude that an actual award of civil penalties does in fact bring with it a significant quantum of deterrence over and above what is achieved by the mere prospect of such penalties.").  A small civil penalty for a violation of 2 U.S.C. § 439a(b) would amount to little more than a license fee or low-interest loan for the personal use of campaign funds.

The need for deterrence of personal use violations is particularly great given the vast amounts of money that are contributed to campaign committees.  In the 2012 election cycle alone, presidential and congressional candidates received more than $2.65 *billion*.  Press Release,

19

FEC, *FEC Summarizes 21-Month Campaign Activity of the 2012 Election Cycle* (Jan. 30, 2013).[13]  At the conclusion of that election cycle, more than $423.8 million of those funds remained unspent.  *See id.*  The amount of money received by campaign committees almost invariably increases from election cycle to election cycle, and therefore there will always be significant opportunity and temptation for those in control of those funds to abuse the generosity of campaign contributors.  In fact, in 2007, the Department of Justice reported that it had seen a "dramatic rise" in the number of cases in which candidates and others "steal money that has been contributed to a candidate . . . for the purpose of electing the candidate."  Department of Justice, *Federal Prosecution of Election Offenses*, 194-95 (7th ed. May 2007).[14]  And in 2012, the FEC recommended that Congress expand FECA's personal use ban to apply to all political committees to stem the "growing problem" of the personal use of money contributed for political purposes.  FEC, *Legislative Recommendations of the Federal Election Commission 2012* at 7 (May 10, 2012).[15]

Finally, this Court should impose a civil penalty with real deterrent impact because its ruling would constitute particularly important authority for future violations of FECA's personal use ban.  The vast majority of FECA violations are resolved during the statutorily mandated conciliation process under 2 U.S.C. § 437g(a)(4)(A).  As a result, as far as we are aware, a ruling by this Court imposing remedies for a civil violation of 2 U.S.C. § 439a(b) would be the first of its kind and thus an important indication of the sanctions would-be violators are likely to face in court.

---

[13]     *See* http://www.fec.gov/press/press2013/20130130_2012-Q3Summary.shtml.

[14]     *See* http://www.justice.gov/criminal/pin/docs/electbook-0507.pdf.

[15]     *See* http://www.fec.gov/law/legrec2012.pdf.

### 2.     Injury to Contributors to the Craig Committee

Defendants' conversion of campaign funds injured contributors to the Craig Committee to the same extent that it benefited Craig.  The Court should consider that injury in determining the civil penalty.  The more than $216,000 that defendants converted from the Craig Committee is equal to more than two-thirds of the total amount of contributions the Craig Committee received in 2007 and 2008 ($318,180).  (FEC Facts ¶ 24.)  The Craig Committee received those contributions from at least 107 individuals and 108 political committees.  (*Id.*)  The injury to these contributors is not unlike injury from fraud:  Their contributions were made for a legitimate purpose, but the recipient used the funds for a different and illegitimate purpose.

The act of making a contribution is protected by the First Amendment.  *See Buckley v. Valeo*, 424 U.S. 1, 20-23 (1976).  As the Supreme Court has explained, "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate."  *Id.* at 22.  It also "serves as a general expression of support for the candidate and his views."  *Id.* at 21.  But defendants took advantage of the Craig Committee contributors' acts of affiliation with and support for Craig — *the candidate* — and his political views.  Defendants injured their contributors when their funds were not used to advance those political views and the Court should take that into account and assess a substantial civil penalty.

### 3.     Defendants' Violations Undermined the Public's Confidence in Government and the Campaign Finance System

"[T]here is always harm to the public when FECA is violated."  *FEC v. Am. Fed'n of State, Cnty. and Mun. Emps.— P.E.O.P.L.E. Qualified*, No. 88-3208, 1991 WL 241892, at *2 (D.D.C. Oct. 31, 1991).  Congress enacted FECA to "'promote fair practices in the conduct of election campaigns for Federal political offices.'"  *McCutcheon v. FEC*, 893 F. Supp. 2d 133, 134-35 (D.D.C. 2012) (three-judge court) (quoting Pub. L. No. 92-225, preamble, 86 Stat. 3, 3

(1972)), *prob. juris. noted*, 133 S. Ct. 1242 (2013).  And the ban on personal use of campaign funds is a key part of FECA's statutory scheme.  It serves at least two important interests that are undermined by defendants' violation.

First, the personal use ban helps prevent corruption and the appearance of corruption, potential dangers which undermine confidence in government.  Even when the funds given are used for proper purposes, large contributions that are "'given to secure a political *quid pro quo* from current and potential office holders'" undermine the "'integrity of our system of representative democracy.'"  *EMILY's List v. FEC*, 581 F.3d 1, 6 (D.C. Cir. 2009) (quoting *Buckley*, 424 U.S. at 26-27).  That system is threatened even further when federal candidates use contributions to subsidize their *own* personal expenses, such as discretionary legal endeavors unrelated to their campaigns for office.  At the very least, it *appears* corrupt to the public when candidates use contributions for their personal projects.  And as the Supreme Court has explained, "the avoidance of the appearance" of corruption is "critical" to prevent the public's "confidence in the system of representative Government" from being "eroded to a disastrous extent."  *Buckley*, 424 U.S. at 27 (internal quotation marks omitted).

Second, the personal use ban promotes confidence in the system of financing federal election campaigns.  As explained above, *supra* p. 21, citizens contribute money to political campaigns believing that they are assisting a candidate's bid for election and expressing general support for the candidate and his or her views.  When contributions are used instead for the personal gain of the very people the public has entrusted with the levers of our government — in this case, a United States Senator — the general public will view the collection of campaign funds with greater skepticism.  Indeed, the United States Senate itself has stated that the personal use of campaign funds is "contrary to accepted morals . . . [and] the public trust expected of a

Senator." U.S. Senate Select Committee on Ethics, *Senate Ethics Manual* at 155 (2003 ed.) (internal quotation marks omitted).[16]  As a result of this breach of trust, citizens will be deterred from participating in the political system and from exercising the First Amendment-protected expression and affiliation that occurs when making a contribution to a candidate.  A substantial civil penalty should be imposed for this "injury to the public."  *See FEC v. Comm. of 100 Democrats*, 844 F. Supp. 1, 7 (D.D.C 1993); *Furgatch*, 869 F.2d at 1258 (same).

### 4.      Craig Profited from Defendants' Violation

In determining an appropriate civil penalty under 2 U.S.C. § 437g(a)(6)(B), the Court should also consider that Craig profited greatly from his FECA violation.  *See Furgatch*, 869 F.2d at 1258, n.1.  He converted more than $216,000 to purchase top-tier legal representation in a discretionary effort to withdraw a guilty plea for disturbing the peace.  The attorneys he hired at Sutherland charged up to $650 per hour, while the Kelly firm charged $550 per hour.  (FEC Facts ¶¶ 10-12.)  And because Craig was able to use campaign funds for these legal expenses, his own funds remained available for other personal purchases and expenses.

In *Furgatch*, the Ninth Circuit affirmed an order that a defendant who violated FECA pay a civil penalty under section 437g(a)(6)(B) that was essentially 100 percent of the amount of involved in the violation ($25,000 penalty for $25,008 in expenditures), despite the fact that the defendant derived no financial benefit from violating FECA's reporting requirements.  869 F.2d at 1258 n.1, 1264.  The court noted, however, that where a defendant does profit, courts should also consider "the desire to eliminate the benefit derived from the violation" as an additional factor in the section 437g(a)(6)(B) civil penalty calculus.  *Id.* (internal quotation marks omitted).

---

[16]      *See* http://www.ethics.senate.gov/public/index.cfm?a=Files.Serve&File_id=f2eb14e3-1123-48eb-9334-8c4717102a6e.

**5.     The Need to Punish Defendants' Serious Violations of Campaign Finance Law**

Civil penalties are intended, in part, "to punish, and label defendants wrongdoers." *Gabelli v. SEC*, --- U.S. ---, 133 S. Ct. 1216, 1223 (2013); *see also Tull v. United States*, 481 U.S. 412, 422 (1987) (explaining that penalties are "intended to punish culpable individuals," not to "restore the status quo"); *see, e.g.*, *Levine*, 517 F. Supp. 2d at 141-42 (imposing a $200,000 civil penalty in addition to a $217,368.59 disgorgement order for securities fraud).  Thus, a court may impose civil penalties that are designed to "require retribution for wrongful conduct" based on factors such as the seriousness of the violation and a lack of good-faith efforts to comply with the law.  *Tull*, 481 U.S. at 423.

Defendants' violation of the FECA personal use ban warrants a substantial civil penalty. As discussed in more detail above, Craig made a profit of more than $216,000 by personally using funds that donors thought they were giving to the Craig Committee to be used for proper political purposes.  *See supra* p. 23.  This improper use of campaign funds harmed Craig's contributors and the public, undermining faith in government and the political process.  *See supra* pp. 21-23.  Defendants' violation should therefore be punished in a significant way. Imposition of a civil penalty in addition to ordering the disgorgement of funds is the only remedy that serves the interest in punishment.

**6.     The Importance of Vindicating the Authority of the Commission and Encouraging Pre-Litigation Settlement**

In determining the civil penalty under section 437g(a)(6)(B), this Court should also consider "the necessity of vindicating the authority of the responsible agency."  *Comm. of 100 Democrats*, 844 F. Supp. at 7; *see also Furgatch*, 869 F.2d at 1258 (same).  Congress has enacted and amended FECA to promote the integrity of the federal electoral process, *see*

24

*generally McConnell v. FEC*, 540 U.S. 93, 117-32 (2003), and it is critical to respond to

defendants' violation with a meaningful civil penalty to reinforce the importance of FECA and

the agency that enforces it.

In addition, if FECA penalties imposed after litigation are not generally higher than those

arrived at through the statutory procedure of voluntary conciliation, the Commission's ability to

administer and enforce the statute through the conciliation process — which is the "preferred

method of dispute resolution under FECA," *FEC v. NRA*, 553 F. Supp. 1331, 1338 (D.D.C.

1983) — will be undermined.  A perverse incentive could be created for parties to forego

meaningful efforts at conciliation in favor of litigation to delay liability and achieve a lesser civil

penalty.  *Cf. Comm. of 100 Democrats*, 844 F. Supp. at 7 ("Individuals must be deterred from

using the [FECA] conciliation process as a ruse and from using the courts as a mechanism for

delay.").  Such an outcome would increase the workload of courts, which benefit from FECA's

policy of encouraging pre-litigation settlement.  Substantial civil penalties for defendants'

violations are therefore further warranted for this reason, and civil penalties totaling $140,000

would constitute an amount that would encourage future violators to enter into conciliation

agreements with the Commission.

### 7.    Defendants' Purported Good Faith Does Not Warrant Penalties Below $70,000

Defendants' discovery responses indicate that they contend that any civil penalty should

be mitigated because they allegedly acted "with a good faith belief that they were in compliance

with federal law and regulations."  (Defs.' Resp. to Pl.'s First Request for Admission and First

Set of Interrogatories at 8, FEC Exh. 6.)  Defendants did produce a contemporaneous letter from

counsel during the FEC's enforcement process (*see* FEC Facts ¶¶ 17, 29), but the Commission is

not seeking the maximum civil penalty here.  Defendants cannot make a showing of good faith

sufficient to lessen their penalty further than the amounts sought here, which are already reduced more than two-thirds below the maximum.

First, defendants failed to request an advisory opinion from the Commission on whether their spending would comply with FECA. (FEC Facts ¶ 16.) As discussed above, *supra* p. 12-13, Craig argued to the Commission that he had made a good faith effort to determine the legality of his spending based on an October 4, 2007 letter he received from counsel. (*Id.* ¶¶ 17, 29.) But Craig's decision to rely on the equivocal opinion of his counsel does not establish good faith here given that he could have obtained a definitive FEC advisory opinion. *Cf. United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 968 (3d Cir. 1981) (finding in the circumstances of a particular administrative proceeding that the failure to seek an agency advisory opinion was evidence of bad faith). Had defendants requested an advisory opinion, the Commission would have been required to issue one in 60 days. *See* 2 U.S.C. § 437f(a)(1); *see also* FEC Facts ¶ 15. Craig's choice not to do so is particularly noteworthy given that his counsel's advice letter informed him that they had "found no directly applicable FEC opinions" regarding his proposed use of campaign funds for his Minnesota legal fees. (FEC Facts ¶ 18.) That Craig nevertheless spent more than $216,000 in campaign funds "does not prove good faith in view of [his] failure to utilize the appropriate administrative mechanism for obtaining [FEC] advice." *Reader's Digest Ass'n, Inc.*, 662 F.2d at 968.

Second, when defendants converted these campaign funds, they were aware of the FEC's Kolbe advisory opinion, which indicates that spending such as Craig's would be considered personal use. (FEC Facts ¶ 22.) Indeed, the October 4, 2007 advice letter cites the Kolbe opinion, although the letter then incorrectly states that on the topic of "legal expenses stemming from official travel," there are "no directly applicable FEC opinions." (*Id.* ¶ 18.) To the

26

contrary, as explained above, the Kolbe opinion explained that an officeholder could "*not* use campaign funds to pay for . . . legal expenses" relating to an inquiry into his official travel if that inquiry "involve[d] allegations not related to [his] duties as a Federal officeholder."  FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *3.  Instead of heeding the Kolbe opinion, defendants converted campaign funds, relying upon provisions of the Constitution that have nothing to do with the use of campaign funds.  (FEC Facts ¶ 20.)[17]  Defendants' "ostrich-like, head-in-the-sand behavior" does not constitute an entirely convincing good-faith attempt to comply with the law. *Metso Minerals, Inc. v. Powerscreen Int'l Distrib. Ltd.*, 833 F. Supp. 2d 333, 338 (E.D.N.Y. 2011).

Third, defendants' shifting rationales for why they assert their actions complied with FECA also weaken their claim of good faith.  The October 4, 2007 advice letter indicates that, at the time of the expenditures at issue here, defendants thought that spending was permissible due to the Constitution and that there were "no directly applicable FEC opinions."  (FEC Facts ¶ 18.) Before this Court, however, defendants have conceded that the Constitution's application is "irrelevant" (Defs.' Reply to Commission's Mem. in Opp'n to Defs.' Mot. to Dismiss at 3 (Docket No. 7)) and instead argued primarily that "no principled distinction can be drawn between the Kolbe matter and this case" (Mem. in Supp't of Defs.' Mot to Dismiss at 8 (Docket No. 3-1)).  Defendants' changing arguments suggest post-hoc rationalizations, not good faith.

---

[17]       The October 4, 2007 advice letter claims that under the Constitution's Qualifications Clause and Speech or Debate Clause, Craig's travel was "a *necessary* incident of his status as a U.S. Senator" (Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to the Honorable Larry E. Craig, United States Senate at 2 (Oct. 4, 2007), FEC Exh. 5 (emphasis added)) — an incorrect assertion that defendants appear to have abandoned before this Court. *Compare* Mem. in Supp't of Defs.' Mot. to Dismiss at 5 (arguing that Craig's "trip itself was constitutionally required") (Docket No. 3-1) *with* Defs.' Reply to Commission's Mem. in Opp'n to Defs.' Mot. to Dismiss at 3 (stating that the "actual application" of the Constitution "to this matter is irrelevant") (Docket No. 7).

Finally, defendants should receive no further reduction in penalties for purported good faith because the potential remedies defendants face under section 437g(a)(6)(B) already reflect credit for their state of mind.[18]  If held liable, defendants face total potential civil penalties based on amounts equal to their expenditures — $433,968.  *See* 2 U.S.C. § 437g(a)(6)(B).  Had defendants *knowingly and willfully* violated the personal use ban, however, they would have been subject to a potential civil penalty *twice* as large — that is, $867,936.  *See* 2 U.S.C. § 437g(a)(6)(C) (authorizing a civil penalty of "the greater of $10,000 or an amount equal to 200 percent of any . . . expenditure involved").  The potential civil penalty in this case therefore already reflects a reduction for defendants' state of mind, and the Commission requests only less than one third of each defendant's potential liability.  The Court therefore should not further reduce the civil penalty further based on alleged good faith.

### 8.   Defendants Cannot Show That Craig Would Be Unable to Disgorge the Converted Funds and Pay an Appropriate Civil Penalty

Defendants' discovery responses suggest that they will also argue that it would be difficult for Craig to disgorge the funds he converted to his personal use and to pay a civil penalty.  FEC Facts ¶ 34; *see also Comm. of 100 Democrats*, 844 F. Supp. at 7 (citing "defendant's ability to pay" as a civil penalty factor).  The financial documentation Craig provided in discovery, however, indicates otherwise.[19]

Craig is the co-owner of a Washington, D.C.-based political consulting firm.  (FEC Facts ¶ 35.g.)  His net worth is more than $685,000 (*id.* ¶ 41), and he owns at least $629,000 in assets

---

[18]      In *Furgatch*, 869 F.2d at 1259 n.2, 1264, the Ninth Circuit did indicate that courts may consider a defendant's intent in assessing a penalty within the range permitted for FECA violations that are not knowing and willful, although the court went on to uphold a civil penalty of essentially 100 percent of the amount in violation.

[19]      The Craig Committee has now spent virtually all of its funds, so it would be unable to pay a substantial civil penalty without disgorged funds from Craig, unless the Committee were able to raise funds.  *See supra* p. 17 n.11.

that are either liquid or could be easily liquidated (*id.* ¶¶ 35.a, 35.c.i-v).[20]  Craig has more than

$450,000 in one retirement account.  (*Id.* ¶ 35.c.i.)  The strong state of Craig's personal finances

undermines any claim that his disgorgement or civil penalty should be mitigated.

In addition, any difficulty Craig may have in paying for his violation would be caused at

least in part by how he chose to spend the proceeds of his lawbreaking.  Craig used the campaign

funds he converted to buy services, the value of which cannot be recouped, as opposed to

property that could have been liquidated.  *Cf.* Consent Order of Forfeiture at 2-3, *United States v.*

*Jackson*, No. 13-cr-0058 (D.D.C. Aug. 19, 2013) (Docket No. 56-1) (ordering former

Congressman to forfeit specific items of personal property he purchased with campaign funds).

And Craig's use of campaign funds in 2007 and 2008 ensured that more than $216,000 of his

own funds remained available for additional personal spending.  In 2010, Craig purchased a

5,000-square-foot house sitting on two acres of land, and he later obtained a $180,000 home

equity line of credit to remodel that house.  (FEC Facts ¶ 35.b.)  Also in 2010, he purchased a

second boat for more than $8,000 to add to the 42-foot yacht he bought for $100,000 in 2003.

(*Id.* ¶ 35.d.i-ii.)  And Craig did so even though months before, in May 2009, the FEC had found

reason to believe that he violated the personal use ban, putting him on notice that he could face

significant financial liability in this case.  (FEC Facts ¶ 30.)  Craig should not be rewarded for

any illiquidity or alleged difficulty in paying for his violation that he brought upon himself.

\* \* \*

In summary, this Court should order Craig and the Craig Committee to each pay a civil

penalty of $70,000.

---

[20]     The information Craig provided in discovery indicates his and his spouse's financial
status as of August 13, 2013.  (*See* FEC Facts ¶ 35 & n.2.)

C.      **This Court Should Declare that Defendants Violated the Act and Issue a Permanent Injunction**

If the Court concludes that defendants violated 2 U.S.C. § 439a(b) by converting campaign funds to personal use, the Court should issue a declaration to that effect and permanently enjoin defendants from committing any future violations of section 439a(b).  *See* 2 U.S.C. § 437g(a)(6)(B).  Although Craig is no longer a federal officeholder, he has not stated that he will not run for federal office again, and he is still active as a political consultant in Washington, D.C.  (FEC Facts ¶ 35.g.)  An injunction would only preclude defendants from repeating the unlawful conduct involved in this case, *see Reader's Digest Ass'n*, 662 F.2d at 969-70, and therefore it would not interfere with any lawful future activities of defendants.

## CONCLUSION

For the foregoing reasons, the Court should (1) hold that defendants violated 2 U.S.C. § 439a(b) and grant summary judgment in favor of the Commission; and (2) order appropriate remedies as the Commission has proposed under 2 U.S.C. § 437g(a)(6)(B).

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

*/s/ Kevin P. Hancock*
Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650
Fax: (202) 219-0260

September 30, 2013

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                )

FEDERAL ELECTION COMMISSION,     )
                                )     Civ. No. 12-958 (ABJ)

      Plaintiff,              )

                                )

      v.                        )

                                )     LCvR 7(h)(1) STATEMENT OF

CRAIG FOR U.S. SENATE, *et al.*,      )     MATERIAL FACTS

                                )

      Defendants.            )
_____)

**PLAINTIFF FEDERAL ELECTION COMMISSION'S STATEMENT OF MATERIAL**
**FACTS AS TO WHICH IT CONTENDS THERE IS NO GENUINE ISSUE**

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650
Fax: (202) 219-0260

September 30, 2013

## TABLE OF CONTENTS

I.     BACKGROUND ...........................................................................................................1

II.    CRAIG WAS ARRESTED IN MINNESOTA FOR DISTURBING THE
       PEACE AND HE PLEADED GUILTY TO THAT CHARGE TWO
       MONTHS LATER.........................................................................................................2

III.   CRAIG SPENT MORE THAN $216,000 IN CAMPAIGN FUNDS ON LEGAL
       EXPENSES IN AN ATTEMPT TO WITHDRAW HIS GUILTY PLEA ...................2

       A.     Craig Retained Attorneys in Washington, D.C. and Minnesota in an
              Effort to Withdraw His Guilty Plea ...................................................................2

       B.     Craig Decided to Use Campaign Funds for His Minnesota Legal Fees on
              the Basis of a Letter from Counsel, Without Requesting an FEC
              Advisory Opinion and While Aware of the Kolbe Advisory Opinion ..............3

       C.     The Campaign Funds That Craig Spent on His Minnesota Legal Expenses
              Came from His Primary Campaign Committee, Craig for U.S. Senate ...........5

IV.    CRAIG ADMITTED TO THE SENATE ETHICS COMMITTEE THAT HIS
       ARREST WAS FOR PURELY PERSONAL CONDUCT UNRELATED TO
       HIS OFFICEHOLDER DUTIES ...................................................................................6

V.     THE COMMISSION FOUND PROBABLE CAUSE TO BELIEVE THAT
       DEFENDANTS VIOLATED FECA'S BAN ON PERSONAL USE OF
       CAMPAIGN FUNDS ...................................................................................................7

VI.    CRAIG CANNOT DEMONSTRATE THAT HE IS UNABLE TO
       DISGORGE THE CONVERTED FUNDS OR PAY A CIVIL PENALTY .................9

## I.      BACKGROUND

1.      The Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-57, bars federal candidates and officeholders from converting campaign funds to personal use.  2 U.S.C. § 439a(b).

2.      Plaintiff Federal Election Commission ("Commission" or "FEC") is an independent agency of the United States government with exclusive jurisdiction over the administration, interpretation, and civil enforcement of FECA.  (FEC's Complaint for Civil Penalty, Declaratory, Injunctive, and Other Appropriate Relief ("Compl.") ¶ 6 (Docket No. 1); Answer ¶ 5 (Docket No. 12).)

3.      The Commission is authorized to investigate possible violations of FECA, *id.* § 437g(a)(1)-(2), and to initiate civil actions in the United States district courts to obtain judicial enforcement of FECA, *id.* §§ 437d(e), 437g(a)(6).  (Compl. ¶ 5 (Docket No. 1); Answer ¶ 5 (Docket No. 12).)

4.      Defendant Larry Craig was a United States Senator from Idaho from January 1991 to January 2009.  (Compl. ¶ 6 (Docket No. 1); Answer ¶ 6 (Docket No. 12).)

5.      In 2007, Craig was a candidate for the United States Senate in the 2008 election, and he authorized defendant Craig for U.S. Senate ("Craig Committee") as his principal campaign committee under 2 U.S.C. § 431(5)-(6).  (Compl. ¶¶ 6-7 (Docket No. 1); Answer ¶¶ 6-7 (Docket No. 12).)  Accordingly, the Craig Committee was authorized to receive campaign contributions and make expenditures on Craig's behalf.  (Compl. ¶ 7 (Docket No. 1); Answer ¶ 7 (Docket No. 12).)

6.      Craig is a defendant in this matter in his personal capacity and in his official capacity as treasurer of the Craig Committee.  (*See* Minute Order dated May 1, 2013.)

**II.    CRAIG WAS ARRESTED IN MINNESOTA FOR DISTURBING THE PEACE AND HE PLEADED GUILTY TO THAT CHARGE TWO MONTHS LATER**

7.      On June 11, 2007, Craig was arrested while using a restroom at the Minneapolis-St. Paul International Airport, where he was awaiting a scheduled flight to Washington, D.C. (Compl. ¶ 12 (Docket No. 1); Answer ¶ 12 (Docket No. 12); Mem. in Supp't of Defs' Mot. to Dismiss at 3 (Docket No. 3-1).)

8.      Craig was charged under Minnesota law with disturbing the peace-disorderly conduct and interference with privacy.  (Compl. ¶ 12 (Docket No. 1); Answer ¶ 12 (Docket No. 12).)

9.      About two months after being charged, Craig pleaded guilty to a misdemeanor count of disorderly conduct on August 8, 2007.  (Compl. ¶ 12 (Docket No. 1); Answer ¶ 12 (Docket No. 12).)

**III.   CRAIG SPENT MORE THAN $216,000 IN CAMPAIGN FUNDS ON LEGAL EXPENSES IN AN ATTEMPT TO WITHDRAW HIS GUILTY PLEA**

    **A.    Craig Retained Attorneys in Washington, D.C. and Minnesota in an Effort to Withdraw His Guilty Plea**

10.     Craig subsequently retained the Washington, D.C. law firm of Sutherland, Asbill & Brennan ("Sutherland") and the Minnesota law firm of Kelly & Jacobson ("Kelly") in an effort to withdraw his guilty plea.  (Compl ¶ 13 (Docket No. 1); Answer ¶ 13 (Docket No. 12).)

11.     Attorneys at Sutherland charged Craig as much as $650 per hour for work on Craig's effort to withdraw his guilty plea.  (*See, e.g.*, Invoice dated Oct. 26, 2007 from Sutherland, Asbill & Brennan LLP to Larry Craig, FEC Exhibit ("Exh.") 1.)

12.     Attorneys at the Kelly firm charged Craig as much as $550 per hour for work on Craig's effort to withdraw his guilty plea.  (*See, e.g.*, Invoice dated Sept. 27, 2007 from Kelly & Jacobson to Larry E. Craig, FEC Exh. 2.)

13.     On September 10, 2007, Craig filed a motion to withdraw his guilty plea in Minnesota state district court, which was denied on October 4, 2007.  (Compl. ¶ 14 (Docket No. 1); Answer ¶ 14 (Docket No. 12).)  Craig appealed the ruling to the Minnesota Court of Appeals, which rejected the appeal on December 9, 2008.  (Compl. ¶ 14 (Docket No. 1); Answer ¶ 14 (Docket No. 12).)

14.     Craig's first expenditure in connection with his effort to withdraw his guilty plea occurred on October 29, 2007, over four months after Craig's trip and over two-and-a-half months after his guilty plea.  (*See* Invoice dated Oct. 26, 2007 from Sutherland, Asbill & Brennan LLP to Larry Craig, FEC Exh. 1; 2007 Year-End Report for Craig for U.S. Senate (Jan. 31, 2008) at Schedule B, p. 7, FEC Exh. 3;[1] Compl. ¶¶ 19-20 (Docket No. 1); Answer ¶¶ 19-20 (Docket No. 12).)

**B.      Craig Decided to Use Campaign Funds for His Minnesota Legal Fees on the Basis of a Letter from Counsel, Without Requesting an FEC Advisory Opinion and While Aware of the Kolbe Advisory Opinion**

15.     FECA allows a person to submit a "written request concerning the application" of FECA or any Commission regulation "with respect to a specific transaction or activity by the person."  2 U.S.C. § 437f(a)(1).  In response, the Commission "shall render a written opinion relating to such transaction or activity to the person" within 60 days.  *Id.*

16.     None of the defendants sought an advisory opinion from the Commission regarding whether Craig could legally spend campaign funds on his legal expenses arising from his effort to withdraw his guilty plea.  *See* FEC, Advisory Opinion Search Page, http://saos.nictusa.com/saos/searchao (search for "Craig" in the "Requestor or AO Name" field reveals no advisory opinions requested by or issued to defendants).

---

[1]     This report can be found on Commission's website at http://images.nictusa.com/pdf/ 008/28020050008/28020050008.pdf.

17.     In a letter to the Commission dated December 2, 2008, Craig stated that he "did make a good faith effort to ascertain the legality of using campaign funds for" his Minnesota legal expenses on the basis of an October 4, 2007 letter from his counsel at the Brand Law Group (Letter from Larry E. Craig, United States Senator to Thomasenia P. Duncan, General Counsel, FEC (Dec. 2, 2008), FEC Exh. 4), who are also his counsel in this litigation.  Craig provided the October 4, 2007 letter to the Commission.  (*See* Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to the Honorable Larry E. Craig, United States Senate (Oct. 4, 2007), FEC Exh. 5.)

18.     The October 4, 2007 letter advises Craig that he could legally use campaign funds to pay for his representation before the Senate Ethics Committee, based, in part, on the Kolbe advisory opinion.  (Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to The Honorable Larry E. Craig, United States Senate (Oct. 4, 2007) at 1 (citing "FEC Advisory Opinion ("AO") 2006-35"), FEC Exh. 5.)  The October 4, 2007 letter's next paragraph states: "Second, although we conclude that all expenses incurred for your legal representation in Minnesota state court are also fully payable with campaign funds, we have found no directly applicable FEC opinions."  (*Id.*)  The October 4, 2007 letter also states that the "FEC has apparently never addressed legal expenses stemming from official travel."  (*Id.* at 2.)

19.     The October 4, 2007 letter does not mention or rely upon FEC Advisory Opinions 1997-27 (Boehner), 2000-40 (McDermott), or 2005-11 (Cunningham).  (*See generally* Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to the Honorable Larry E. Craig, United States Senate (Oct. 4, 2007), FEC Exh. 5.)

20.     To support its conclusion that Craig could use campaign funds to pay for his legal representation in Minnesota state court, the October 4, 2007 letter relies upon two provisions of

the United States Constitution: Clause two of Article I, section three, and clause one of Article I, section six.  (Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to The Honorable Larry E. Craig, United States Senate (Oct. 4, 2007) at 2, FEC Exh. 5.)

21.     In support of their motion to dismiss, defendants stated to this Court that the "actual application" of the Constitution "to this matter is irrelevant."  (Defs.' Reply to Commission's Mem. In Opp'n to Defs.' Mot. to Dismiss at 3 (Docket No. 7).)  Defendants also argued to this Court that "no principled distinction can be drawn between the Kolbe matter and this case."  (Mem. in Supp't of Defs' Mot. to Dismiss at 8 (Docket No. 3-1).)

22.     Defendants were aware of the FEC's Kolbe advisory opinion when they spent campaign funds on Craig's Minnesota legal expenses.  (Defs.' Resp. to Pl.'s First Request for Admission and First Set of Interrogatories at 11, FEC Exh. 6.)

**C.     The Campaign Funds That Craig Spent on His Minnesota Legal Expenses Came from His Primary Campaign Committee, Craig for U.S. Senate**

23.     From October 29, 2007 through October 5, 2008, the Craig Committee paid at least $139,952 in campaign funds to Sutherland and $77,032 in campaign funds to Kelly in connection with Craig's failed efforts to withdraw his guilty plea.  (Compl. ¶¶ 19-20 (Docket No. 1); Answer ¶¶ 19-20 (Docket No. 12).)  Thus, defendants spent a total of at least $216,984 in campaign funds from the Craig Committee on Craig's effort to withdraw his guilty plea.

24.     The Craig Committee reported receiving $318,180 in total contributions in 2007 and 2008.  *See* FEC, Candidate and Committee Viewer, http://www.fec.gov/finance/disclosure/candcmte_info.shtml (search for "C00115667" in the "Partial Name, Partial ID or Complete Image Number" field reveals disclosure information for Craig for U.S. Senate, including two-year summary information from 2000 to present).  Those contributions were made to the Craig Committee by at least 107 individuals and 108 political

committees.  (*Id.*)

## IV.  CRAIG ADMITTED TO THE SENATE ETHICS COMMITTEE THAT HIS ARREST WAS FOR PURELY PERSONAL CONDUCT UNRELATED TO HIS OFFICEHOLDER DUTIES

25.     The United States Senate Select Committee on Ethics ("Senate Ethics Committee") conducted an inquiry into Craig's conduct in connection with his arrest, conviction, and subsequent conduct.  (Compl. ¶ 16 (Docket No. 1); Answer ¶ 16 (Docket No. 12).)

26.     The Brand Law Group in Washington, D.C. — which represents defendants in this matter — also represented Craig before the Senate Ethics Committee.  (Compl. ¶ 21 (Docket No. 1); Answer ¶ 21 (Docket No. 12).)  In a September 5, 2007, letter to the Senate Ethics Committee, Craig's counsel argued that the Senate Ethics Committee should not exercise jurisdiction over the matter because Craig's arrest and conviction was for "'*purely personal conduct unrelated to the performance of official Senate duties*.'"  (Compl. ¶ 22 (Docket No. 1) (quoting Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to the Honorable Barbara Boxer, Chairwoman, Senate Select Committee on Ethics (Sept. 5, 2007), FEC Exh. 7); Answer ¶ 22 (Docket No. 12).)

27.     On February 13, 2008, the Senate Ethics Committee issued a "Public Letter of Admonition" unanimously concluding that, among other matters, Craig had not complied with Senate Rule 38.2, which requires Senate Ethics Committee approval of any payments for legal expenses paid with funds of a principal campaign committee.  (Compl. ¶ 23 (Docket No. 1); Answer ¶ 23 (Docket No. 12).)  Specifically, the Ethics Committee wrote:

> [T]he *Senate Ethics Manual* states that "Members, officers or employees may pay legal expenses incurred in connection with their official duties with funds of a Senator's principal campaign committee, but only if such payment is approved by the Committee." . . . It appears that you have used over $213,000 in campaign funds to pay legal (and, apparently, "public relations") fees in connection with your appeal of your criminal conviction

and in connection with the preliminary inquiry before the Committee in this matter.  *It appears that some portion of these expenses may not be deemed to have been incurred in connection with your official duties*, either by the Committee or by the Federal Election Commission (which has concurrent jurisdiction with the Committee on the issue of conversion of a Senator's campaign funds to personal use).

(Compl. ¶ 23 (Docket No. 1) (quoting *Public Letter of Admonition,* United States Senate (Feb. 13, 2008) (Select Committee on Ethics), http://www.ethics.senate.gov/downloads/ pdffiles/craig.pdf) (emphasis omitted; second emphasis added); Answer ¶ 23 (Docket No. 12).)

## V.   THE COMMISSION FOUND PROBABLE CAUSE TO BELIEVE THAT DEFENDANTS VIOLATED FECA'S BAN ON PERSONAL USE

28.     On November 10, 2008, the Commission received an administrative complaint alleging that Craig had violated FECA by spending campaign funds to pay legal fees and expenses incurred in connection with his arrest and conviction.  (Compl. ¶ 24 (Docket No. 1); Answer ¶ 24 (Docket No. 12).)  The complaint was designated by the Commission as Matter Under Review ("MUR") 6128 for administrative purposes.  (Compl. ¶ 24 (Docket No. 1); Answer ¶ 24 (Docket No. 12).)

29.     By letter dated November 18, 2008, the Commission notified defendants that the administrative complaint had been filed and provided defendants with a copy.  Craig responded to the Commission on December 2, 2008.  (Compl. ¶ 25 (Docket No. 1); Answer ¶ 25 (Docket No. 12).)  In that response, Craig claimed that he did not violate FECA, and that he acted in good faith on the basis of a letter from his counsel, dated October 4, 2007, which Craig attached. (Letter from Larry E. Craig, United States Senator to Thomasenia P. Duncan, General Counsel, FEC (Dec. 2, 2008), FEC Exh. 4; Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to the Honorable Larry E. Craig, United States Senate (Oct. 4, 2007), FEC Exh. 5.)

30.     After reviewing the then-available information, on May 19, 2009, the Commission voted 5-0 (with one Commissioner recused) to find "reason to believe" that

defendants had violated 2 U.S.C. § 439a(b).  (Compl. ¶ 26 (Docket No. 1); Answer ¶ 26 (Docket

No. 12).)  The Commission notified defendants of its reason-to-believe determination by letter

dated June 30, 2009.  (Compl. ¶ 27 (Docket No. 1); Answer ¶ 27 (Docket No. 12).)  Defendants

responded by letter dated August 10, 2009.  (Compl. ¶ 24 (Docket No. 1); Answer ¶ 24 (Docket

No. 12).)

       31.     Following an investigation, the Commission's General Counsel notified

defendants by letter dated April 8, 2011, that the General Counsel was prepared to recommend

that the Commission find "probable cause" to believe that defendants violated 2 U.S.C.

§ 439a(b).  (Compl. ¶ 28 (Docket No. 1); Answer ¶ 28 (Docket No. 12).)  The General Counsel

also provided defendants with a brief stating the position of the General Counsel on the legal and

factual issues of the case.  (Compl. ¶ 28 (Docket No. 1); Answer ¶ 28 (Docket No. 12).)

The defendants filed a response with the Commission dated April 25, 2011 (Compl. ¶ 24 (Docket

No. 1); Answer ¶ 24 (Docket No. 12)), and counsel for defendants appeared at a probable cause

hearing before the Commission on May 25, 2011 (*see* FEC's Mem. in Opp'n to Defs.' Mot. to

Dismiss, Exh. B (Docket No. 5-2)).  After reviewing the information available, on February 7,

2012, the Commission voted 5-0 to find probable cause to believe that defendants had violated

2 U.S.C. § 439a(b).  (Compl. ¶ 29 (Docket No. 1); Answer ¶ 29 (Docket No. 12).)

       32.     The Commission notified all of the defendants of its February 7 findings by letter

dated February 22, 2012, and, as FECA requires, for a period of not less than 30 days,

endeavored to correct the violations through informal methods of conference, conciliation, and

persuasion.  (Compl. ¶ 30 (Docket No. 1); Answer ¶ 30 (Docket No. 12).)  Unable to secure

acceptable conciliation agreements with the defendants, on May 3, 2012, the Commission voted

5-0 to authorize filing this suit against defendants.  (Compl. ¶ 30 (Docket No. 1); Answer ¶ 30

(Docket No. 12).)

33.     The Commission filed this action on June 11, 2012, pursuant to its authority under

2 U.S.C. §§ 437d(a)(6), 437g(a)(6)(A).  (*See* Compl. (Docket No. 1).)

## VI.     CRAIG CANNOT DEMONSTRATE THAT HE IS UNABLE TO DISGORGE THE CONVERTED FUNDS OR PAY A CIVIL PENALTY

34.     Defendants intend to argue that it would be difficult or impossible for Craig to

disgorge the funds he converted to his personal use and to pay a civil penalty, if the Court were

to determine that defendants violated 2 U.S.C. § 439a(b).  (Defs.' Resp. to Pl.'s First Request for

Admission and First Set of Interrogatories at 5-7, FEC Exh. 6.)

35.     As of August 13, 2013, Craig and his spouse owned at least $1,370,529.08 in total

assets.[2]  Those assets consisted of:

    a.     $36,764.00 in cash and deposit accounts (Financial Disclosure Statement
           of Larry E. Craig (Aug. 13, 2013) ("Fin. Discl. Stmt.") at 6, Schedule
           ("Sched.") 1, FEC Exh. 8);

    b.     $600,000.00 in the value of a 5,000-square-foot home sitting on two acres
           of land that Craig bought in October 2010 (*id.* at 7, Sched. 3);

    c.     at least $573,361.37 in cash surrender value of various deferred income
           arrangements, including:

        i.     $454,848.37 in cash surrender value of Craig's Thrift Savings Plan
               account (Thrift Savings Plan Account Balance for Larry Craig
               (July 15, 2013), FEC Exh. 9);

       ii.     $118,513.00 in cash surrender value of Craig's spouse's Individual

---

[2]     All facts in Section VI reflect Craig and his spouse's reported financial state as of August 13, 2013, the date on which defendants provided the Commission with an amended financial disclosure statement.

Retirement Account (Fin. Discl. Stmt. at 8, Sched. 4, FEC Exh. 8);

    iii.    an undisclosed amount in cash surrender value of Craig's federal retirement annuity (*id.*);

    iv.    an undisclosed amount in cash surrender value of the Craigs' retirement plans from the Public Employee Retirement System of Idaho (*id.*); and

    v.    an undisclosed amount in cash surrender value of Craig's spouse's retirement account from the United Dairy Industry Association (*id.* at 9, Sched. 4);

d.    at least $55,000.00 in vehicles, as valued by Craig (*id.* at 4), including:

    i.    a 42-foot yacht Craig purchased for $100,000 in 2003 (*id.* at 11, Sched. 6; Coast Guard Vessel Documentation for "Suz II," FEC Exh. 10);[3] and

    ii.    a second boat, which Craig purchased on April 9, 2010 for $8,348.78 (Fin. Discl. Stmt. at 12, Sched. 6, FEC Exh. 8);

e.    $86,400.00 in personal property (*id.* at 13, Sched. 8);

f.    $19,003.71 in cash surrender value of Craig's spouse's life insurance policy (*id.* at 14, Sched. 10); and

g.    an undisclosed amount for the value of two limited liability companies — New West Strategies, LLC and Craig and Associates, LLC — for which Craig is either the sole or partial owner (*id.* at 13, Sched. 7).  New West

---

[3]    The information in FEC Exhibit 10 was obtained from a search of the United States Coast Guard's vessel documentation database, which can be found at http://www.st.nmfs.noaa.gov/st1/CoastGuard/VesselByName.html.

> Strategies, LLC is a political consulting firm located in Washington, D.C. that "provides strategic advocacy, advice and guidance to companies, trade associations and other clients on a broad range of federal and state legislative and regulatory issues."  (*See* New West Strategies, http://newweststrategiesllc.com.)

36.    Craig had $230,000.00 in available credit.  That credit consisted of:

   a.    $50,000.00 in revolving credit from two Visa credit cards issued by Zions Bank (Fin. Discl. Stmt at 15, Sched. 11, FEC Exh. 8); and

   b.    $180,000.00 from a home equity line of credit issued by Zions Bank ($98,387.54 of which Craig used to remodel his home) (*id.* at 16, Sched. 11.B; *see also* Zions Bank Home Equity Credit Line Account Statement (June 14, 2013), FEC Exh. 11).

37.    Craig had $684,701.23 in total liabilities.  Those liabilities consisted of:

   a.    $409,553.59 for a real estate mortgage (Fin. Discl. Stmt at 7, Sched. 3, FEC Exh. 8);

   b.    $98,387.54 for a home equity loan (*id.* at 16, Sched. 11.B);

   c.    $20,000.00 for state and federal income taxes (with an additional $30,000-$45,000 coming due on January 15, 2014) (*id.* at 18, Sched. 17);

   d.    approximately $4,000.00 for credit card purchases (*id.* at 15, Sched. 11);

   e.    $14,317.00 for other debts and accounts payable (*id.* at 19, Sched. 18);

   f.    $80,753.10 for vehicle leases and boat purchases (*id.* at 11-12, Sched. 6);

   g.    $53,690.00 for medical and legal expenses (*id.* at 20, Sched. 20); and

   h.    $4,000.00 for other unspecified liabilities (*id.* at 4).

38.     Craig had $230,000.00 in contingent liabilities, resulting from an undisclosed lease or contract for which Craig is the endorser or co-maker.  (Fin. Discl. Stmt. at 3, FEC Exh. 8.)

39.     Craig had $16,407.81 in monthly income.  The sources of that monthly income were:

       a.     $6,000.00 in salary from New West Strategies, LLC (Fin. Discl. Stmt. at 20, Sched. 21, FEC Exh. 8);

       b.     $25.00 in interest, dividends, and/or business income (*id.* at 21, Sched. 21);

       c.     $4,529.02 in federal retirement annuity payments to Craig (*id.* at 8, Sched. 4; 20, Sched. 21);

       d.     $2,416.67 in Thrift Savings Plan payments to Craig (*id.* at 8, Sched. 4; 21, Sched. 21);

       e.     $117.71 in payments from the Public Employee Retirement System of Idaho to Craig (*id.* at 8, Sched. 4; 21, Sched. 21);

       f.     $523.86 in payments from the Public Employee Retirement System of Idaho to Craig's spouse (*id.*);

       g.     $1,329.00 in Social Security payments to Craig's spouse (*id.* at 9, Sched. 4; 21, Sched. 21); and

       h.     $1,466.55 in retirement payments from the United Dairy Industry Association to Craig's spouse (*id.* at 21, Sched. 21).

40.     Craig had $14,451.00 in monthly expenses.  Those expenses included:

       a.     $4,100 for house mortgage, home equity loan, boat, and slip rental for boat

(Fin. Discl. Stmt. at 22, Sched. 22, FEC Exh. 8);

b.      $150.00 to Capital Educator's Credit Union for a loan to buy Craig's

second boat, a 2008 Paddle King Pontoon Outboard 2000 (*id.*);

c.      $750.00 in automobile and transportation expenses (*id.*); including:

    i.      $395.39 for a lease for 2012 Toyota RAV4 (*id.* at 11, Sched. 6);

and

    ii.     $224.31 for a lease for 2012 Scion IQ (*id.* at 11, Sched. 6);

d.      $426.00 in utility payments (*id.* at 22, Sched. 22);

e.      $4,000.00 in credit card payments (*id.*);

f.      $225.00 in telephone and internet expenses (*id.*);

g.      $400.00 in insurance premiums for cars, home, personal property, and

liability (*id.*), including:

    i.      $118.00 for Craig's spouse's life insurance policy premium (*id.* at

14, Sched. 10);

h.      $2,000.00 in medical and legal expenses (*id.* at 22, Sched. 22), including:

    i.      $1,730.00 to Brand Law Group, David Rice, MD, and Skip Pierce,

DDS (*id.* at 20, Sched. 20);

j.      $250.00 in charitable contributions (*id.* at 22, Sched. 22); and

k.      $2,150.00 in other expenses, including taxes (*id.* at 22, Sched. 22).

41.     Craig's net worth is $685,827.85 given his $1,370,529.08 in total assets (*supra*

¶ 36) and $684,701.23 in non-contingent liabilities (*supra* ¶ 38).

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

*/s/ Kevin P. Hancock*
Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650
September 30, 2013                    Fax: (202) 219-0260

14