**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL ELECTION COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civ. No. 1:12-CV-958 (ABJ)** |
| **v.** ) | |
| ) | |
| **CRAIG FOR U.S. SENATE,** *et. al.,* ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

**DEFENDANTS' OPPOSITION TO FEDERAL ELECTION COMMISSION'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

In its motion for summary judgment, the Federal Election Commission

("Commission" or "FEC") strains to transform a *bona fide* dispute over the classification

of fully-disclosed expenditures into illicit conduct. Advocating for harsh penalties, the

Commission recklessly and unfairly employs terms like "theft" and "steal" to

characterize defendants' activity. The Commission bases its legal argument on precedent

addressing fraud and similar conduct. Criminal allegations do not apply here and – if

defendants are held liable – should not inform the determination of a remedy.

The Commission correctly asserts that "defendants' liability as a matter of law

and the factual and legal determinations that enable the Court to determine the

appropriate remedy" remain to be decided. Joint Local Rule 16.3 Report ¶ 1(2) (Docket

No. 13). The Commission errs, however: (1) in claiming that no issues of material fact

remain as to the application of 2 U.S.C. § 439a(b)'s "personal use" ban; and (2) in

requesting harsh, unjustified remedies should defendants be found liable.

In this memorandum, defendants will: (1) detail material facts that the Commission has omitted or obscured (Section II); (2) address genuine issues of material fact that relate to: (a) defendants' reliance on the Commission's advisory opinions (Section III.A) and (b) the Commission's calculation of the expenditures that allegedly constituted personal use (Section III.B); (3) establish that the expenditures, in whole or in part, did not constitute personal use (Section IV); and (4) demonstrate that the Commission's requested remedies are not justified by facts or law (Section V).

* * *

Although defendants maintain that they did not violate the Federal Election Campaign Act's ("the Act's") personal use ban, they recognize that the Court's order denying their motion to dismiss essentially held to the contrary. *See FEC v. Craig for U.S. Senate*, 933 F. Supp. 2d 111, 118-19 (D.D.C. 2013). While preserving their claims for appeal, defendants will not ask the Court to revisit its analysis; they will, however, briefly identify several outstanding legal issues.

The Commission's motion should be denied because material facts – facts relevant to defendant's good faith reliance on the Commission's advisory opinions and the purpose and amount of the expenditures at issue – remain in doubt.

Regarding the Commission's proposed remedies, no authority justifies its request for both disgorgement *and* sizable civil penalties. The Commission bases its demands on the theory that Senator Craig heedlessly converted funds from his campaign committee, Craig for U.S. Senate ("Craig Committee"). To the contrary, Senator Craig sought the advice of counsel and made the expenditures only after receiving authorization from counsel. The Commission acknowledges that defendants accurately reported the

2

expenditures. That it now seeks to bar such spending does not defeat the presumption of good faith that defendants' actions engender.

The Commission also overlooks the legal defense fund established by Senator Craig. This required written approval from the Senate Select Committee on Ethics ("Ethics Committee"), which necessarily acknowledged that Senator Craig's legal expenditures "relate to or arise by virtue of the service of the Member." *See* Select Committee on Ethics, U.S. Senate, *Senate Ethics Manual*, Appendix I, Regulations Governing Trust Funds to Defray Legal Expenses Incurred by Members, Officers and Employees of the United States Senate at 488 (2003) ("*Senate Ethics Manual*").[1] Just as the Commission utilizes Senate proceedings to bolster its case, it must also acknowledge this finding that the expenditures related to Senator Craig's office.

Further, the Commission blames defendants for "increasing the risk of corruption . . . while undermining the public's confidence in government and the campaign finance system, which deters participation in the political process." FEC's Memorandum in Support of its Motion for Summary Judgment ("FEC Memo.") at 1 (Docket No. 16). This claim goes too far; as the Court noted, the Commission's guidance on the personal use statute authorizes campaign expenditures to defend against charges of actual corrupt activity, as opposed to the misdemeanor conduct presented here. *See, e.g., Craig for U.S. Senate*, 933 F. Supp.2d at 125 (discussing authorization of committee expenditures for legal fees relating to criminal investigations).

Regarding the effect on "public confidence,"  the Commission again overstates defendants' role. To cite just one example, these expenditures pale in comparison to

---

[1]        Available at http://www.ethics.senate.gov/downloads/pdffiles/manual.pdf.

3

"Leadership PAC" spending. One publication reveals what *The New York Times* described as "extravagant" spending on golf, meals and a $107,752 bill "at the exclusive Breakers resort in Palm Beach, Fla." Jeremy W. Peters, *Special PACs Spent Money at Resorts, Book Says*, N.Y. Times, October 21, 2013, at A14. Overall, Leadership PACs garnered *over $46 million* during the 2012 election cycle, spending much of it on similar items and activities with almost no legal restrictions.[2] In light of this dichotomy, and the other inconsistencies that the Commission acknowledges pervade the system,[3] blaming the "undermining [of] the public's confidence" on defendants' expenditures is absurd. Defendants should be judged solely on the merits and effects of their own actions.

The Commission's assessment of Senator Craig's finances also ignores his negative net worth. As such, any penalty should equal only the amount that the Commission establishes was spent solely on legal work for the Minnesota case. A permanent injunction is not warranted in this matter.

## II.    THE COMMISSION OMITS MATERIAL FACTS

The Commission fails to provide a full and accurate depiction of facts material to this matter. These facts relate to defendants' decision to use committee funds to pay for Senator Craig's challenge to the Minnesota case and their reliance on the Commission's guidance in making that determination.

The Commission misstates that "Craig subsequently retained" legal counsel *after* he entered his misdemeanor plea. Commission's Statement of Material Facts ("FEC

---

[2]      *See* Leadership PACs, OpenSecrets.org, http://www.opensecrets.org/pacs/industry. (last visited Nov. 12, 2013).

[3]      *See*, *infra* at 24 (discussing Commission approval of $150,000 in committee expenditures for clothing for Governor Sarah Palin and her family).

Facts") ¶ 10 (Docket No. 16). Senator Craig actually retained Sutherland, Asbill &

Brennan ("Sutherland") in March 2007, to address a potential defamation claim against

the *Idaho Statesman* newspaper. Defendants' ("Defs.'") Facts ¶¶ 9-10. The Commission

addresses the Craig Committee's expenditures to Sutherland and to the Minnesota firm of

Kelly & Jacobson through October 5, 2008. *See* FEC Memo at 3. As defendants address,

*infra* Section IV, significant portions of these services addressed media, ethics, political

and Commission concerns.[4] *See* Defs.' Facts ¶ 25.

     The Commission also omits material details about Senator Craig's arrest.[5]

According to the arresting officer, after being detained Senator Craig displayed his

"business card that identified himself as a United States Senator as he stated, 'What do

you think about that?'" *Id.* ¶ 3. The officer told Senator Craig: "You're gonna have to pay

a fine and that will be it. Okay. I don't call media. I don't do any of that type of crap." *Id.*

¶ 4. The officer "ended the interrogation by insulting the Senator and implicating his

political career, stating that it was '[n]o wonder why [the country] is going down the

tubes.'" *Id.* ¶ 5. On August 1, 2007, without consulting counsel, Senator Craig signed the

"Petition to Enter Plea of Guilty – Misdemeanor" and mailed it to the court. *Id.* ¶¶ 6-8.

Senator Craig explained that he did so because he was "[d]eeply panicked about the

events, and based on [the officer's] representations to me regarding the potential

outcome, my interest in handling the matter expeditiously, and the risk that protracting

the issue could lead to unnecessary publicity." *Id.* ¶ 6.

---

[4]    As detailed, *infra* at 12-13, the Commission sanctions certain committee expenditures in connection with legal matters unrelated to official duties.

[5]    Defendants' Statement of Material Facts in Dispute sets forth additional details relating to Senator Craig's arrest. *See* Defs.' Facts ¶¶ 1-5.

Shortly before his arrest, the *Idaho Statesman* conducted an investigation of Senator Craig "related to alleged homosexual activity by him"; he retained Sutherland to address that inquiry. *Id*. ¶ 9-10. "The *Statesman's* investigation included such tactics as contacting scores of the Senator's friends and family, demanding the Senator's FBI files, and patrolling bars and restrooms with the Senator's picture." *Id*. As such, when the Minnesota arrest occurred, Senator Craig was concerned that these allegations would become public and would provide the *Idaho Statesman* with an excuse to publish the article it had been threatening to run. *Id* ¶ 8. Thus, in lieu of seeking legal advice, Senator Craig plead guilty under terms which, he believed, offered him a private, expeditious resolution of the matter. *Id.* ¶ 6-8.

Of course, despite the officer's statement to the contrary and Senator Craig's fervent wish to avoid embarrassing and damaging publicity, the arrest quickly became public. Defs.' Exh. 3 (John McArkle, *Craig Arrested, Pleads Guilty Following Incident in Airport Restroom*, Roll Call, August 27, 2007). Although Senator Craig was unable to establish who "call[ed] media," it is clear that the disclosure and subsequent public scrutiny occurred because he was a member of Congress. By the next day, two complaints had been filed with the Ethics Committee. *See* Defs.' Exh. 4 (Aug. 28, 2007, Ethics Committee Complaint from Citizens for Responsibility and Ethics in Washington); Defs.' Exh. 5 (Daniel W. Reilly*, Senate Republicans Urge Ethics Investigation of Craig*, *Politico,* August 28, 2007). Senator Craig then asked his counsel at Sutherland – already addressing the *Statesman* inquiry – to challenge his plea in Minnesota state court. Defendants did so with the sole purpose of defending Senator Craig's reputation and vindicating him personally and professionally. *See* Defs.' Exh. 2 ¶ 10.

6

The Commission telescopes the ongoing legal advice that defendants received into a single letter written near the outset of the matter. While using the October 4, 2007, letter from the Brand Law Group to the Ethics Committee to assert that defendants did not rely on Kolbe or other opinions, the Commission omits a subsequent letter sent to the Ethics Committee on November 14, 2007. Defs.' Exh. 6 (letter). There, Senator Craig's counsel cited to Kolbe, explaining that the Commission had recently advised "that a member of Congress could utilize campaign funds to pay for legal expenses incurred in connection with inquiries by House Ethics Committee and the Department of Justice. FEC AO 2006-35 [Kolbe]." *Id.* at 7. The letter continued: "Relying on the advice of counsel and applying this framework, Senator Craig determined that the FEC guidance was clear and controlling on this issue. All expenditures of campaign funds for legal fees have been properly reported in accordance with FEC regulations." *Id.* Based on the legal advice, defendants were confident that the use of campaign funds for these expenditures was legal and customary. Indeed, they would not have made the committee expenditures had they not received authorization from counsel. Defs.' Exh. 2 ¶ 8.

The Commission also fails to disclose that in 2008 the Ethics Committee authorized Senator Craig to establish a legal defense fund "to pay for expenses incurred by you in connection with *State of Minnesota v. Larry Edwin Craig*, a criminal action." Defs.' Exh. 9 at 1. The Senate standard for approval closely tracks the Act's personal use provision, allowing the establishment of a fund in cases "relating to or arising by virtue of [a Member's] service in or to the Senate" and barring establishment where "the legal expenses are for purely personal matters." *Senate Ethics Manual* at 488.[6] Senator Craig's

---

[6]     The Ethics Committee's approval for the legal defense fund appears to be in

legal defense fund, the "Fund for Justice," received thousands of dollars in contributions. *See* Defs.' Exh. 10 (listing contributions). Senator Craig also made personal expenditures related to the fund. *See, e.g.,* Defs.' Exh. 16 ($1,797.51 invoice for fund expenses).

When the Commission received an administrative complaint and opened a matter under review ("MUR") in 2008, defendants complied with, and  participated in, the process. *See* FEC Memo. at 4-5; FEC Facts ¶¶ 28-32 (detailing defendants' participation throughout the 43-month administrative proceeding). At the Commission's request, Defendants voluntarily produced legal bills detailing services provided by the three law firms and the public relations entity. *See* Defs.' Facts ¶ 24.

## ARGUMENT

### III.    GENUINE ISSUES OF MATERIAL FACT REMAIN IN DISPUTE

The Commission cannot establish that no genuine issues of material fact remain. Under Fed. R. Civ. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986). In deciding a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the nonmoving plaintiff. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

---

tension with its assertion that "some portion of these expenses may not be deemed to have been incurred in connection with your official duties." Defs.' Exh. 9 at 2. Regardless, it is irrefutable that the Committee authorized Senator Craig's legal defense fund for the Minnesota state case under the applicable "official" standard.

### A.  DEFENDANTS RELIED IN GOOD FAITH ON THE COMMISSIONS' ADVISORY OPINIONS

The Commission references the October 4, 2007, letter from counsel to Senator Craig to establish that defendants did not rely in good faith upon the Commission's advisory opinions. *See* FEC Memo. at 12-13. "Because good faith is dependent on motivation and conduct of the defendant as established at trial, the validity of the defense is ordinarily a question for the jury." *Landrum v. Moats*, 576 F.2d 1320, 1329 (8th Cir. 1978) (*citing Pierson v. Roy*, 386 U.S. 547, 557-58 (1967)).

The Commission urges the Court to summarily determine that "defendants cannot invoke these opinions as a safe harbor under 2 U.S.C. § 437f(c)(2)," but offers only the one letter in support. FEC Memo at 13. As the letter reflects, defendants were aware of Kolbe when they made the initial expenditures relating to the Minnesota matter on October 29, 2007. FEC Facts ¶ 23. The November 14, 2007, letter from the Brand Law Group to the Ethics Committee expands on Kolbe's facts and holding. Responding, in part, to allegations relating to personal use, the letter cites Kolbe to establish that a committee may pay for "legal expenses incurred in connection with inquiries by the House Ethics Committee and Department of Justice." Defs.' Exh. 6 at 7. The letter concludes: "Senator Craig's use of contributed funds for these legal services is proper under the attendant statutes, regulations *and FEC opinions*. Any constraint on his ability to use these funds in such a manner runs counter to unequivocal legal authority enacted by Congress and *enforced by the FEC*." *Id.* at 9 (emphasis added). Certainly, by November 2007 defendants were relying on Kolbe to authorize the expenditures at issue.

The invoices from Senator Craig's Washington, D.C. counsel in the Minnesota matter and his ethics counsel reflect this analysis. The November 2007 invoices indicate

substantial discussions about the Commission's guidance and authority. Both
Washington, D.C.-based firms spent substantial time in October and November 2007
reviewing and discussing "ethics issues." Defs.' Exh. 13 at "Craig 59-60" (Oct. 30 & 31);
*id.* at "Craig 41-42" (Oct. 3, 24 & 31). On November 7, the Brand Law Group billed
Senator Craig for 5.70 hours to "Research FEC fees guidance, Senate ethics procedures,
rule." *Id.* at "Craig 55." As late as November 20, the Brand Law Group was still
"[r]eview[ing] FEC proposed rule (use of campaign funds)." *Id. at* "Craig 56." Michael
O. Ware, Senator Craig's Chief of Staff also recalls participating in discussions about
Commission guidance during this time period. *See* Defs.' Exh. 2 ¶ 9.

Throughout the administrative process, Defendants' position remained constant:
Kolbe "authorized the use of campaign funds to pay for expenses related to inquiries by
the Department of Justice regarding Representative Kolbe's rafting trip to the Grand
Canyon with two former pages." Defs.' Exh. 11 at 3 (Aug. 10, 2009, letter from Brand
Law Group to Commission restating legal arguments and citing advisory opinions).

The Commission's claim that the October 2007 letter, by itself, precludes
defendants from establishing good faith reliance also ignores this Court's own
determination that Kolbe is ambiguous, at best: "One possible – and unconfirmed –
subject of the inquiry could have been Kolbe's own interactions with a page or former
page during the trip, but it also could have been Kolbe's receipt of information about
another Congressman." *Craig for U.S. Senate*, 933 F. Supp.2d at 124.[7]

While the Court ruled that defendants could not use Kolbe's record to clarify the
holding, it does acknowledge that the record offers some support for defendants' position.

---

[7]      Although defendants cite this finding, they respectfully maintain that the Court's
reading of the Kolbe opinion is in error.

*See id* at 122-24. No bar exists on Defendant's use of the record to establish good faith reliance. *See Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir. 2005) ("fail[ing] to see any merit to an objection" to appellate court taking judicial notice of the contents of a state agency's website); *see also Seifer v. Winter,* 555 F. Supp. 2d 3, 11 (D.D.C. 2008) (permitting trial court to take judicial notice of documents not in administrative record in lawsuit under Administrative Procedures Act).

Finally, non-record materials bolster defendants' assertion that the Commission endorsed the use of legal funds to defend against allegations relating to Representative Kolbe's conduct on his trip. On October 14, 2006, *The Arizona Republic* printed a detailed description of the Justice Department's investigation into allegations relating to his conduct, including his sister's statements that "absolutely nothing inappropriate occurred" on the trip. Defs.' Exh. 14 (Billy House, *Prosecutors Look Into Claim of Kolbe Misbehavior on Trip*, The Arizona Republic, October 14, 2006 at A7) (internal quotation omitted). On January 25, 2007, *Roll Call* reported that the Commission would vote on the Kolbe advisory opinion that day and that its primary concern was whether the trip was official. Defs.' Exhibit 15 (Matthew Murray, *FEC Expected to OK Kolbe Use of Campaign Surplus*, Roll Call, Jan 25, 2007). The article quoted then-Commissioner Hans van Spakovsky: "It's squarely within our regulations . . . . The statute says you can use campaign funds basically to pay for any expenses connected with your specific duties as a federal office holder." *Id* at 3. These public materials demonstrate that defendants were, at least, justified in relying on the Kolbe advisory opinion for guidance.

**B.  THE COMMISSION HAS NOT ESTABLISHED THE AMOUNT OF LEGAL FEES THAT CONSTITUTED "PERSONAL USE"**

The Commission maintains that the over $216,000 in legal fees spent "in connection with" the Minnesota case constitutes "personal use" in violation of section 439a(b). FEC Memo at 6; *see also* FEC Facts ¶ 23. The Commission, however, has not demonstrated that all of these expenditures violated the ban on personal use.

The Commission's guidance establishes that a member's media-related expenditures are never wholly personal use: "[A]ny legal expense that relates directly and exclusively to dealing with the press, such as preparing a press release, appearing at a press conference, or meeting or talking with reporters, would qualify for 100% payment with campaign funds because [the person is] a candidate or Federal officeholder." FEC AO 1998-1 (Hilliard), 1998 WL 108618, at *4 (Feb. 27, 1998)[8] (*citing* FEC AO 1997-12 (Costello), 1997 WL 529598, at *4 (Aug. 15, 1997)[9]); *see also* FEC AO 2008-7 (Vitter), 2008 WL: 4265321, at *4-5 (Sept. 9, 2008).[10] Further, "50% of any legal expense [not directly and exclusively press related] that does not directly relate to allegations arising from campaign or officeholder activity can be paid for with campaign funds because [the person is] a candidate or Federal officeholder and [is] providing substantive responses to the press." FEC AO 1998-1, 1998 WL 108618 at *4.

The legal invoices indicate significant "ethics," "[a]ppropriation," "media" and "public relations" activities that would not necessarily constitute personal use. Defs.' Facts ¶ 25. For example, as late as December 2008 – when Sutherland was drafting Senator Craig's appellate brief in the Minnesota case – counsel also devoted time to

---

[8]     Hilliard is available at: http://saos.nictusa.com/aodocs/1998-01.pdf.
[9]     Costello is available at : http://saos.nictusa.com/aodocs/1997-12.pdf.
[10]    Vitter is available at: http://saos.nictusa.com/aodocs/AO%202008-07%20final.pdf.

media concerns. Defs.' Facts ¶ 25.f. Sutherland's invoices are replete with legal and media-related tasks relating to coordination with the Senator's staff and ethics counsel. To cite one example, on September 1, 2007, a Sutherland attorney billed 6.80 hours to "Attend to media and legal issues surrounding Minneapolis proceeding. Attend to senate ethics issues. Numerous teleconferences with M. Ware [Senator Craig's Chief of Staff], J. Smith [media consultant], B. Martin regarding same." Defs.' Exh. 13 at "Craig 35."

Under the Commission's guidance these services would be fully or partially payable with committee funds. *See* FEC 2008-07 at 5 (Vitter), 2008 WL 4265321, at *4-5 (authorizing payments to "subpoena counsel" representing Senator in matter unrelated to duties as an officeholder). In Vitter, the Commission authorized the expenditure of campaign funds to, *inter alia,* inform Ethics Counsel about criminal proceedings and consult with "[Senator Vitter] and his public relations professional regarding press management and press statements."[11] *Id*.

Yet, despite its access to the invoices – which it apparently used to calculate the allegedly improper expenditures – the Commission fails to demonstrate how it arrived at that amount and which legal services constituted personal use. Because disputed factual issues remain, the Court cannot grant summary judgment.

## IV.  AS A MATTER OF LAW, DEFENDANTS' EXPENDITURES DID NOT CONSTITUTE "PERSONAL USE"

Citing the Court's opinion denying defendants' motion to dismiss, the Commission maintains the following: 1) defendants used campaign funds for Senator

---

[11]     The Commission also considered but could not "approve a response by the required four affirmative votes" relating to the "use of campaign funds to pay legal fees and expenses incurred in monitoring" the criminal matter and "quashing the subpoenas issued to Senator Vitter." FEC 2008-07 at 5 (Vitter), 2008 WL 4265321, at *4. As such, it remains an open question whether similar expenditures in this case would be permissible.

Craig's "personal use" and, 2) no advisory opinion "forecloses sanctions" against defendants. *See* FEC Memo. at 6-12. The Court has ruled on these questions as a matter of law. *See Craig for U.S. Senate*, 933 F. Supp.2d at 120-24. Defendants' Answer admitted many of the Complaint's factual allegations. (Docket No. 12.) As such, defendants acknowledge that the legal standard relating to Senator Craig's alleged personal use has essentially been decided and likely constitutes the "law-of-the-case."

The purpose of the law-of-the-case doctrine is to ensure that "'the same issue presented a second time in the same case in the same court should lead to the same result.'" *Sherley v. Sebelius*, 689 F.3d 776, 780-781 (D.C. Cir. 2012) (*quoting LaShawn A. v. Barry*, 87 F.3d 1389, 1393, (D.C. Cir. 1996)). "The courts are appropriately loathe to reconsider issues already decided, [except in the case of] extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *LaShawn A.*, 87 F.3d at 1393 (internal quotation omitted).

In the apparent absence of "extraordinary circumstances," Defendants do not seek rehearing of their arguments (Docket No. 3-1 (Defs.' Memo. at 5-9) and Docket No. **7** (Defs.' Reply at 5-25).) Defendants stress, however, that they persist that the expenditures did not violate section 439a and that the Commission's Kolbe advisory opinion, and related opinions, support their position.

In lieu of restating its arguments, defendants state the following:

1.  They have not "abandoned [their] earlier reliance upon the Speech or Debate Clause" or other constitutional privileges. *Craig for U.S. Senate*, 933 F. Supp.2d at 117, n.5. Defendants' position remains that when a member of Congress engages in official travel, as occurred here, constitutional concerns must inform any legal analysis relating to

that travel. *See* Defs.' Exh. 6 at 4-5 (detailing Senator Craig's "layman's understanding of his [constitutional] privileges relating to official travel").

2. Defendants persist that the Kolbe advisory opinion both presents facts "materially indistinguishable" from this matter and establishes that section 439a does not bar defendants' expenditures. FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *3 (Jan. 26, 2007)[12]. Defendants also maintain that they were entitled to rely on Kolbe's holding, and other Commission opinions, pursuant to 2 U.S.C. § 437f(c).[13]

3. Finally, on October 31, 2013, the Commission issued an opinion that informs this matter. FEC AO 2013-11 (Miller).[14] In Miller, the Commission authorized a former senatorial candidate to use campaign committee funds to pay legal expenses – including any future judgment – in a suit involving his state employment records. Although many of the expenditures occurred well after his unsuccessful campaign, the Commission held that a media request for those records – and the candidate's decision to intervene – would not have existed irrespective of his campaign. *See id.* at *4, *7.

The Miller opinion raises significant questions about the Commission's position in this matter. Much like Miller's decision to fight disclosure of personal material that could harm his campaign, Senator Craig's challenge to his plea stemmed from his desire

---

[12]     Kolbe is available at: http://saos.nictusa.com/aodocs/2006-35.pdf.

[13]     Defendants note that the Commission's interpretation, endorsed by the Court, reduces the Kolbe opinion to a restatement of the personal use statute rather than an application of that law to a specific set of facts. *Compare Craig for U.S. Senate*, 933 F. Supp.2d at 124 ("the FEC went out of its way to hedge its opinion given the uncertainties and confidentiality involved") *with* 11 C.F.R. § 112.1(b) ("Requests presenting a general question of interpretation, or posing a hypothetical situation . . . do not qualify as advisory opinion requests.").

[14]   Miller is available at:
http://saos.nictusa.com/aodocs/AO%20201311%20(Miller)%20Final%20(10.31.13).pdf.

to counter allegations that he believed would be damaging to his public stature as a United States Senator and his viability as a future candidate. Defs.' Facts ¶ 8; Defs.' Exh. 2 ¶ 10. These expenditures must also be viewed in light of the preexisting defamation issues relating to the *Idaho Statesman* and Senator Craig's concerns about how the Minnesota arrest would affect that inquiry. *See* Defs.' Facts ¶ 6, 7, 9-11, 13. Senator Craig's plea would not have leaked nor been publicized were it not for his position.

Using Miller's guidance, much of defendants' expenditures would not constitute personal use. *See* FEC AO 2013-11 at *3. Nor should what the Commission describes as the "temporal ground" for expenditures occurring well after the events in question affect the analysis. *Compare* FEC AO 2013-11 at *4-5 (intervention to "defend [candidate's] privacy interests" after the election "would not have arisen irrespective of his candidacy") *with Craig for U.S. Senate*, 933 F. Supp.2d at 118 (expenses incurred "two months" after trip informed Court's decision that expenditures were personal use).

## V.        THE REQUESTED REMEDIES ARE NOT JUSTIFIED

The Commission argues that the Court should: 1) order Senator Craig to disgorge $216,984 to his Committee; 2) order him to pay a $70,000 penalty; 3) order the Craig Committee to pay a $70,000 penalty; and 4) declare that defendants violated section 439a(b) and issue a permanent injunction. If the Court does find a violation of the personal use ban, then, pursuant to the Commission's guidance discussed above, the penalty should be no greater than the amount that the Commission can establish was improperly spent *solely* on legal issues relating to the Minnesota case. Additional punishment and/or a permanent injunction is not warranted.

16

### A.  Defendants' Conduct Does Not Warrant Disgorgement *and* Additional Civil Penalties

As discussed above, *supra* Section III.B, disputed factual issues remain regarding calculation of the allegedly improper expenditures. These outstanding questions prevent the Court from granting summary judgment on the issue of damages. Should the Commission establish both a violation of the personal use statute and the amount of improper expenditures, the Court would, of course, be authorized to impose a civil penalty. *See* 2 U.S.C. § 437g(a)(6)(B).

The statute, however, does not explicitly authorize imposition of a penalty *and* disgorgement. The Commission notes that the statute permits "other orders" to remedy violations of the Act. *See* FEC Memo. at 14. However, the primary case cited for this proposition, *FEC v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989), is a clear counterweight to the claim that this action merits severe penalties.

In *Furgatch,* the Ninth Circuit assessed the appropriate civil penalty when a defendant neither properly labeled a newspaper advertisement nor disclosed his $25,008 independent expenditure. *Id.* at 1258-59. In upholding a penalty equal to the total expenditure, the court examined defendant's intent. *Id.* at 1259 n.2 ("[T]he statutory scheme might suggest Congress's belief that intent *is* relevant in assessing the propriety of any particular civil penalty."). The court found that defendant's "refus[al] to comply with the FEC's request for a report . . . until the district court on remand ordered him to do so" justified the harsh penalty. *Id.* at 1258.

In reaching this conclusion, the court compared the defendant unfavorably to the defendant in *FEC v. Ted Haley Congressional Commission.*, 852 F.2d 1111 (9th Cir. 1988). *See Furgatch*, 869 F.2d at 1259, n.2. In *Ted Haley*, the court upheld a district

court's decision *not* to impose a civil penalty based in large part on "the clear innocence of [appellee's] motives." 852 F.2d at 1116.

The Commission's decision to rely solely on *Furgatch* demonstrates the harshness of its approach. Furgatch disregarded the Commission's clear disclosure and reporting requirements. *869* F.2d at 1258-59. Indeed, "Furgatch refused to comply with the FEC's request for a report on the 1980 expenditures until the district court on remand ordered him to do so." *Id.* at 1258. The court also found "ample support in the record for a finding that Furgatch is likely to commit future violations of the Act . . . [and he] has never given any assurances of future compliance." *Id.* at 1262.

In contrast to the intransigent Furgatch, Senator Craig: 1) received written authorization from counsel for his committee expenditures (FEC Facts ¶ 18; Defs.' Facts ¶ 17); 2) fully reported and disclosed all expenditures to the Commission (FEC Facts ¶ 14); 3) formed a Senate-sanctioned legal defense fund (Defs.' Facts ¶¶ 20-21); and 4) participated in the Commission's administrative process (FEC Facts ¶ 28-32). Defendants have made no other expenditures since the commencement of this matter nor evinced the intent to do so in the future.

This matter mirrors several cases involving less severe penalties that the Commission has failed to reference. Most directly, *FEC v. Friends of Jane Harman* held that the illegal acceptance of corporate contributions merited neither disgorgement of the contribution nor a civil penalty. 59 F. Supp. 2d 1046, 1058-60 (W.D. Cal. 1999). In considering defendants' state of mind, the court rejected many of the same arguments now proffered by the Commission. First, the court found that defendants' reasonable reliance on the advice of counsel militated against any penalty. *Id.* at 1059. The court

reached this conclusion even though the counsel advising the defendant committee was employed by the corporate entity charged with making the illegal contributions. *Id.* at 1058-59. Here, as the Commission acknowledges, defendants relied on their own counsel and produced counsel's advice to the Commission at the start of the administrative process. FEC Facts ¶¶ 17-18. While the Commission and this Court may disagree with that legal assessment, the *Harman* court held that such disagreement should not diminish a defendant's good faith efforts to comply with the Act.

The *Harman* court also rejected the Commission's claim that the "defendants' 'determined resistance' to conciliation in this action" justified a penalty. 59 F. Supp.2d at 1059. Instead, the court held that "Defendants were entitled to have the complicated statutory and regulatory issues in this case determined by a court. *Cf. California Med. Ass'n*, 502 F. Supp. at 204 (noting that FEC limited its penalty request "'because of the complex constitutional and statutory questions surround this litigation.'")." *Id*.

The Commission returns to this rejected approach in this motion. *See* FEC Memo. at 24-25. As the Court's extensive opinion reflects, the statutory, regulatory and advisory guidance presents a complicated question requiring substantial analysis. Indeed, the Court rejected the Commission's interpretation of the application of the personal use ban to sections 439a(1)-(5) in favor of defendants' reading. *Craig for U.S. Senate*, 933 F. Supp.2d at 116 n.2. Like the *Harman* defendants, Senator Craig should not be punished for seeking judicial guidance on these questions.

The Commission cites four "Conciliation Agreements" where disgorgement occurred. *See* FEC Memo. at 15. The Commission, however, omits that the respondents in those cases failed to disclose the expenditures at issue. The Commission also cites to

cases relating to "restitution, forfeiture, and other financial penalties" to support its disgorgement claim. *See* FEC Memo. at 16. Each of these cases involved theft, fraud or similar financial crimes, conduct that simply does not pertain to this matter.

### B. Defendants' Conduct Does Not Warrant Imposition of a Penalty Exceeding the Amount Expended

In advocating for disgorgement, a significant civil penalty and an injunction, the Commission dismisses defendants' good faith attempts to comply with the Act's regulations and reporting requirements.

First, the October 4, 2007, letter reveals that counsel authorized defendants to make the expenditures related to both the Ethics Committee and Minnesota state matters. *See* FEC Exh. 4. Regardless of any disagreement with that legal analysis, there can be no claim that defendants made the expenditures without securing legal advice. Certainly since November 2007, defendants' legal position has remained the same. *See* Defs.' Facts ¶¶ 17, 23; Defs.' Exhs. 6, 11. The Commission does not claim that the defendants failed to disclose the expenditures at issue or violated any other obligations under the Act. *See, e.g.,* Complaint, ¶¶ 18-21; FEC Facts ¶ 14; FEC Exh. 1.

### C. There is No Need for Deterrence for Future Actions

The Commission maintains that imposition of disgorgement and civil penalties would "deter defendants and others from engaging in similar illegal activities." FEC Memo. at 18.[15] The Commission essentially urges the Court to "make an example" of Senator Craig. *Id*. at 20 ("[A] ruling by this Court imposing remedies for a civil violation

---

[15]     The Commission fails to explain how – in a matter that the Commission concedes is not a "knowing and willful" violation – imposition of a harsh penalty will deter other parties' future conduct. *See* FEC Memo at 28.

of 2 U.S.C. § 439a(b) would be the first of its kind and thus an important indication of the sanctions would-be violators are likely to face in court.").

Any deterrent effect has already been achieved. The professional and personal consequences of Senator Craig guilty plea have been severe. Senator Craig has made significant expenditures to pay for legal counsel since 2007. He continues to incur legal costs in this matter, which has also prolonged public focus on the events in Minnesota. To argue that without a harsh penalty a party might want to duplicate this experience ignores these costs.[16]

This Court should consider these costs in imposing a penalty. *See FEC v. Nat'l Educ. Ass'n*, 457 F. Supp. 1102, 1112 (D.D.C. 1978) (civil penalty unwarranted where expenses defendant would incur from refunding monies illegally collected for political contributions from dues assessments would be sufficient penalty) and *FEC v. Gus Savage for Congress '82 Comm.*, 606 F. Supp. 541, 548 (N.D. Ill. 1985) (no grounds for imposing civil penalties because the defendant had already incurred great personal cost by having to hire a lawyer and an accountant).

Strangely, the Commission cites to its legislative recommendation that "Congress expand [the Act's] personal use ban to apply to all political committees." FEC Memo. at 20. In advocating for this change, the Commission stated: "Such an amendment [to the personal use statute] would provide for *coherent and consistent* application of FECA." FEC, *Legislative Recommendations of the Federal Election Commission 2012* at 7 (May

---

[16]     The Commission cites to the more than $2.65 billion in contributions that presidential candidates received during the 2012 cycle, as well as the Department of Justice's report of a "dramatic rise in theft of contributions" FEC Memo. at 19-20. This information is irrelevant.

21

10, 2012) (emphasis added).[17] Yet, the Commission sees no conflict between its request for harsh penalties and its recent statement to Congress that the personal use ban applies in neither a "coherent" nor "consistent" manner. *Id.*

Indeed, it is impossible to reconcile the Commission's position in this case with its decision to authorize a $150,000 clothing purchase that it determined was made "in connection with" a candidate's official duties. *See* Notification with Factual and Legal Analysis to Gov. Sarah Palin, MUR 6105 (Gov. Sarah Palin).[18] The Act's quixotic application of the personal use ban – applicable to campaign committees but not party committees – raises questions not only about the Commission's harsh penalty request but, more generally, about the fairness of the law as applied to defendants.

### D.  The Record Contains No Evidence of Injury to the Committee's Contributors

The Commission asserts that the Craig Committee's expenditures injured contributing individuals and political committees.  It presents neither record evidence of this injury nor any evidence of requests for refunds from contributors.

### E.  Defendants' Actions Cannot, By Definition, Be Corrupting

The Commission asserts that the "corruption" present in this matter will deter citizens from making contributions to candidates. *See* FEC Memo. at 23. However, the Commission fails to address the Supreme Court's assessment in *Citizens United v. FEC*: "When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." 558 U.S. 310, 359 (2010) (*citing Buckley v. Valejo*, 424 U.S. 1, 26-28, 30, 46-48 (1976)). Defendants' actions do not constitute the type of *quid pro quo* corruption

---

[17]    *See* http://www.fec.gov/law/legrec2012.pdf.

[18]    MUR 6105 is available at: http://eqs.nictusa.com/eqsdocsMUR/29044241486.pdf.

contemplated by the Supreme Court. Even under a more general concept of corruption, the Commission overreaches. These circumstances represent a legal dispute over the proper allocation of funds, not an attempt to improperly exert influence.

### F.  Defendants Acted in Good Faith

The Commission maintains that defendants cannot make a showing of good faith "sufficient to lessen their penalty." FEC Memo. at 26. Despite the Commission's claim of munificence, its request for disgorgement and $140,000 in civil penalties is extremely severe and apparently unprecedented. Its brief fails to identify a single matter where it imposed a penalty of this size in a matter when the defendant or respondent relied on advice of counsel and fully-disclosed the expenditures to the Commission.

The Commission also claims that defendants' failure to request an advisory opinion from the Commission before making the expenditures indicates a lack of good faith. Of course, as detailed, *supra at* Section III.A, the defendants have relied on the Kolbe opinion since 2007.

*Citizens United* also undermines the assertion that the failure to request an advisory opinion reflects bad faith. *See* 558 U.S. 310, 335-336 ("Because the FEC's 'business is to censor, there inheres the danger that [it] may well be less responsive than a court – part of an independent branch of government – to the constitutionally-protected interests in free expression.'" (*Quoting Freedman v. Maryland*, 380 U.S. 51, 57-58 (1965)). As such, defendants should not be punished for failing to seek prior approval to use committee funds in a case that implicated constitutional rights and privileges and posed significant legal questions. *See Harman*, 59 F. Supp. 2d at 1059 (party entitled to judicial determination of legal questions).

Citing the October 4, 2007, letter, the Commission also criticizes defendants' "shifting rationales" for compliance and argues that this indicates bad faith. FEC Memo. at 27. As defendants have established, their legal arguments have remained consistent since 2007. Moreover, the Commissions' own rationale in this matter has shifted. In its Factual and Legal Analysis ("FLA") relating to the MUR, the Commission proffered a "necessary nexus" standard for assessing whether conduct related to official duties. *See* Defs.' Exhibit 11 at 1-2, 4 (Aug. 10, 2009 letter from Brand Law Group to Commission). In responding to the FLA, counsel stated: "The FEC also fails to provide any standards or notice for what type of activity would provide a 'necessary nexus' to official duties; it simply refers to 'conduct that is the subject of his arrest' and alleges a lack of such a 'nexus.'" *Id.* The "necessary nexus" standard has not reappeared in this case.

### G. Senator Craig's Financial Resources Limit His Ability to Pay Both Disgorgement and a Civil Penalty[19]

In claiming that defendants possess the ability to pay the large fines requested, FEC Memo. at 28, the Commission cites to *FEC v. Committee of 100 Democrats*, 844 F. Supp. 1, 7 (D.D.C 1993), where the court imposed a fine on defendants who violated a conciliation agreement with the Commission and continually failed to file disclosure reports required both by law and an agreement. This case does not inform this matter; defendants have not displayed the type of willful, intransigent conduct seen in *Committee of 100 Democrats* or the other cases cited by the Commission relating to remedies.

Moreover, the Commission's claim ignores Senator Craig's financial forms disclosing that his total net worth is *negative* $155,258.12. Defs.' Facts ¶ 26. The "42-foot yacht" purchased in 2003 has a current value of "negative $15,000." *Id.* ¶ 28. The

---

[19] Defendants agree with the Commission's position that a penalty, if any, should be refunded to the Craig Committee. *See* FEC Memo at 17 & 17 n.12.

disclosure form demonstrates that, if found liable, Senator Craig would be forced to liquidate retirement assets in order to pay a civil penalty. *Id.* ¶ 29.

### H.  Injunctive Relief is Not Appropriate

The Commission's request for an injunction against future unlawful conduct is insupportable. Injunctions in Commission enforcement cases are so extraordinary that the Ninth Circuit refused to impose relief even against the intransigent Furgatch:

> [W]hile the record would support a finding that Furgatch is likely to commit future violations of the Act, the record does not justify the imposition of a permanent injunction. Furgatch has not demonstrated the sort of *extraordinary intransigence and hostility* toward the FEC and the Act which would support the inference that he will remain likely to violate the Act for the rest of his life.

*Furgatch*, 869 F.2d at 1262 (emphasis added). *See also Harman*, 59 F. Supp. 2d at 1059 (denying permanent injunction because "[n]o evidence has been submitted by the FEC that defendants have ever violated any other provisions of the Act" and "Representative Harman is no longer in office").

In this matter, the Commission made no claim that Senator Craig had previously violated the Act during his 28-year congressional career. Nor do his actions during this matter – consulting with counsel, reporting the expenditures, establishing a legal defense fund and cooperating with the administrative process – indicate any need for the imposition of injunctive relief.

## VI.   CONCLUSION

For the reasons stated above, defendants respectfully request that the Court deny the Commission's motion for summary judgment.

Dated:  November 13, 2013          Respectfully Submitted,


                          _____/s/ Andrew D. Herman_____
                          ANDREW D. HERMAN
                          D.C. Bar # 462334
                          MILLER & CHEVALIER CHARTERED
                          655 Fifteenth Street, Suite 900
                          Washington, DC 20005
                          (202) 626-5869

                          STANLEY M. BRAND
                          D.C. Bar # 213082
                          BRAND LAW GROUP, PC
                          923 Fifteenth Street, N.W.
                          Washington, D.C. 20005
                          (202) 662-9700