# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                          )
FEDERAL ELECTION COMMISSION,              )
                                          )        Civ. No. 12-958 (ABJ)
          Plaintiff,                      )
                                          )
          v.                              )
                                          )        REPLY IN SUPPORT OF
CRAIG FOR U.S. SENATE, *et al.*,          )        SUMMARY JUDGMENT
                                          )
          Defendants.                     )
_____)

## PLAINTIFF FEDERAL ELECTION COMMISSION'S REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Lisa J. Stevenson
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

January 10, 2014

# TABLE OF CONTENTS

I.    THERE ARE NO DISPUTED MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT ........................................................................2

    A.    Defendants Have Admitted All of the Complaint's Factual Allegations and Thus Violated the Personal-Use Ban Under the Court's Preliminary Ruling ..........................................................................2

    B.    Defendants' Purported Facts Are Immaterial ....................................3

    C.    No FEC Advisory Opinion Shields Defendants from Sanctions for Their Personal-Use Violations ....................................................4

          1.    The Advisory Opinions Defendants Cite Are Materially Distinguishable from Their Personal Use of Campaign Funds ............4

          2.    Defendants Failed to Rely Upon Any Advisory Opinions ...................6

          3.    The Miller Advisory Opinion Does Not Help Defendants ...................9

    D.    The Amount of Campaign Funds Defendants Spent to Attempt to Withdraw Craig's Guilty Plea Was Admitted in Their Answer and Was at Least $216,984 ................................................................10

II.    THE COURT SHOULD ORDER THE FEC'S REQUESTED REMEDIES .............12

    A.    Defendants Do Not Deny That Craig Will Be Unjustly Enriched Unless He Disgorges the Campaign Funds He Used to Try to Withdraw His Guilty Plea ...............................................................12

    B.    A Substantial Civil Penalty Is Necessary in This Case....................................14

          1.    Contributors to the Craig Committee Were Injured ............................14

          2.    Defendants' Violations Undermined the Public's Confidence in Government and the Campaign Finance System ............................15

          3.    Craig Profited from Defendants' Violations........................................16

          4.    Defendants Should Face Punishment for Their Serious Violations.....17

          5.    Future Personal-Use Violations Should Be Deterred, Particularly Since Billions of Dollars Are Contributed to Federal Candidates.......18

i

6.      The Authority of the Commission Should be Vindicated and
        Pre-Litigation Settlement Encouraged....................................................20

7.      Defendants' Purported Good Faith Does Not Warrant Penalties
        Below $70,000 for Each Defendant.......................................................20

C.      Defendants Have Confirmed That Craig Is Able to Disgorge the
        Converted Funds and Pay an Appropriate Civil Penalty ................................23

D.      This Court Should Issue a Declaration and a Permanent Injunction ...............25

III.    CONCLUSION.........................................................................................................25

In March 2013, this Court held that plaintiff Federal Election Commission ("FEC" or "Commission") had successfully stated a claim that former Senator Larry Craig and his campaign committee, Craig for U.S. Senate ("Craig Committee"), violated the Federal Election Campaign Act's ("FECA") ban on converting campaign funds to personal use, 2 U.S.C. § 439a(b). *FEC v. Craig for U.S. Senate*, 933 F. Supp. 2d 111 (D.D.C. 2013). Since then, defendants have admitted the facts of the Complaint, and now, in response to the Commission's motion for summary judgment, fail to controvert any of the Commission's proposed material facts. No FEC advisory opinion shields defendants from liability for their violations. Thus, the Court should hold that they violated section 439a(b), enter summary judgment for the Commission, and impose appropriate civil remedies, as the Commission requests.

Defendants have admitted that they spent at least $216,984 in Craig Committee funds in an effort to withdraw Craig's guilty plea in Minnesota. Craig should be required to disgorge that amount, since otherwise he would profit from his violation. Craig and the Craig Committee should also each pay a $70,000 civil penalty, which is less than one third of what FECA authorizes for their violations. These reasonable penalties would effectively punish defendants' violations, which injured their contributors and the public, and it would deter future personal use of campaign funds. These penalties would also reflect defendants' lack of substantial good faith. Defendants ignored admonitory language in FEC guidance indicating their spending would be illegal, and they now admit that they did not ask for their own advisory opinion because they were concerned the Commission might say no. Instead, defendants spent the campaign funds, and they continued even after the Senate Ethics Committee warned them they were likely violating FECA. Defendants confirm in their opposition that Craig has the financial ability to disgorge his profits and pay the requested civil penalty. He should be ordered to do so.

# I.   THERE ARE NO DISPUTED MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT

## A.   Defendants Have Admitted All of the Complaint's Factual Allegations and Thus Violated the Personal-Use Ban Under the Court's Preliminary Ruling

This Court's ruling denying defendants' motion to dismiss addressed whether they had violated 2 U.S.C. § 439a(b) ("the personal-use ban"), *see Craig for U.S. Senate*, 933 F. Supp. 2d at 116-25, and defendants do "not ask the Court to revisit its analysis" (Defs.' Opp'n to FEC's Mem. in Supp't of Mot. for Summ. J. ("Defs.' Opp'n") at 2 (Docket No. 19); *see also id.* at 14 ("Defendants do not seek rehearing of their arguments.")).  In that analysis, this Court assumed the truth of the Complaint and determined that Craig's Minnesota legal expenses were personal and not incurred in connection with his officeholder duties.  (*See* FEC's Mem. in Supp't of Its Mot. for Summ. J. ("FEC SJ Br.") at 7-8 (Docket No. 16).)  While not asking the Court to revisit its analysis, defendants do incorrectly assert that the Court decided only "the legal standard relating to Senator Craig's alleged personal use."  (Defs.' Opp'n at 14.)  The Court's ruling, of course, also determined that defendants' alleged conduct violated that standard.  *Craig for U.S. Senate*, 933 F. Supp. 2d at 117-19.

Defendants have since admitted *all* of the Complaint's factual allegations — not just "many" of the Complaint's factual allegations, as they claim.[1]  (*See* FEC's Statement of Material Facts As to Which It Contends There Is No Genuine Issue ("FEC Facts") ¶¶ 2-5, 7-10, 13-14, 23-32 (Docket No. 16) (citing the Complaint and Answer); Defs.' Opp'n at 14.)  Defendants should also be deemed to have admitted the additional facts submitted in support of the FEC's motion for summary judgment because defendants violated the Local Rules and this Court's

---

[1]      The Answer's five specific denials respond to legal conclusions in the Complaint, not factual allegations.  (Answer ¶¶ 11, 22-23, 33-34 (Docket No. 12).)  Defendants also stated in the parties' Joint Local Rule 16.3 Report that they "do not dispute any of the relevant facts regarding the violations alleged in this case."  (Joint Local Rule 16.3 Report at 2, ¶ 1(2) (Docket No. 13).)

Scheduling Order by failing to file as part of their opposition "a separate document that responds directly and individually to the [FEC's] material facts" and indicates "whether or not a dispute exists as to each." Scheduling Order at 3, ¶¶ 6-7 (Docket No. 14); *see* LCvR 7(h)(1); *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 61 n.3 (D.D.C. 2012) (deeming admitted paragraphs for which opposing party "did not cite to specific parts of the record controverting" moving party's statement). The Court should therefore hold that defendants violated the personal-use ban.

### B.   Defendants' Purported Facts Are Immaterial

Defendants have alleged two sets of new facts that they contend are relevant to whether they violated the personal-use ban. Both sets, however, are immaterial. First, defendants allege "details about Senator Craig's arrest." (Defs.' Opp'n at 5-6.) These details are irrelevant because they merely show that Craig feared his arrest would result in "embarrassing and damaging publicity" and that he acted accordingly. (*Id.* at 6.) After being arrested, Craig told the officer he was a Senator, pled guilty in hopes that his arrest would go unnoticed by the media, and asked his attorneys to rescind his guilty plea once the arrest went public to "defend[ his] reputation and vindicat[e] him personally and professionally." (*Id.* at 5-6.) As this Court explained, though, "it does not matter" if Craig's "decision to withdraw the guilty plea was motivated by political considerations" or if his conviction harmed his reputation or status as a Senator. *Craig for U.S. Senate*, 933 F. Supp. 2d at 119. What matters is whether Craig's officeholder duties resulted in his arrest and expenses. *Id.* They did not, since "the charge did not relate[] to his conduct as a legislator, but only actions undertaken in the privacy and anonymity of a restroom stall." *Id.*

Second, the alleged facts relating to the Senate Ethics Committee's 2008 decision to allow Craig to establish a legal defense fund for his Minnesota case are also irrelevant. (*See*

Defs.' Opp'n at 3, 7-8.)  Defendants suggest that the Senate Ethics Committee's decision shows that legal expenses relating to the Minnesota case are officeholder-related and not personal.  (*Id.*) The Senate Ethics Committee's letter approving the fund, however, states the exact opposite:  It reminds Craig that the Senate Ethics Committee "has not approved your use of campaign funds" for the Minnesota case given that "'some portion of these expenses may not be deemed to have been incurred in connection with your official duties.'"  (Defs.' Exhibit ("Exh.") 9 at 2 (Docket No. 19-11).)  The Committee then warned Craig that any further use of campaign funds for the Minnesota case would "'demonstrat[e] your continuing disregard of ethics requirements.'"  (*Id.*) Defendants' attempt to equate their use of legal defense funds with their use of Craig Committee funds for the Minnesota case illustrates that they fail to appreciate the injury suffered by their campaign contributors, who did not intend to pay for Craig's personal legal expenses.[2]

**C.      No FEC Advisory Opinion Shields Defendants from Sanctions for Their Personal-Use Violations**

**1.      The Advisory Opinions Defendants Cite Are Materially Distinguishable from Their Personal Use of Campaign Funds**

As defendants recognize, this Court held that no FEC advisory opinion that defendants purport to have relied upon shields them from sanctions for their violation.  (Defs.' Opp'n at 13-14 (citing *Craig for U.S. Senate*, 933 F. Supp. 2d at 120-24).)  To obtain protection under 2 U.S.C. § 437f(c), defendants must have relied on, and acted in good faith accordance with, the provisions of an advisory opinion that is materially indistinguishable from their campaign spending.  (*See* FEC SJ Br. at 9.)  In denying defendants' motion to dismiss, this Court

---

[2]      Defendants state that they have not abandoned their reliance upon the Speech or Debate Clause or other constitutional privileges in claiming that they did not violate section 439a(b). (Defs.' Opp'n 14-15.)  The FEC continues to oppose those arguments for the reasons stated in its previous briefing (*see* FEC's Mem. in Opp'n to Defs.' Mot. to Dismiss at 15-18 (Docket No. 5)) and in the Court's previous ruling, *Craig for U.S. Senate*, 933 F. Supp. 2d at 117 n.5.

determined that the Kolbe, Boehner, McDermott, and Cunningham advisory opinions offer defendants no immunity because each is materially distinguishable from defendants' alleged activities.  *Craig for U.S. Senate*, 933 F. Supp. 2d at 120-25.

Defendants now renew their contention that their spending of campaign funds is materially indistinguishable from the facts of the Kolbe advisory opinion, and in so doing they continue their meritless efforts to rewrite that opinion.  (Defs.' Opp'n at 11, 15.)  First, this Court's reading of the Kolbe opinion did not reduce it to a "restatement of the personal use statute," divorced from any application to facts, as defendants argue.  (*Id.* at 15 n.13.)  As detailed in the Kolbe opinion, the Department of Justice ("DOJ") was conducting a preliminary inquiry into a Congressional trip to the Grand Canyon that then-Congressman Kolbe attended, and DOJ had yet to make the details of that inquiry public.  FEC Advisory Op. ("AO") 2006-35 (Kolbe), 2007 WL 419188, at *3 (Jan. 26, 2007).[3]  Applying section 439a to those facts, the Commission determined that because the subject of the inquiry at that time — the official trip — was officeholder-related and not personal, FECA permitted Kolbe to use campaign funds to respond to the inquiry (with the caveat that the result would be different if the scope of the inquiry were to extend beyond his duties as an officeholder).  *Id.*  Here, by contrast, Craig incurred legal expenses because he was arrested for what he admits was personal behavior.  *See Craig for U.S. Senate*, 933 F. Supp. 2d at 120-22.

Second, defendants attempt to perform an end run around the Kolbe authority by claiming that two news articles show that the FEC's opinion "endorsed" the use of campaign

---

[3]     FEC AO 2006-35 (Kolbe) can also be found at http://saos.fec.gov/aodocs/2006-35.pdf. Please note that the web addresses to FEC documents that the FEC provided in its opening brief and its statement of material facts (Docket No. 16) have since changed.  Those web addresses can be brought up-to-date by replacing "saos.nictusa.com" with "saos.fec.gov," "eqs.nictusa.com" with "eqs.fec.gov," and "images.nictusa.com" with "docquery.fec.gov," where applicable.  The Commission regrets any inconvenience.

funds to defend against allegations of personal wrongdoing.  (Defs.' Opp'n at 11.)  But neither news article was part of Representative Kolbe's advisory opinion request, and section 437f(c) protects reliance on an advisory opinion, not "public materials" that defendants identify here for the first time more than five years after their illegal spending of campaign funds and nearly seven years after issuance of the Kolbe opinion.  *Id.*; *see Craig for U.S. Senate*, 933 F. Supp. 2d at 122. Moreover, just like the pre-decisional communications on which defendants attempted to rely in their failed motion to dismiss, *see Craig for U.S. Senate*, 933 F. Supp. 2d at 122-24, neither article shows any Commission endorsement of campaign funds for personal litigation.  On the contrary, the *Arizona Republic* article confirms that DOJ had not made public the details of its preliminary inquiry and that DOJ had not identified Kolbe as a target.  (Defs.' Exh. 14 (Docket No. 19-16) at 1 (stating that "Kolbe's office . . . had not been contacted by" DOJ and that DOJ would not "discuss what specific allegations prompted the federal review" of the Grand Canyon trip).)  And the *Roll Call* article also does not state that DOJ had made public why it was investigating Kolbe's trip (since DOJ had not).  (*See* Defs.' Exh. 15 (Docket No. 19-17) at 1-3.)

## 2. Defendants Failed to Rely Upon Any Advisory Opinions

For an advisory opinion to protect defendants from sanctions for violating the personal-use ban, the opinion must not only be materially indistinguishable from their activities, but defendants must also have relied on, and acted in good faith accordance with, that opinion.  *See* 2 U.S.C. § 437f(c)(2); *see also* FEC SJ Br. at 12-13.  In their opposition, defendants do not dispute the Commission's contention that they did not rely upon the McDermott, Boehner, or Cunningham opinions.  (*See* FEC SJ Br. at 12-13; *see generally* Defs.' Opp'n.)

The evidence also establishes that defendants did not rely on the Kolbe opinion for payment of the fees at issue here.[4] (*See* FEC SJ Br. at 12-13.)  In December 2008, soon after the start of the FEC's review of this matter, Craig told the Commission that he had made a "'good faith effort to ascertain the legality of using campaign funds'" for his Minnesota legal expenses based on the advice from counsel he received in a letter dated October 4, 2007.[5] (FEC Facts ¶ 17 (quoting FEC Exh. 4 (Docket No. 16-4)).)  The October 4, 2007 letter advised Craig that there were "'no directly applicable FEC opinions'" on whether he could spend campaign funds on his Minnesota legal fees, and claimed that the "'FEC has apparently never addressed legal expenses stemming from official travel.'" (FEC Facts ¶ 18 (quoting FEC Exh. 5 at 1-2 (Docket No. 16-5)).)  The letter states this despite citing the Kolbe opinion for a separate issue. (*Id.*)  Defendants started spending campaign funds on the Minnesota case just a little over three weeks later on October 29, 2007. (*Id.* ¶¶ 14, 23.)

Defendants do not dispute the Commission's reading of the October 4, 2007 letter. Instead, they claim that the FEC unfairly "telescopes" ongoing advice into that one letter (Defs.' Opp'n at 7), even though Craig focused on the letter exclusively in 2008 as evidence of his alleged good-faith compliance with the law (*see* FEC Facts ¶ 17).  Now, defendants point to a later letter, dated November 14, 2007, that their counsel sent to the Senate Ethics Committee, and argue that it shows defendants relied upon the Kolbe opinion in spending the funds at issue

---

[4]     Defendants' failure to rely in good faith on any advisory opinion is an additional and independent reason that section 437f(c) does not protect them from FECA sanctions.  Even if defendants could successfully show that there is a genuine issue of material fact as to their purported good faith reliance on an advisory opinion, summary judgment would still be appropriate due to the material differences between the opinions and defendants' activities. *See supra* pp. 4-6; FEC SJ Br. at 9-12.

[5]     Defendants' brief incorrectly states that the October 4, 2007 letter was from Craig's counsel to the Senate Ethics Committee. (Defs.' Opp'n at 7.)  It is addressed to Craig, not the Committee. (FEC Exh. 5 (Docket No. 16-5).)

here.  (Defs.' Opp'n at 7 (citing Defs.' Exh. 6 (Docket No. 19-8)).)  As an initial matter, to the extent defendants offer this letter in support of an advice-of-counsel defense on the merits, it should be disregarded, since defendants have expressly waived any such defense.[6]

But even if considered, the November 14, 2007 letter does not show that defendants relied on the Kolbe opinion for their spending on the Minnesota case.  Just like the October 4, 2007 letter, the November 14, 2007 letter reflects reliance on the Kolbe opinion only for spending campaign funds on representation *before the Senate Ethics Committee* (which is related to holding office).[7]  (Defs.' Exh. 6 at 6-9).  The November 14, 2007 letter never discusses the

---

[6]       Defendants argue that based on the legal advice reflected in the November 14, 2007 letter, they "were confident that the use of campaign funds for these expenditures was legal and customary" and that they would not have made the expenditures otherwise.  (Defs.' Opp'n at 7.)  Defendants contend that this alleged fact precludes summary judgment.  (Defs.' Facts ¶ 18.)  By doing so, they appear to be invoking an advice-of-counsel defense on the merits; however, defendants waived such a defense in discovery (*see* Defs.' Resp. to FEC's First Req. for Admis. and First Set of Interrogs. at 9, Interrog. 5, FEC Exh. 6 (Docket 16-6)), and, in reliance on that waiver, the FEC did not pursue discovery of defendants' legal advice.  The Court should therefore not allow an advice-of-counsel defense or admit any evidence for that purpose, such as the November 14, 2007 letter and parts of the Ware Declaration (Decl. of Michael O. Ware, ¶¶ 6, 8-9, Defs.' Exh. 2 (Docket No. 19-4).)  *See, e.g., Bailey v. Pataki*, __ F. Supp. 2d __, No. 08-8563, 2013 WL 3379305, at *1-*3 (S.D.N.Y. July 8, 2013) (precluding invocation of advice-of-counsel defense following waiver).  If defendants' evidence is admitted, the Court should reopen discovery on the issue.  In any event, defendants have failed to establish all four elements of an advice-of-counsel defense on the merits.  *See SEC v. Prince*, 942 F. Supp. 2d 108, 138 (D.D.C. 2013) (defendant must have "(1) made complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice" (internal quotation marks omitted)).  Finally, even if defendants were able to satisfy those elements, a general advice-of-counsel defense on the merits is not available here where the FEC has not sought to prove a knowing and willful violation and need not establish that defendants possessed a certain state of mind.  Their state of mind is relevant only to the extent it bears on whether they relied in good faith on an advisory opinion under section 437f(c)(2) and what the appropriate remedies are.

[7]       (*Compare* Defs.' Exh. 6 (Nov. 14, 2007 letter) at 6, ¶ 7 ("In using campaign funds to pay for both assistance with press relations and for representation *before this Committee*[,] Senator Craig relied on unequivocal, applicable guidance from the [FEC]." (emphasis added)), *with* FEC Exh. 5 (Oct. 4, 2007 letter) at 1, ¶ 2 ("First it is clear that FEC advisory opinions authorize full payment with campaign funds for legal representation in all matters *before the Senate Ethics Committee*.  *See* FEC Advisory Opinion ("AO") 2006-35 [(Kolbe)] at 3." (emphasis added)).)

Kolbe opinion in relation to the Minnesota legal fees at issue here, and it is dated *after* October 29, 2007 (*id.*), when Craig had already started spending campaign funds on his Minnesota legal fees — by then, Craig had already spent more than $66,000 (*see* FEC Facts ¶¶ 14, 23; Defs.' Opp'n. at 9). As defendants do not contest, the October 4, 2007 letter shows that Craig *did not* rely on the Kolbe opinion for that spending. And as late as August 2009, defendants' counsel were maintaining to the FEC that "[o]ur legal analysis has not changed since we provided our letter to Senator Craig in October 2007," while making no mention of the November 14, 2007 letter. (Defs.' Exh. 11 at 2 (Docket No. 19-13).) [8]

### 3.     The Miller Advisory Opinion Does Not Help Defendants

Defendants also cite the FEC's recent Miller advisory opinion (Defs.' Opp'n at 15), but that opinion offers defendants no help under section 437f(c). The FEC issued the Miller opinion less than three months ago, on October 31, 2013, and so defendants obviously did not rely on it in good faith while spending campaign funds in 2007 and 2008. *See* FEC AO 2013-11 (Miller), 2013 WL 6022101 (Oct. 31, 2013). And the Miller opinion is materially distinguishable because it involved a federal candidate who incurred legal fees because of his candidacy: The lawsuit that resulted in Miller's expenses was initiated by media entities that sought to obtain and publicize Miller's employment records because he was running for federal office. *Id.* at *4. In

---

The Commission has allowed federal officeholders to use campaign funds for expenses incurred in responding to House and Senate Ethics Committee inquiries. Expenses incurred in responding to those inquiries are in connection with the duties of holding office — even if the allegations concern activities unrelated to office — because those expenses would not exist if the subject of the inquiry was not a Member of Congress. *See, e.g.*, FEC AO 2006-35 (Kolbe), 2007 WL 419188, at *2; FEC AO 2008-07 (Vitter), 2008 WL 4265321, at *3 (Sept. 9, 2008).

[8]     Defendants also suggest that invoices for legal services that Craig received in October and November 2007 and the Ware Declaration show that defendants relied on advisory opinions to use campaign funds for the Minnesota fees. (Defs.' Opp'n at 9-10 (citing Defs.' Exhs. 2 (Docket No. 19-4), 13 (Docket No. 19-15).) But neither exhibit even mentions any FEC advisory opinions, let alone reflects reliance on the Kolbe opinion. (*See* Defs.' Exhs. 2, 13.)

contrast, the fact that Craig was a Senator did not cause his arrest or any of his resulting legal fees. *Craig for U.S. Senate*, 933 F. Supp. 2d at 119.

> **D.** **The Amount of Campaign Funds Defendants Spent to Attempt to Withdraw Craig's Guilty Plea Was Admitted in Their Answer and Was at Least $216,984**

Defendants spent at least $216,984 in campaign funds trying to withdraw Craig's guilty plea. There is no dispute over this fact, contrary to what defendants now claim (Defs.' Opp'n at 12-13), since defendants *admitted in their Answer that they spent that amount* in their effort to withdraw the plea (Answer ¶¶ 19-20). Defendants admitted they paid "at least $139,952" to Sutherland, Asbill & Brennan ("Sutherland"), and "approximately $77,032" to Kelly & Jacobson ("Kelly") "for providing legal services to Mr. Craig in connection with his efforts to withdraw his guilty plea." (Compl. ¶¶ 19-20; *see* Answer ¶¶ 19-20; *see also* FEC Facts ¶ 23.)

Now, faced with the FEC's motion for summary judgment, defendants apparently would like to take back their admission. However, "admissions in the pleadings are binding," *Nat'l Ass'n of Life Underwriters, Inc. v. C.I.R.*, 30 F.3d 1526, 1530 (D.C. Cir. 1994), and because they remain binding "throughout the course of the proceeding," they "may support summary judgment against the party making such admissions," *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 61 (1st Cir. 1992) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be . . . genuinely disputed" may cite to "admissions"). Admissions remain binding and continue to support summary judgment "even if the post-pleading evidence conflicts with the evidence in the pleadings." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1305 (4th Cir. 1994).

Even if post-pleading evidence were relevant, defendants have failed to identify any evidence that actually conflicts with their admission. Defendants do not deny that the entire

$216,984 in legal fees they paid to the Sutherland and Kelly firms was for work relating to

Craig's effort to revoke his guilty plea.  (*See* Defs.' Opp'n at 12-13.)  Instead, they claim that

some unspecified portion of those fees may "not necessarily" constitute personal use under FEC

advisory opinions, because vague entries they selected from the Sutherland and Kelly invoices

use the words "ethics," "appropriation," "media," and "public relations."  (*Id.* at 12.)  But

defendants make no effort to show that they satisfy section 437f(c)'s requirements for protection

by these advisory opinions, nor could they show that.[9]

      The $216,984 figure already reflects deductions the FEC made during its investigation

for expenditures that clearly related directly and exclusively to media work.[10]  Also during that

investigation, the FEC offered defendants the opportunity to identify the amount of campaign

funds "that were disbursed to pay legal fees to [the Sutherland and Kelly firms] to respond to

media inquiries."  (Letter from Shana M. Broussard, Attorney, FEC to Andrew D. Herman, Esq.,

Brand Law Group PC at 3, ¶ 5 (Aug. 19, 2009), FEC Exh. 13 (Docket No. 21-2).)  In response,

defendants "decline[d] to respond directly to [the FEC's] questions."  (Letter from Andrew D.

Herman, Brand Law Group, to Shana Broussard, Esq., FEC at 1 (Sept. 21, 2009), FEC Exh. 14

(Docket No. 21-3).)  Defendants similarly fail to identify any such amount here.

---

[9]    For example, defendants cite the Hilliard advisory opinion (Defs.' Opp'n at 12), which states that legal expenses relating to allegations of personal wrongdoing are nevertheless considered 50 percent officeholder-related where the expense involves "providing substantive responses to the press (beyond *pro forma* 'no comment' statements)."  FEC AO 1988-01 (Hilliard), 1998 WL 108618, at *5 (Feb. 27, 1998).  None of the invoice entries that defendants cite show that they qualify.  (*See, e.g.*, Defs.' Opp'n at 13 (citing Defs.' Facts ¶ 25.f (citing Defs.' Exh. 13 at Craig 71 ("Review draft letter to Idaho Statesman.")); Defs.' Exh.13 at Craig 35 ("Attend to media . . . issues.")); Defs.' Facts ¶¶ 25.a (citing Defs.' Exh. 13 at Craig 44 ("Field and redirect media calls.")); 25.d (citing Defs.' Exh. 13 at Craig 79 ("Handle calls from sources wanting factual information relevant to the case.")).)

[10]    Craig hired a public relations firm (called Impact Strategies) to perform media work relating to the Minnesota case.  The FEC did not include Impact Strategies' fees of more than $100,000, which are reflected in Sutherland's invoices to Craig, in the $216,984 figure.  (General Counsel's Br. at 5-6, MUR 6128 (Craig) (Apr. 8, 2011), FEC Exh. 12 (Docket No. 21-1).)

In any event, defendants are bound by their prior admission to spending at least $216,984 on legal expenses in their effort to withdraw Craig's guilty plea.[11]

\*      \*      \*

In sum, the Court should grant the FEC's motion for summary judgment because defendants converted $216,984 in campaign funds to Craig's personal use in violation of 2 U.S.C. § 439a(b), and no FEC advisory opinion shields them from sanctions for that offense.

## II.      THE COURT SHOULD ORDER THE FEC'S REQUESTED REMEDIES

### A.      Defendants Do Not Deny That Craig Will Be Unjustly Enriched Unless He Disgorges the Campaign Funds He Used to Try to Withdraw His Guilty Plea

In their opposition, defendants do not dispute that Craig profited from his use of campaign funds to try to withdraw his guilty plea.  Defendants also do not deny that Craig would be unjustly enriched unless he were to disgorge the entire $216,984 he used.  This Court should therefore order Craig to disgorge that amount.  (*See* FEC SJ Br. at 14-17.)

FECA gives this Court broad authority to remedy FECA violations by "grant[ing] a permanent or temporary injunction, restraining order, *or other order*, including a civil penalty." 2 U.S.C. § 437g(a)(6)(B) (emphasis added).  Defendants argue that this statute does not permit disgorgement *and* a civil penalty (Defs.' Opp'n at 17), but the statute's open-ended language contains no such restriction and does not require the Court to choose one remedy over another. The FEC regularly requires both disgorgement of profits and a civil penalty to conciliate personal-use violations.[12]

---

[11]      If the Court were to conclude that defendants are not bound by their admission, discovery should be reopened on the issue of how much defendants spent in violation of the personal-use ban, since the Commission relied upon that admission in not seeking discovery on the issue.

[12]      In its opening brief, the FEC cited examples of conciliation agreements where the agency required respondents to disgorge converted funds and pay a civil penalty.  (*See* FEC SJ Br. at

In fact, without disgorgement, any civil penalty in this case would amount to no penalty at all.  If Craig were allowed to keep his $216,984 ill-gotten profit, the $70,000 civil penalty the FEC has requested would amount to a $146,984 *net gain* for Craig.  This result would obviously fail to punish Craig or deter future violations of the personal-use ban.  Even if the Court imposed the maximum civil penalty permitted here, without disgorgement, Craig would simply break even on his violation of FECA.  Civil penalties, however, are "intended to punish culpable individuals," not merely to "restore the status quo."  *Tull v. United States*, 481 U.S. 412, 422 (1987); *see also, e.g.*, *SEC v. Levine*, 517 F. Supp. 2d 121, 141-42 (D.D.C. 2007) (imposing a $200,000 civil penalty in addition to a $217,368.59 disgorgement order for securities fraud).

Defendants repeatedly suggest that disgorgement is a type of civil penalty, apparently so they can incorrectly claim that the FEC is requesting "severe" civil penalties.  (Defs.' Opp'n at 17, 20, 24 n.19.)  In reality, the civil penalty the FEC requests is less than one third of the amount defendants spent and so reflects restraint, particularly in light of *FEC v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989).  There, the Ninth Circuit affirmed a civil penalty that was just shy of *100 percent* of the amount spent in violation of FECA.  *Id.* at 1258, 1264.  Disgorgement was not necessary, since *Furgatch* involved a reporting violation which conferred no profit to the violator, *see id.* at 1258 n.1, unlike the personal use of campaign funds.  Disgorgement is therefore not only statutorily authorized in this case, but it is essential to ensure that Craig does not profit and that a civil penalty is effective.[13]

---

15.)  The fact that these respondents also violated FECA disclosure requirements, as defendants note (Defs.' Opp'n at 19), is irrelevant to the disgorgement they agreed to pay.  No profit results from failing to disclose (and so there is nothing to disgorge), and disclosure violations are distinct FECA violations, punishable in their own right.

[13]     The FEC does not "rely solely" on *Furgatch*, as defendants assert (Defs.' Opp'n at 18); *Furgatch* illustrates that a court may consider "'the desire to eliminate the benefit derived from

B.      **A Substantial Civil Penalty Is Necessary in This Case**

Section 437g(a)(6)(B) authorizes this Court to assess a civil penalty against each

defendant in "an amount equal to" the full $216,984 they spent in violation of FECA.  The

Commission requests that the Court order Craig to pay a $70,000 civil penalty and the Craig

Committee to pay a $70,000 civil penalty.  (FEC SJ Br. at 14.)  These measured and appropriate

penalties, when coupled with disgorgement, would effectively serve the important interests

identified by the Commission (*id.* at 18-29) and discussed further below.  Defendants do not

dispute the relevance of any of these interests, and they have failed to present any convincing

reason why they should face lesser civil penalties.[14]

1.      **Contributors to the Craig Committee Were Injured**

Contributors to the Craig Committee were injured by defendants' violations.  (*See* FEC

SJ Br. at 21.)  Their contributions were First Amendment-protected acts of political affiliation

with, and general expressions of support for, Craig's candidacy and political views.  (*Id.*)

However, defendants used those contributions for a different and illegitimate purpose.  (*Id.*)

Nevertheless, defendants now object that the Commission has presented no evidence of injury,

such as "requests for refunds from contributors."  (Defs.' Opp'n at 22.)  But the nature of the

injury here is self-evident:  Contributor funds were used for an unintended and improper

purpose.  *Cf. Furgatch*, 869 F.2d at 1259 ("In this case, the [FECA] violations were clearly

serious, and serious public harm should therefore be presumed.").  Indeed, defendants do not

---

the violation'" when ordering remedies under section 437g(a)(6)(B) (*see* FEC SJ Br. at 15
(quoting *Furgatch*, 869 F.2d at 1258 n.1)).

[14]      The Commission notes that civil penalties are paid to the United States Treasury, not the
Craig Committee as defendants suggest, perhaps as a result of their confusion of disgorgement
with civil penalties.  (Defs.' Opp'n at 24 n.19.)  In contrast, the FEC recommends that any funds
disgorged by Craig be refunded to the Craig Committee to restore the *status quo*, or alternatively
to the Treasury, if the Court deems appropriate.  (FEC SJ Br. at 17 & n.12.)

actually deny that Craig Committee contributors were injured, they simply complain about a lack of evidence.

Defendants' apparent failure to appreciate the nature and significance of their contributors' injury is further illustrated by their attempt to equate their use of legal defense funds with their use of campaign funds for Craig's Minnesota legal fees.  (Defs.' Opp'n at 3, 7-8, 18.)  While donors to Craig's legal defense fund knew they were paying for his personal legal expenses stemming from an arrest, contributors to the Craig Committee did not.  Craig Committee contributors, of course, gave funds to support Craig's candidacy for Senate.

### 2. Defendants' Violations Undermined the Public's Confidence in Government and the Campaign Finance System

The personal-use ban is intended to prevent officeholders from engaging in corrupt self-dealing with campaign funds, and by doing so, to promote the public's confidence in government and the campaign finance system.  (*See* FEC SJ Br. at 21-23.)  To the extent the personal-use ban is violated, as here, these important interests suffer.

Defendants point out that their self-dealing did not also result in a different kind of corruption — *quid pro quo* corruption.  (Defs.' Opp'n at 22-23.)  While the need to prevent *quid pro quo* corruption undergirds FECA's contribution limits, *Buckley v. Valeo*, 424 U.S. 1, 26-29 (1976) (*per curiam*), the personal-use ban also serves Congress's different interest in preventing personal enrichment with funds contributed for campaign purposes (*see* FEC SJ Br. at 22-23). That defendants did not also engage in *quid pro quo* corruption does not justify a lower penalty.

The personal-use ban plays such a critical role in protecting the integrity of our government that in recent years the FEC has recommended that Congress expand the law's application to all political committees.  *See* FEC SJ Br. at 20; *see also* Press Release, FEC, *FEC*

15

*Approves . . . Legislative Recommendations*[] (Dec. 17, 2013).[15]  In mid-November, a bipartisan

bill was introduced in the House of Representatives that would enact the Commission's

recommendation.[16]  Defendants argue that these efforts actually show that it is unfair that they

have been pursued and face penalties for their violations.  (Defs.' Opp'n at 21-22.)  But instead,

the recent legislative activity shows just the opposite, highlighting the importance of the

personal-use ban, especially as applied to campaign committees, which are at the core of the

campaign finance system.  Defendants contend that spending by "leadership PACs," which

candidates create to support other candidates, 11 C.F.R. § 100.5(e)(6), demonstrates that the

Commission's pursuit of their violations of the law is misplaced (Defs.' Opp'n at 3-4).  Because

the personal use of candidate campaign funds is clearly prohibited, however, contributors to

committees like the Craig Committee reasonably expect that their contributions will not be

subject to personal use, despite what may happen in other contexts, such as with contributions to

leadership PACs.  Defendants' violation of the 34-year-old personal-use ban is no less injurious

to the public because some in Congress believe the scope of the ban should be broader.[17]

### 3.    Craig Profited from Defendants' Violations

The Court should impose a significant penalty for the additional reason that Craig

profited from defendants' violation of the personal-use ban, and defendants do not claim

---

[15]    *See* http://www.fec.gov/press/press2013/news_releases/20131217release2.shtml.

[16]    *See* H.R. 3466, 113th Cong. (Nov. 13, 2013), *available at* http://www.gpo.gov
/fdsys/pkg/BILLS-113hr3466ih/pdf/BILLS-113hr3466ih.pdf.

[17]    In arguing that the FEC is treating them unfairly, defendants blatantly mischaracterize the
FEC's determination in an enforcement matter named Matter Under Review ("MUR") 6105
(Palin).  (Defs.' Opp'n at 4 n.3, 22.)  In MUR 6105, the FEC found no reason to believe that
then-Vice Presidential candidate Sarah Palin violated the personal-use ban, because the clothing
purchases at issue were made with Republican Party funds — to which section 439a(b) does not
apply — as opposed to campaign committee funds.  Factual and Legal Analysis at 1-3, MUR
6105 (Palin), http://eqs.fec.gov/eqsdocsMUR/29044241486.pdf.  The FEC did not conclude that
the clothing purchases were made "in connection with" Palin's candidacy, as defendants claim.

otherwise.  His use of more than $216,000 from Craig Committee contributors allowed him to

pay for high-priced legal representation in a personal matter, while leaving his own funds

available for personal purchases and expenses.  (*See* FEC SJ Br. at 23.)

### 4.    Defendants Should Face Punishment for Their Serious Violations

The Court should impose a civil penalty that will effectively punish defendants' violation

of FECA.  (*See* FEC SJ Br. at 24.)  Punishing wrongdoers is an appropriate goal of a civil

penalty.  *Gabelli v. SEC*, 133 S. Ct. 1216, 1223 (2013).  Defendants' actions were contrary to

clear guidance from the FEC and demonstrated a lack of substantial good faith.  As this Court

stated, defendants' claim that their spending was legal "disregards clear admonitory language in

the very opinion that defendants insist bears most directly on this case" — the Kolbe advisory

opinion.  *Craig for U.S. Senate*, 933 F. Supp. 2d at 113.  Defendants were aware of the Kolbe

opinion at the time of their violation (FEC Facts ¶¶ 18, 22), and yet they claim that they could

use campaign funds for all legal expenses related to any conduct on an official trip, even though

the Kolbe opinion states "just the opposite," *Craig for U.S. Senate*, 933 F. Supp. 2d at 121.

Nevertheless, defendants suggest that they deserve leniency for not also being

"intransigent," citing *Furgatch*.  (Defs.' Opp'n at 18.)  However, as explained above, *Furgatch*

illustrates that the civil penalty the FEC seeks here is reasonable and appropriate.[18]  *See supra* p.

13.  Defendants also ask for leniency because they did not also violate *other* provisions of

---

[18]       Defendants rely on two additional cases (*see* Defs.' Opp'n at 17-18), but both are very
different from this case.  In *FEC v. Ted Haley Congressional Committee*, the court's civil penalty
decision was based in part on the defendant-candidate's "rapid repayment," from his own
personal funds, of an excessive contribution his committee received in violation of FECA.  852
F.2d 1111, 1113 (9th Cir. 1988).  Essentially, the defendant disgorged the proceeds of his
committee's FECA violation even though he did not personally profit, while here, Craig, who
did profit, continues to fight any disgorgement.  In *FEC v. Friends of Jane Harman*, a district
court determined that the defendant's FECA violation was "not substantial nor obvious," 59 F.
Supp. 2d 1046, 1057 (C.D. Cal. 1999), in stark contrast to the violation here.

FECA:  They repeatedly point out that they reported the funds they spent for Craig's personal benefit to the FEC.  (Defs.' Opp'n at 1, 18-20, 23.)  But had they not, it would have violated a separate provision of FECA, 2 U.S.C. § 434, resulting in additional civil penalties.  Defendants do not deserve lesser civil penalties for their personal-use violations because they did not also illegally hide the funds they were personally using.  Compliance with other laws makes their violation no less punishable.

> ### 5.     Future Personal-Use Violations Should Be Deterred, Particularly Since Billions of Dollars Are Contributed to Federal Candidates

A civil penalty should be imposed to deter defendants and others from future violations. To be effective, the penalty must be large enough that it amounts to more than a license fee or low interest rate for defendants' personal use of campaign funds.  (*See* FEC SJ Br. at 18-20.)

The legal fees that Craig has incurred in this case are not a penalty or a sufficient deterrent, as defendants argue.  (Defs.' Opp'n at 21.)  Defendants claim without citation that Craig has made "significant expenditures" to pay for legal counsel (*id.*) — but that is what he largely did *not* do and the record shows Craig spending at most a couple thousand dollars (*see* Defs.' Exh. 16 (Docket No. 19-18)).  In any event, if paying legal fees in one case to contest liability for failing to pay them in another were the only "penalty," it would fail to deter personal use and encourage litigation over conciliation, since a roll-of-the-dice in court would never result in a civil penalty.  No case defendants cite (*see* Defs.' Opp'n at 21) supports their position.[19]

---

[19]     Defendants misrepresent what occurred in *FEC v. Gus Savage for Congress '82 Comm.*, 606 F. Supp. 541 (N.D. Ill. 1985).  There, the court ordered the defendant to pay a $5,000 civil penalty for failing to file reports, which he proceeded to pay despite having to hire an attorney and accountant and despite having "no substantial assets and only a modest salary," unlike Craig. *Id.* at 542, 545 & n.8.  The court denied the FEC's request for an additional civil penalty, which the agency had sought due to the defendant's failure to timely comply with the initial order.  *Id.* at 547-48.  In *FEC v. Nat'l Educ. Ass'n*, 457 F. Supp. 1102 (D.D.C. 1978), the district court held that it would be a "sufficient penalty" for a national teachers union to bear the costs of executing a court-approved plan to inform about 760,000 of its members that the court had found it liable

Defendants also point out that the "professional and personal consequences of Senator Craig's guilty plea have been severe" (Defs.' Opp'n at 21), but as defendants acknowledge, those consequences resulted from Craig's "guilty plea" (*id.*), not his subsequent decision to illegally spend campaign funds.  A civil penalty is needed to deter that latter decision.  Courts' declining to impose sanctions on this ground would essentially give free reign to scandal-plagued officeholders to raid their campaign accounts for legal fees on their way out of office.

The need for deterrence of others here is particularly great given the "dramatic rise" in personal use of political funds observed by DOJ and the similarly dramatic rise in contributions to federal candidates in recent years ($2.65 billion in the 2012 election cycle).  (*See* FEC SJ Br. at 19-20.)  Defendants attempt to dismiss these facts as "irrelevant" (Defs.' Opp'n at 21 n.16), but the facts highlight the need to deter others from taking advantage of the ever-increasing opportunities for abuse of campaign funds.  The Commission does not seek to "make an example" of Craig, as defendants assert (*id.* at 20) — indeed, the civil penalty the FEC seeks is far less than what is statutorily authorized.  Nor are the requested sanctions "unprecedented," as defendants contend (*id.* at 23), as the Commission has obtained larger penalties in cases involving purported advice of counsel and disclosed spending, *see, e.g.*, Conciliation Agreement, MURs 5403, 5466 (America Coming Together) ¶¶ IV.1, IV.16, IV.20, VI.1 (reciting a $775,000 civil penalty) (Aug. 20, 2007).[20]  The FEC recognizes that an effective civil penalty must be substantial enough to motivate others to make every good-faith effort to comply with the personal-use ban, as defendants failed to do here.[21]  *See infra* pp. 20-23.

---

for illegally collecting contributions from them and to return such contributions to those who wanted a refund.  *Id.* at 1108, 1112.  Defendants point to no similar costs they would incur here.

[20]    *See* http://eqs.fec.gov/eqsdocs/000061A1.pdf.

[21]    Because civil penalties encourage others to make good-faith efforts to comply with the law, deterrence is a valid civil penalty consideration even in cases involving non-knowing and

6.      **The Authority of the Commission Should Be Vindicated and Pre-Litigation Settlement Encouraged**

In setting the civil penalty, this Court should also consider the importance of vindicating the FEC's authority and the need to encourage pre-litigation settlement during the Commission's conciliation process, which is the "preferred method of dispute resolution under FECA." *FEC v. NRA*, 553 F. Supp. 1331, 1338 (D.D.C. 1983); *see also* FEC SJ Br. at 24-25. A civil penalty that is too low would create a perverse incentive for parties to forego meaningful efforts at conciliation in favor of litigation, resulting in increased burden for the courts.

In their opposition, defendants dispute none of these points. Instead, they argue that they are entitled to seek judicial review on what they claim is the "complicated question" involved in this case. (Defs.' Opp'n at 19.) To be sure, defendants are entitled to have this Court consider their case, but that does not mean that there should be an incentive to litigate instead of conciliate — particularly in this case, which does not involve a complicated question. *See supra* p. 17.

7.      **Defendants' Purported Good Faith Does Not Warrant Penalties Below $70,000 for Each Defendant**

The record in this case does not reflect significant good faith on defendants' part, and that justifies a higher, not lower, civil penalty. At the time they spent their campaign funds for Craig's personal use, defendants were aware of the Kolbe advisory opinion (FEC Facts ¶¶ 18, 22-23), which has "clear admonitory language" stating that campaign funds cannot be used for legal fees resulting from personal allegations relating to official travel, *Craig for U.S. Senate*, 933 F. Supp. 2d at 113. Defendants nevertheless did not rely on the Kolbe opinion. *See supra*

---

willful violations of FECA. *See, e.g., Furgatch*, 869 F.2d at 1259 (stating that the district court in a non-knowing and willful FECA case was "free to conclude that the absence of good faith efforts by [the defendant] to undo or cure his violations is indicative of the need for a large penalty to deter future wrongdoing"). Defendants incorrectly suggest otherwise. (*See* Defs. Br. at 20 n.15.) A substantial civil penalty here would also deter knowing and willful violations of the personal-use ban by signaling that the courts take all personal-use violations seriously.

pp. 6-9.  They instead took the implausible view that the "FEC has apparently never addressed

legal expenses stemming from official travel" and that there were "no directly applicable FEC

opinions" on the issue.  (FEC Facts ¶ 18 (internal quotation marks omitted).)

In light of this supposed lack of Commission guidance, defendants could have obtained

from the FEC, in just 60 days or less, their own advisory opinion on whether their proposed

spending would comply with the law.  *See* 2 U.S.C. § 437f(a)(1).  But they did not, and that

failure alone suggests a lack of good faith in attempting to comply with the law.  *Cf. United

States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 968 (3d Cir. 1981).  And defendants'

opposition reveals a fact that is even more damaging to their claim to good faith:  Defendants

admit that they did not ask for an advisory opinion because *they were concerned the FEC might

say no*.  Defendants state that they did not seek FEC "prior approval" in lieu of judicial review

here because the "'FEC's business is to censor'" and so it "'may well be less responsive than a

court'" to assertions of constitutional rights.  (Defs.' Opp'n at 23 (quoting *Citizens United v.

FEC*, 558 U.S. 310, 335-36 (2010).)

Defendants' position is untenable.  Their spending involved no protected speech, and

their argument amounts to an admission that they did not seek an advisory opinion because they

were concerned they might not like the answer they were likely to get from the agency charged

with interpreting FECA.  In effect, defendants appear to have gambled that they would not be

pursued for their violations, or if they were, that they would manage to prevail in court.  Their

conduct may reflect hope in Grace Hopper's famous observation that it is often easier to seek

forgiveness than permission.  But that conduct does not reflect much effort to comply with

federal law.  Moreover, defendants were not faced with a choice between a before-the-fact

advisory opinion and after-the-fact judicial review:  Had the FEC denied their request,

defendants could have asked a district court in this Circuit to review the FEC's advisory opinion. *See Unity08 v. FEC*, 596 F.3d 861, 864-67 (D.C. Cir. 2010).

In October 2007, defendants started to spend more than $200,000 in campaign funds on legal fees for the Minnesota case, ostensibly based on Craig's counsel's view that provisions of the Constitution (that have nothing to do with the use of campaign funds) permitted their spending. (*See* FEC SJ Br. at 27; FEC Facts ¶ 20.) Four months later, on February 13, 2008, the Senate Ethics Committee warned Craig in a public letter of admonition that "some portion of [your] expenses may not be deemed to have been incurred in connection with your official duties, either by the Committee or by the Federal Election Commission." (FEC Facts ¶ 27.) Eight months later, on October 5, 2008, defendants nevertheless continued to spend campaign funds for Craig's personal use. (*Id.* ¶ 23.)

Now that defendants face civil liability, they assert, contrary to their previous position, that they did rely upon the Kolbe opinion. (Defs.' Opp'n 9-11.) But in doing so, defendants argue that the Kolbe opinion approves "just the opposite" of what its "clear admonitory language" bars, and they have even "altered the language of the opinion" in an "inaccurate" and "misleading" way before this Court, *Craig for U.S. Senate*, 933 F. Supp. 2d at 113, 121, all in an effort to rationalize their illegal spending after the fact.[22]

Thus, although defendants claim they are entitled to a lower civil penalty in light of their "good faith attempts" to comply with FECA (Defs.' Opp'n at 20), this sequence of events does *not* show significant good faith. In addition, defendants face a penalty under a statute that

---

[22]     Faced with their own shifting rationales for their illegal spending, defendants accuse the FEC of creating a "necessary nexus" standard under section 439a(b) and then abandoning it. (Defs.' Opp'n at 24.) The FEC has never used an alternative standard. The FEC's Factual and Legal Analysis (Docket No. 5-1) used the "necessary nexus" phrase not as a legal term of art, but as a descriptive shorthand for the actual legal standard (*id.* at 10), which the analysis states in full a page earlier (*id.* at 9), and which the FEC has consistently applied throughout this matter.

already takes into account their non-"knowing and willful" state of mind, *see* 2 U.S.C.

§ 437g(a)(6)(B)-(C); FEC SJ Br. at 28 (explaining that total penalties for knowing and willful

violations could have been twice as large, or approximately $870,000), and the Commission has

recommended a civil penalty far below what that statute authorizes.  The Court should not reduce

the penalty even further based on defendants' dubious claims of good faith.

      **C.**     **Defendants Have Confirmed That Craig Is Able to Disgorge the Converted Funds and Pay an Appropriate Civil Penalty**

Defendants confirm in their opposition that Craig has the ability to disgorge the

converted funds and pay an appropriate civil penalty.  As they point out, Craig could liquidate a

portion of his retirement assets to pay the penalty the Commission requests.  (Defs.' Opp'n at 24-

25.)  And defendants do not dispute that Craig owns at least $629,000 in assets that are either

liquid or could be easily liquidated.  (FEC SJ Br. at 28-29 (citing FEC Facts ¶¶ 35.a, 35.c.i-v).)

Additionally, Craig's financial documentation shows that his net worth is at least

$685,000, and likely much higher.  (*See* FEC Facts ¶ 41.)  Defendants claim that Craig has a

negative net worth (Defs.' Opp'n at 24), but their incorrect calculation (Defs.' Facts ¶ 26 (citing

FEC Exh. 8 at 4)) is a result of two significant omissions they made from Craig's assets.  First,

defendants failed to include Craig's Thrift Savings Plan ("TSP") account balance of $454,848.37

among Craig's assets.  (*See* FEC Exh. 9 (Craig's TSP statement reflecting balance) (Docket No.

16-9); FEC Exh. 8 at 4, 8 (asset calculations omitting the TSP's surrender value) (Docket No.

16-8).)  This omission is particularly glaring given that defendants admit that Craig could

liquidate his TSP to pay a civil penalty.  (Defs.' Opp'n at 24-25 (citing Defs.' Facts ¶ 29).)

Second, defendants vastly understate the asset value of Craig's $600,000 home.  They

inaccurately claim it is worth only $190,446 (*see* FEC Exh. 8 at 4) by counting his unpaid

mortgage amount as not only a liability (*see id.* (listing a $410,000 mortgage liability)) but also a

deduction from the value of his home on the asset side of the ledger (*see id.* at 7 (stating that $190,466.41 is the home's "market price less unpaid mortgage" of $409,553.59)).  In reality, Craig's home is a $600,000 asset (FEC Facts ¶ 35.b) and his mortgage for the home is approximately a $410,000 liability (FEC Facts ¶ 37.a).

These two omissions allowed defendants to understate Craig's assets by more than $860,000.  Even after adjusting for these two errors, Craig's net worth is likely well in excess of the FEC's $685,000 estimate, given that defendants failed to provide any information on the cash surrender value of three other retirement accounts that Craig holds (*see* FEC Facts ¶¶ 35.c.iii-v; FEC Exh. 8 at 8) or the value of Craig's share of the two limited liability companies he owns (*see* FEC Facts ¶ 35.g (citing FEC Exh. 8 at 13, Sched. 7)).

Thus, Craig is able to disgorge his profits and pay an appropriate civil penalty, and he should be required to do so.  Craig's current net worth reflects the profits of his offense, and so disgorgement would properly restore the pre-violation *status quo*.  As for the civil penalty, to be sure, all civil penalties impose difficulties on liable defendants.  But that is the point, since punishment is a proper purpose of a civil penalty.  Further, any difficulty Craig might experience from paying an effective civil penalty would be due in significant part to the amount of monthly expenses he has chosen to incur generally (allegedly, $14,451 per month (FEC Facts ¶ 40)), and particularly, the discretionary spending he has engaged in since being put on notice in May 2009 that he may face significant financial liability in this case (*see* FEC SJ Br. at 29).  Craig's income and home value are far above average for his place of residence, Boise, Idaho.  His claimed household income of more than $196,800 per year (*see* FEC Facts ¶ 39) is more than four times the median annual household income for Boise of $49,182.[23]  Craig's $600,000 home (FEC

---

[23]     U.S. Census Bureau, Quick Facts for Boise City, Idaho, http://quickfacts.census.gov/qfd/states/16/1608830.html.

Facts ¶ 35.b) is worth more than three times as much as the $188,200 median value of an owner-occupied home in Boise.  *See supra* note 23.  Craig has the resources to disgorge his illegal profits and pay an appropriate penalty while still maintaining a relatively high standard of living.

### D.      This Court Should Issue a Declaration and a Permanent Injunction

This Court should declare that defendants violated 2 U.S.C. § 439a(b) and permanently enjoin them from committing future violations.  *See* 2 U.S.C. § 437g(a)(6)(B); FEC SJ Br. at 30. In their opposition, defendants do not object to the FEC's requested declaratory relief, but they do oppose injunctive relief.  (Defs.' Opp'n at 25.)  An injunction under section 437g(a)(6)(B) is proper where "there is a likelihood of future violations," as evidenced by, *inter alia*, a "defendant's persistence in claiming that (and acting as if) his conduct is blameless," such as "by rejecting the FEC's attempts at conciliation."  *Furgatch*, 869 F.2d at 1262.  Here, defendants do not state that Craig will forego a future run for federal office.  Moreover, defendants did not conciliate with the Commission, and they continue to maintain that their conduct is blameless in this litigation.  Indeed, defendants continued to divert campaign funds to Craig's personal use more than eight months after being warned by the Senate Ethics Committee that they were likely violating FECA.  *See supra* p. 22.  For these reasons, a permanent injunction is warranted.

## III.    CONCLUSION

For the foregoing reasons, the Court should (1) hold that defendants violated 2 U.S.C. § 439a(b) and grant summary judgment in favor of the Commission; and (2) order appropriate remedies as the Commission has proposed under 2 U.S.C. § 437g(a)(6)(B).

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

*/s/ Kevin P. Hancock*
Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

January 10, 2014

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
FEDERAL ELECTION COMMISSION,              )
                                          )        Civ. No. 12-958 (ABJ)
        Plaintiff,                        )
                                          )
        v.                                )
                                          )        RESPONSE TO DEFENDANTS'
CRAIG FOR U.S. SENATE, *et al.*,          )        STATEMENT OF FACTS
                                          )
        Defendants.                       )
_____)

### PLAINTIFF FEDERAL ELECTION COMMISSION'S RESPONSE TO
### DEFENDANTS' STATEMENT OF ALLEGED MATERIAL FACTS IN DISPUTE

Lisa J. Stevenson
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

January 10, 2014

On September 30, 2013, plaintiff Federal Election Commission ("FEC" or "Commission") filed a motion for summary judgment accompanied by a statement of material facts as to which the FEC contends there is no genuine issue, as required by Local Civil Rule 7(h)(1). (*See* FEC's Statement of Material Facts as to Which It Contends There Is No Genuine Issue ("FEC Facts") (Docket No. 16).) In response, defendants failed to file "a separate document that responds directly and individually to the [Commission's] material facts" and indicates "whether or not a dispute exists as to each," as required by this Court's Scheduling Order and Local Civil Rule 7(h)(1). (*See* Scheduling Order at 3, ¶¶ 6-7 (Docket No. 14).) The FEC Facts should therefore be deemed admitted by defendants. *See, e.g.*, *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 61 n.3 (D.D.C. 2012) (deeming admitted paragraphs for which opposing party "did not cite to specific parts of the record controverting" moving party's statement).

With their opposition to the FEC's motion for summary judgment, however, defendants did file a statement of alleged material facts in dispute. (*See* Defs.' Statement of Material Facts in Dispute ("Defendants' Facts") (Docket No. 19-1).) But Defendants' Facts fail to present any genuine dispute of material fact for trial. The vast majority of Defendants' Facts are immaterial for the reasons noted below and explained more fully in the FEC's Reply Memorandum in Support of Its Motion for Summary Judgment ("FEC Reply Br.") (Docket No. 21), and so any disputes regarding those immaterial facts do not preclude this Court from granting the Commission's motion for summary judgment and the relief the Commission requests. To the extent defendants have presented any undisputed material facts, those facts support summary judgment in favor of the Commission. Below, pursuant to the Court's Scheduling Order (*see* Scheduling Order at 4, ¶ 11 (Docket No. 14)), the Commission responds to each of defendants' alleged facts individually.

1

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| 1 | Senator Craig plead guilty in Minnesota district court to a charge of disorderly conduct; specifically that he "[e]ngaged in conduct which [he] knew or should have known tended to arouse alarm or resentment of others which conduct was physical (versus verbal) in nature." (*See* Motion to Withdraw Plea, Exhibit E (Petition to Enter Plea) at 1, Defendants' ("Defs.')" Exhibit (Exh.") 1.) | Not disputed.<br><br>This alleged fact is material and supports summary judgment against defendants because it demonstrates that the conduct resulting in Senator Craig's arrest was personal and not officeholder-related. |
| 2 | The arresting officer reported that Senator Craig placed his roller bag against the front of his stall door, tapped his feet, moved his foot closer to the officer and swiped his hand under the stall divider a number of times. (*See* Defs.' Exh. 1 at 3-4; *see also* Defs.' Exh. 1, Exh. B at 7-8.) | Not disputed.<br><br>This alleged fact is material and supports summary judgment against defendants because it demonstrates that the conduct resulting in Senator Craig's arrest was personal and not officeholder-related. |
| 3 | After he was detained, Senator Craig displayed his "business card that identified himself as a United States Senator as he stated, 'What do you think about that?'" (Defs.' Exh. 1, Exh. B at 8.) | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |
| 4 | During the arresting officer's interview he informed Senator Craig that: "You're gonna have to pay a fine and that will be it. Okay. I don't call media. I don't do any of that type of crap." (Defs.' Exh. 1, Exh. C at 3.) | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |
| 5 | The officer also commented twice about Senator Craig's status as a Member of Congress. First, saying, "I guess I'm gonna say I'm just disappointed in you sir. I'm just really am. I expect this from the guy that we get out of the hood. I mean, people vote for you." As the interview concluded, he again commented, "Embarrassing, embarrassing. No wonder | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
|  | why we're going down the tubes." (Defs.' Exh. 1, Exh. C at 6.) | |
| 6 | As Senator Craig explained in his affidavit filed in connection with his withdrawal motion, "Deeply panicked about the events, and based on [the officer's] representations to me regarding the potential outcome, my interest in handling the matter expeditiously, and the risk that protracting the issue could lead to unnecessary publicity, I did not seek the advice of an attorney on the date of my arrest, and I made the decision on that date to seek a guilty plea to whatever charges would be lodged against me." (Defs.' Exh. 1, Exh. A ¶ 12.) On August 1, 2007, Senator Craig signed and returned "Petition to Enter Plea of Guilty – Misdemeanor" to the court. (Defs.' Exh. 1, Exh. E.) | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |
| 7 | In Senator Craig's mind, "the terms of the plea included the promise made by [the officer] that the alleged incident would not be released to the media." (Defs.' Exh. 1 at 6; *see also* Defs.' Exh. 1, Exh. A ¶¶ 12-13.) | Not disputed.<br>This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |
| 8 | Wishing to "seek a speedy resolution of the matter," Senator Craig "did not seek the advice of an attorney" before entering his plea. ((Defs.' Exh. 1, Exh. A ¶ 13.) Senator Craig plead guilty, in part because he was concerned that the allegations would be made public and that they would provide the *Idaho Statesman* with an excuse to publish the article it had been threatening to run. (Defs.' Exh. 1 at 2.) | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |
| 9 | In 2006, well before his arrest in Minnesota, Senator Craig learned that the *Idaho Statesman* was "investigating allegations related to alleged homosexual | Not disputed.<br>This alleged fact is immaterial because, *inter alia*, it does not concern Craig's personal |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| | activity by him." (Defs.' Exh. 1 at 1.) "The *Statesman's* investigation included such tactics as contacting scores of the Senator's friends and family, demanding the Senator's FBI files, and patrolling bars and restrooms with the Senator's picture." (*Id.*) | behavior on June 11, 2007 that resulted in his arrest and defendants' subsequent violation of 2 U.S.C. § 439a(b). |
| 10 | Senator Craig retained both legal counsel and media consulting services to address the *Statesman's* investigation. (*See* Affidavit of Michael O. Ware, Chief of Staff to Senator Craig, Defs.' Exh. 2 ¶ 3.) His campaign committee, Craig for U.S. Senate, paid for their services. *Id.* | Not disputed. This alleged fact is immaterial because, *inter alia*, it does not concern Craig's personal behavior on June 11, 2007 that resulted in his arrest and defendants' subsequent violation of 2 U.S.C. § 439a(b). |
| 11 | In June 2007, shortly before his Minnesota arrest, Senator Craig met with reporters for the *Statesman* and requested that the newspaper cease its harassment and other activities relating to its investigation. (*See* Defs.' Exh. 1 at 2.) | Not disputed. This alleged fact is immaterial because, *inter alia*, it does not concern Craig's personal behavior on June 11, 2007 that resulted in his arrest and defendants' subsequent violation of 2 U.S.C. § 439a(b). |
| 12 | Despite the arresting officer's statements to the contrary, the details relating to Senator Craig's arrest and misdemeanor plea soon became public. (*See* John McArkle, *Craig Arrested, Pleads Guilty Following Incident in Airport Restroom*, Roll Call, August 27, 2007, Defs.' Exh. 3.) | Not disputed. This alleged fact is immaterial because, *inter alia*, Craig's fear that his arrest for personal behavior would harm his reputation or status as an officeholder is irrelevant to whether defendants violated 2 U.S.C. § 439a(b). (*See* FEC Reply Br. at 3.) |
| 13 | After his plea became public, Senator Craig and his Chief of Staff viewed the matter as a continuation of the *Statesman* investigation. (*See* Defs.' Exhibit 2 ¶ 4.) As such, they sought assistance from the same legal and media consulting team that they had put into place to address the *Statesman* matter. (*Id.*) | To the extent the proposed fact extends beyond alleging "the new matter related to the same issues as the *Statesman* investigation," it is unsupported.  The fact is otherwise not disputed. This alleged fact is immaterial because, *inter alia*, Craig's reasons for selecting media consultants and the lawyers who would attempt to overturn his guilty plea have no bearing on whether he violated 2 U.S.C. § 439a(b). |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| 14 | In the days following the leak and publication of the story, two complaints relating to the Minnesota incident were filed with the Senate Select Committee on Ethics ("Ethics Committee"). (*See Politico,* Daniel W. Reilly, *Senate Republicans Urge Ethics Investigation of Craig,* August 28, 2007, Defs.' Exhibit 5; *see also* Letter (Complaint) from Melanie Sloan, Executive Director, Citizens for Responsibility and Ethics in Washington ("CREW") to the Hon. Barbara Boxer, Chair and the Hon. John Cornyn, Vice Chair, Senate Select Committee on Ethics (Aug. 28, 2007), Defs.' Exh. 4.) | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, it has no bearing on whether defendants violated 2 U.S.C. § 439a(b). |
| 15 | Senator Craig's legal counsel suggested that his campaign committee retain other counsel to assist with the Senate ethics issues. (Defs.' Exh. 2 ¶ 4.) | Disputed.  The alleged fact is hearsay, and defendants' citation to the record does not support the proposition asserted.<br><br>In any event, this alleged fact is immaterial because, *inter alia*, defendants' choice of counsel has no bearing on whether they violated 2 U.S.C. § 439a(b). |
| 16 | In response to a request from the Ethics Committee, on November 14, 2007, Senator Craig's counsel sent an eight-page letter to the Chairwoman and Ranking Member of the Committee. (Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to the Hon. Barbara Boxer, Chair and the Hon. John Cornyn, Vice Chair, Senate Select Committee on Ethics (Nov. 14, 2007), Defs.' Exh. 6.) | The Commission does not dispute that the letter was sent.<br><br>The Commission objects to this fact because defendants waived any advice-of-counsel defense in discovery.  (Defs.' Resp. to FEC's First Req. for Admission and First Set of Interrogs. at 9, Interrog. 5, FEC Exh. 6 (Docket 16-6); *see also* FEC Reply Br. at 8 & n.6.)<br><br>If considered, this alleged fact would nevertheless be immaterial because, *inter alia*, this letter fails to demonstrate that defendants relied in good faith on the Kolbe advisory opinion while spending campaign funds on legal fees in their attempt to overturn Craig's guilty plea.  Also, the letter is dated after October 29, 2007, when Craig had already started spending campaign funds on his Minnesota legal fees.  (*See* FEC Reply Br. at |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| | | 7-9.)  In any event, even if the letter did demonstrate relevant reliance on the Kolbe opinion, it still would not preclude summary judgment for the FEC.  (*See id.* at 7 n.4.) |
| 17 | Senator Craig's counsel cited to the Kolbe advisory opinion, explaining that the FEC had recently advised "that a member of Congress could utilize campaign funds to pay for legal expenses incurred in connection with inquiries by House Ethics Committee and the Department of Justice. FEC AO 2006-35 [Kolbe]." (*Id.* at 7 (emphasis added).) The letter continued: "Relying on the advice of counsel and applying this framework, Senator Craig determined that the FEC guidance was clear and controlling on this issue. All expenditures of campaign funds for legal fees have been properly reported in accordance with FEC regulations." (*Id.*) | The Commission does not dispute that the letter was sent as quoted. The Commission objects to this fact because defendants waived any advice-of-counsel defense in discovery.  (Defs.' Resp. to FEC's First Req. for Admission and First Set of Interrogs. at 9, Interrog. 5, FEC Exh. 6 (Docket 16-6); *see also* FEC Reply Br. at 8 & n.6.) If considered, this alleged fact would nevertheless be immaterial because, *inter alia*, the November 14, 2007 letter cited does not show that defendants relied on the Kolbe opinion for their spending on legal representation to attempt to overturn Craig's guilty plea in Minnesota.  Also, the letter is dated after October 29, 2007, when Craig had already started spending campaign funds on his Minnesota legal fees.  (*See* FEC Reply Br. at 7-9.)  In any event, even if the letter did show relevant reliance on the Kolbe opinion, this would not preclude summary judgment for the FEC.  (*See id.* at 7 n.4.) |
| 18 | During this process and based on this legal opinion, defendants "were confident that the use of campaign committee funds for these expenses was legal and customary." Senator Craig would not have made the committee expenditures had they not received authorization from counsel. (Defs.' Exh. 2 ¶ 7.) | Disputed.  The alleged fact is hearsay, and the citation to the record does not support the proposition asserted. The Commission objects to this fact because defendants waived any advice-of-counsel defense on the merits during discovery, and, in any event, defendants' state of mind is irrelevant to their violation.  (*See* FEC Reply Br. at 8 & n.6.) If considered, this alleged fact would nevertheless be immaterial because, *inter alia*, it does not demonstrate that defendants relied in good faith on the Kolbe advisory opinion while spending campaign funds on legal fees |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| | | in their attempt to overturn Craig's guilty plea.  (*See id.* at 6-9.) |
| 19 | On February 13, 2008, the Committee issued a "Public Letter of Admonition" to Senator Craig, finding that: "The conduct to which you pled guilty, together with your related and subsequent conduct . . . constitutes improper conduct reflecting discreditably on the Senate and through this letter the Select Committee on Ethics, on behalf of and pursuant to authority granted by the United States Senate, publicly admonishes you for that conduct." (Letter from Six Members of the Senate Select Committee on Ethics to the Hon. Larry E. Craig (Feb. 13, 2008), Defs.' Exh. 7 at 2.) | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, any effect that Craig's arrest for personal behavior may have had on his officeholder reputation or status has no bearing on whether defendants violated 2 U.S.C. § 439a(b).  (*See* FEC Reply Br. at 3.) |
| 20 | On June 5, 2008, Senator Craig submitted a legal trust fund agreement to the Ethics Committee, requesting approval of the "Fund for Justice." (Fund for Justice (A Legal Trust Fund for Hon. Larry Craig) Agreement (June 5, 2008), Defs.' Exh. 8.) Attached to the Agreement was an "Affidavit of Senator Larry E. Craig," stating that: "This fund is necessitated by, and intended to defray, legal expenses and related expenses I incur and am responsible for in connection with the *State of Minnesota v. Larry E. Craig*, a criminal action arising from an incident that occurred while I was returning to the United States Senate to cast a vote and therefore related to my service to the United States Senate." (*Id.*, Craig Aff. at 1.) | Disputed to the extent that the first sentence of this alleged fact is not supported by defendants' citation to the record and the embedded legal assertion that funds spent in the effort to withdraw Craig's guilty plea were "related to" his Senate service is incorrect.  Otherwise, this alleged fact is not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, the Senate Ethics Committee's approval of a legal defense fund under its rules does not establish that defendants' use of campaign funds was legal under the Federal Election Campaign Act ("FECA"), 2 U.S.C. §§ 431-57, as the Senate Ethics Committee warned defendants.  (*See* FEC Reply Br. at 3-4.) |
| 21 | On July 25, 2008 The Ethics Committee approved Senator Craig's request to establish a legal defense fund "to pay for expenses incurred by you in connection with *State of Minnesota v. Larry Edwin Craig*, a criminal action." (Letter from | Not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, the Senate Ethics Committee's approval of a legal defense fund under its rules does not establish that defendants' use of campaign funds was legal under FECA, as the Senate |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| | Hon. Barbara Boxer, Chair and the Hon. John Cornyn, Vice Chair, Senate Select Committee on Ethics to Larry E. Craig (July 25, 2008), Defs.' Exh. 9 at 1.) | Ethics Committee warned defendants in the exhibit cited.  (*See* FEC Reply Br. at 3-4.) |
| 22 | Senator Craig's legal defense fund, the "Fund for Justice," received thousands of dollars in contributions. (*See* Defs.' Exh. 10 (spreadsheet listing legal defense fund contributions).) Senator Craig also expended personal funds in the course of this matter. (*See, e.g.,* Defs.' Exh. 16 ($1,797.51 invoice for expenses relating to legal defense fund).) | Not disputed to the extent that the cited evidence shows that Craig spent $1,797.51 on his legal defense fund.<br><br>This alleged fact is immaterial because, *inter alia*, defendants' use of money from donors to Craig's legal defense fund, who knew they were supporting Craig's effort to withdraw his guilty plea, has no bearing on the legality of defendants' use of money from contributors to Craig's campaign committee, who had no idea they were supporting such an effort.  (*See* FEC Reply Br. at 4.) |
| 23 | On August 10, 2009, Senator Craig's counsel sent a detailed letter responding to the Commission's Factual and Legal Analysis. (Letter from Stanley M. Brand and Andrew D. Herman, Brand Law Group to Thomasenia P. Duncan, FEC (Aug. 10, 2009), Defs.' Exh.11.) In that letter, Senator Craig's counsel articulated its position regarding the official elements of the Minnesota case and provided extensive citations to the Commission's relevant advisory opinions. (*Id.* at 2-4.) The letter also addressed a newly-minted "necessary nexus" standard proposed by the Commission and demonstrated that it had no basis in relevant law, regulations or previous advisory opinions. (*Id.* at 4.) | Disputed to the extent that defendants rely on the incorrect legal assertion that the letter "addressed a newly-minted 'necessary nexus' standard proposed by the Commission and demonstrated that it had no basis in relevant law, regulations or previous advisory opinions."  The FEC Factual and Legal Analysis that defendants' exhibit refers to (*see* Defs' Exh. 11 at 4 (citing Docket No. 5-1)) used the "necessary nexus" phrase not as a legal term of art, but as a descriptive shorthand for the actual legal standard (*see* Docket No. 5-1 at 10), which the analysis states in full a page earlier (*id.* at 9), and which the FEC has consistently applied throughout this matter.  Thus, there was no "newly-minted" standard and defendants did not demonstrate that it had no basis in law. (*See* FEC Reply Br. at 22 n.22.)<br><br>The first two sentences of this alleged fact are not disputed.<br><br>This alleged fact is immaterial because, *inter alia*, defendants' counsel's opinion as to whether defendants violated FECA has no bearing on whether defendants in fact violated |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| | | FECA. |
| 24 | On September 21, 2009, defendants also responded to the Commission's request for invoices relating to legal services provided to Senator Craig and provided those invoices to the Commission. (Letter from Andrew D. Herman, Brand Law Group to the Shana Broussard, FEC (Sept. 21, 2008), Defs.' Exh. 12.) | Not disputed. This alleged fact is immaterial because, *inter alia*, it has no bearing on whether defendants violated 2 U.S.C. § 439a(b), and defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea.  (*See* FEC Reply Br. at 10-12.) |
| 25 | Senator Craig's expenditures in connection with his effort to withdraw his guilty plea do not all relate solely to those efforts, and some of the fees for those services could be partially or fully paid with committee funds: | Disputed.  Defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea. (*See* FEC Facts ¶ 23.)  Also, defendants' legal conclusion that "some of the fees for those services could be partially or fully paid with committee funds" is inaccurate for the reasons explained in the FEC's reply brief.  (*See* FEC Reply Br. at 10-12.) |
| 25 a | The September 27, 2007, Invoice from Kelly & Jacobson, Attorneys At Law, lists activity relating to "media calls." (Defs' Exh. 13 at "Craig 44"); | Not disputed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 b | The October 26, 2007, Invoice from Sutherland, Asbill & Brennan LLP lists numerous activities relating to media issues, conferences with senatorial staff, "political issues," and ethics issues. (Defs.' Exh. 13 at "Craig 36, 35, 34, 33, 32, 31"); | Not disputed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 c | The November 16, 2007, Invoice from Sutherland, Asbill & Brennan LLP lists numerous activities relating to media issues, conferences with senatorial staff, political issues, and ethics issues. (Defs.' | Not disputed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| | Exh. 13 at "Craig 51, 50, 49"); | guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 d | The January 1, 2008, Invoice from Kelly & Jacobson, Attorneys At Law, lists activity relating to "Handl[ing] calls from sources wanting factual information relevant to the case." (Defs' Exh. 13 at "Craig 79, 87"); | Not disputed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 e | The January 7, 2008, Invoice from Sutherland, Asbill & Brennan LLP lists numerous activities relating to media issues, conferences with senatorial staff, political issues, and ethics issues. (Defs.' Exh. 13 at "Craig 59-61"); | Disputed to the extent defendants claim there are "numerous" such activities listed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 f | The January 17, 2008, Invoice from Sutherland, Asbill & Brennan LLP lists numerous activities relating to media issues, conferences with senatorial staff, political issues, and ethics issues. (Defs.' Exh. 13 at "Craig 71"); | Disputed to the extent defendants claim there are "numerous" such activities listed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 g | The September 17, 2008, Invoice from Kelly & Jacobson, Attorneys At Law, lists activity relating to a "Post-hearing press conference." (Defs' Exh. 13 at "Craig 75"); | Not disputed. This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 | The November 1, 2007, Invoice from the Brand Law Group, PC lists numerous | Not disputed. |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| h | activities relating to "FEC rules" and related FEC issues. (Defs.' Exh. 13 at Craig 41-42"; | This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 25 i | The December 7, 2007, Invoice from the Brand Law Group, PC lists activities relating to "FEC fees guidance" and "FEC proposed rule (use of campaign funds)." (Defs.' Exh. 13 at Craig 55-56".) | Not disputed. <br><br> This alleged fact fails to create a genuine issue because, *inter alia*, defendants admitted in their answer that they spent at least $216,984 in their effort to withdraw Craig's guilty plea, and the phrase does not establish that defendants spent less than that amount. (*See* FEC Reply Br. at 10-12.) |
| 26 | Senator Craig and his wife disclosed a "total net worth" of *negative* $155,258.12. (Financial Disclosure Statement of Larry E. Craig (Aug. 13, 2013) ("Fin. Discl. Stmt.") at 4, Summary, FEC Exhibit 8.) | Not disputed to the extent that this alleged fact asserts that defendants state on page four of Craig's financial summary that his "total net worth" is negative $155,258.12. (FEC Exh. 8 at 4.) <br><br> This alleged fact is immaterial, however, because defendants do not dispute the FEC's proposed material fact accurately stating that Craig's net worth is — in reality — at least $685,827.85.  (*See* FEC Facts ¶ 41.) Defendants inaccurately calculated Craig's net worth by omitting more than $860,000 in assets Craig admitted having elsewhere in his financial disclosure form and related documents.  (*See* FEC Reply Br. at 23-24 (citing FEC Exhs. 8-9)).  Craig's true net worth is likely well in excess of $685,827.85 due to additional omissions defendants made on Craig's financial disclosure form.  (*See id.* at 24 (citing FEC Facts ¶¶ 35.c.iii-v, 35.g; FEC Exh. 8 at 8, 13).) <br><br> Also, this fact fails to create a genuine issue because, *inter alia*, it allegedly relates only to the appropriate remedies for defendants' FECA violation. |

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| 27 | The "Fair Market Value" of his home is $190,466.41. (*Id.* at 7, Schedule 3.) | Not disputed to the extent that this alleged fact asserts that defendants state on page seven of Craig's financial disclosure form that the "Fair Market Value" of Craig's home is $190,466.41.  (*See* FEC Exh. 8 at 7.)<br><br>This alleged fact is immaterial, however, because defendants do not dispute the FEC's proposed material fact accurately stating that Craig's home's value is — in reality — $600,000.  (*See* FEC Fact ¶ 35.b.)  Defendants inaccurately calculated Craig's home's value as only $190,446 (*see* FEC Exh. 8 at 4) by counting Craig's unpaid mortgage amount ($409,553.59) as not only a liability (*see* FEC Exh. 8 at 4 (listing a $410,000 mortgage liability)), but also as a deduction from the value of his home on the asset side of the ledger (*see id.* at 7 (stating that $190,466.41 is the home's "market price less unpaid mortgage" of $409,553.59)).  (*See* FEC Reply Br. at 23-24.)<br><br>Also, this fact fails to create a genuine issue because, *inter alia*, it allegedly relates only to the appropriate remedies for defendants' FECA violation. |
| 28 | The "Current Value" of his 1977 Bertram Motor Vessel is negative $15,000. (*Id.* at 11, Schedule 6.) Both automobiles are leased and have "no value to owner." (*Id.*) | Not disputed to the extent that this information is what defendants assert on Craig's financial disclosure form.  (*See* FEC Exh. 8.)  Defendants provide no basis for their assertion, and the FEC notes that similar yachts can be found for sale today for $85,900[1] and $109,000.[2]<br><br>Also, this fact fails to create a genuine issue because, *inter alia*, it allegedly relates only to the appropriate remedies for defendants' FECA violation. |

[1]      *See* http://www.boattrader.com/listing/1977-Bertram-42-Motor-Yacht-102083953 (last visited Jan. 9, 2014).

[2]      *See* http://www.yachtworld.com/boats/1977/Bertram-42-foot-Convertible-2236214/Montauk/NY/United-States#.UjeAcn_iv8A (last visited Jan. 9, 2014).

| # | Defendants' Alleged Material Fact | FEC Response |
|---|---|---|
| 29 | Senator Craig is currently drawing about $2500 a month from his Thrift Savings Plan for living expenses. (*Id.* at 8; Schedule 4; 20, Schedule 21.) | Not disputed to the extent that this information is what defendants assert on Craig's financial disclosure form, and that Craig alleges that his current required expenses are in excess of $14,000 per month. (*See* FEC Exh. 8.)<br><br>Also, this fact fails to create a genuine issue because, *inter alia*, it allegedly relates only to the appropriate remedies for defendants' FECA violation. |

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law

Kevin Deeley
Acting Associate General Counsel

Harry J. Summers
Assistant General Counsel

Robert W. Bonham III
Senior Attorney

*/s/ Kevin P. Hancock*
Kevin P. Hancock
Attorney

COUNSEL FOR PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

January 10, 2014