# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
FEDERAL ELECTION COMMISSION,   )
)
              Plaintiff,   )
)
         v.            )      Civil Action No. 12-0958 (ABJ)
)
CRAIG FOR U.S. SENATE, *et al.*,   )
)
          Defendants.   )
_____)

## MEMORANDUM OPINION

This opinion arises out of former Senator Larry Craig's efforts to withdraw the guilty plea he entered in Minnesota state court in 2007, after he was arrested for disorderly conduct in the Minneapolis-St. Paul International Airport. On June 11, 2012, the Federal Election Commission ("FEC" or "the Commission") brought suit against defendants Craig, the Craig for U.S. Senate campaign committee ("Craig Committee"), and Kaye L. O'Riordan, the former treasurer of the Craig Committee,[1] contending that defendants converted campaign funds to personal use in violation of the Federal Election Campaign Act ("FECA" or "the Act") when they expended those funds to pay legal fees incurred in connection with Senator Craig's efforts to withdraw his plea. Defendants moved to dismiss the complaint for failure to state a claim on August 2, 2012, and the Court denied that motion on March 28, 2013. The FEC then moved for summary judgment on September 30, 2013, seeking an order disgorging from Senator Craig the $216,984 sum that the FEC contends was unlawfully converted, a $70,000 civil penalty against

---

[1]     Defendant Craig has since been substituted for Ms. O'Riordan as the treasurer for the Craig Committee, and he is now named as a defendant in this case in both his personal and official capacities. *See* May 1, 2013 Minute Order.

defendant Craig, a $70,000 civil penalty against the Craig Committee, and declaratory and injunctive relief.

The Court will grant the FEC's motion, although it will not award all of the relief the FEC seeks. The Court finds that defendants violated the FECA when they converted campaign funds to pay for legal expenses related to Senator Craig's efforts to withdraw his guilty plea, which was a personal matter that was not connected to the Senator's duties as an officeholder. Furthermore, the Court finds that the circumstances of this case merit the imposition of both a penalty and an order of disgorgement, as well as the declaratory relief the FEC seeks. But the Court finds that the amount that was unlawfully converted totals $197,535, not $216,984, and that a penalty of $45,000 against Senator Craig is appropriate in this case. The Court will therefore order Senator Craig to pay a total of $242,535 to the U.S. Department of the Treasury, which is comprised of the amount he was unjustly enriched plus the additional penalty. The Court will not order any relief against the now defunct Craig Committee, nor will it issue an injunction in this case.

## BACKGROUND

The following facts are not in dispute.[2] Defendant Larry Craig was a United States Senator from Idaho from January, 1991 to January, 2009. Compl. [Dkt. # 1] ¶ 6; Answer [Dkt. # 12] ¶ 6. Senator Craig is named in this case both in his personal capacity and in his official

---

2       Defendants did not file a statement of material facts in dispute that directly responded to the statement of undisputed material facts filed by the FEC, as required by the Local Rules of this Court and this Court's Scheduling Order [Dkt. # 14]. *See* LCvR 7(h)(1) ("In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). Instead, defendants filed a non-responsive statement of their own disputed facts. *See* Defs.' Statement of Material Facts in Dispute [Dkt. # 19-1]. The FEC, however, filed an additional statement of facts that directly responds to defendants' statement, which the Court will rely on in part to set forth the facts of this case. *See* FEC's Resp. to Defs.' Statement of Alleged Material Facts in Dispute [Dkt. # 21].

capacity as treasurer of defendant Craig for U.S. Senate. *See* May 1, 2013 Minute Order. Defendant Craig for U.S. Senate is a political committee authorized to receive contributions and make expenditures on behalf of defendant Craig. Compl. ¶ 7; Answer ¶ 7. Plaintiff, the Federal Election Commission, is an agency of the United States government that is authorized to enforce the Federal Election Campaign Act. Compl. ¶ 5; Answer ¶ 5.

On June 11, 2007, Senator Craig was arrested in the Minneapolis-St. Paul International Airport and charged with two violations of Minnesota criminal law: "disturbing the peace-disorderly conduct," and interference with privacy. Compl. ¶ 12; Answer ¶ 12. On August 8, 2007, Senator Craig pled guilty to disorderly conduct, a misdemeanor. Compl. ¶ 12; Answer ¶ 12; *see also* FEC's Resp. to Defs.' Statement of Alleged Material Facts in Dispute [Dkt. # 21] ¶ 1 ("FEC Facts Resp."). But on September 10, 2007, Senator Craig filed a motion in Minnesota state district court to withdraw his guilty plea. Compl. ¶ 14; Answer ¶ 14. Senator Craig's efforts to withdraw his plea were unsuccessful, and his final appeal was denied on December 9, 2008. Compl. ¶ 14; Answer ¶ 14.

On September 1, 2007, after the arrest and conviction became the subject of national media attention, Senator Craig announced his intention to resign from the Senate effective September 30, 2007. Compl. ¶ 15; Answer ¶ 15. Meanwhile, the U.S. Senate Select Committee on Ethics ("Senate Ethics Committee") launched an inquiry into the Senator's arrest, guilty plea, and subsequent conduct. Compl. ¶ 16; Answer ¶ 16. Senator Craig then decided not to resign so that he could "continue [his] effort to clear [his] name in the Senate Ethics Committee," and he retired at the end of his term in January 2009 instead. Compl. ¶ 17; Answer ¶ 17.

On July 25, 2008, the Senate Ethics Committee authorized Senator Craig to establish a legal expense trust fund "to pay for expenses incurred in connection with" the Minnesota

litigation, although it warned Senator Craig that its "approval of the Fund and of the trust agreement [did] not indicate approval of [his] continuation of the proceedings in" Minnesota. Ex. 9 to Defs.' Opp. to Pl.'s Mot. for Summ. J. ("Defs.' Opp.") [Dkt. # 19-11] at 1. The Committee also warned that it would "consider any further use of [Senator Craig's] campaign funds for legal expenses without the Committee's approval to be conduct demonstrating [his] continuing disregard of ethics requirements." *Id.* at 2.

Between July 9, 2007 and October 5, 2008, the Craig Committee disbursed more than $480,000 of campaign funds for legal fees and other expenses. Compl. ¶ 18; Answer ¶ 18. The Craig Committee paid at least $139,952 to the law firm of Sutherland, Asbill & Brennan LLP for its legal services to Senator Craig in connection with his efforts to withdraw his guilty plea, and approximately $77,032 to the law firm of Kelly & Jacobson for similar services, for a total of $216,984. Compl. ¶¶ 19–20; Answer ¶¶ 19–20.

On February 13, 2008, the Senate Ethics Committee issued a "Public Letter of Admonition" to Senator Craig, which stated that some portion of the Craig Committee's expenditures "may not be deemed to have been incurred in connection with [Senator Craig's] official duties, either by the Committee or by the Federal Election Commission." Ex. 7 to Defs.' Opp. [Dkt. # 19-9] at 2. Then, on November 10, 2008, the FEC received an administrative complaint alleging that Senator Craig had violated the FECA by spending more than $213,000 in campaign funds to pay legal fees and expenses incurred in connection with his attempts to withdraw his guilty plea. Compl. ¶ 24; Answer ¶ 24. The FEC investigated the complaint and attempts to resolve the matter short of litigation were unsuccessful. Compl. ¶¶ 25–30; Answer ¶¶ 25–30.

The FEC filed this lawsuit on June 11, 2012, claiming that defendants violated 52 U.S.C. § 30114(b)[3] when they disbursed campaign funds to pay legal expenses related to the Senator's efforts to withdraw his guilty plea in Minnesota. Compl. ¶¶ 33–34. The FEC alleged that defendants unlawfully "converted the Craig Committee's funds to personal use" because these expenditures were not "made in connection with Mr. Craig's campaign for federal office and were not ordinary and necessary expenses incurred in connection with his duties as a Senator." *Id.* ¶ 33. Defendants moved to dismiss the complaint on August 2, 2012 for failure to state a claim. Defs.' Mot. to Dismiss [Dkt. # 3]. On March 28, 2013, the Court denied defendants' motion. *See FEC v. Craig for U.S. Senate*, 933 F. Supp. 2d 111, 113 (D.D.C. 2013). Accepting the allegations in the complaint as true, the Court found that the FEC had stated a claim that defendants violated the Act by converting campaign funds to personal use. *Id.* at 116–119. The Court further found that defendants had failed to demonstrate that they were immune from prosecution based on their alleged reliance on prior FEC Advisory Opinions because all of those opinions were distinguishable. *Id.* at 120–25.

Following the Court's ruling on the motion to dismiss, on April 11, 2013, defendants filed an answer that admitted nearly all of the factual allegations in the complaint. *See* Answer ¶¶ 12–31. Then, on September 30, 2013, the FEC moved for summary judgment. FEC's Mot. for Summ. J. [Dkt. # 16] ("FEC Mot."). The FEC sought the following relief in addition to the entry of judgment in its favor: an order disgorging from Senator Craig the $216,984 disbursed to Sutherland, Asbill & Brennan LLP and Kelly & Jacobson; a $70,000 civil penalty against Senator Craig; a $70,000 civil penalty against the Craig Committee; a declaration that defendants

---

3       All of pleadings in this case, as well as the Court's previous opinion, refer to the relevant portion of the FECA as 2 U.S.C. § 439a(b). As of September 1, 2014, however, that provision was recodified at 52 U.S.C. § 30114(b).

violated the Act; and a permanent injunction against all defendants prohibiting them from violating the Act in the future. *Id.* at 14. Defendants opposed the FEC's motion on November 13, 2013, arguing in part that a portion of the legal fees were lawful campaign expenditures. Defs.' Opp. [Dkt. # 19]. Plaintiff filed its reply on January 10, 2014. FEC's Reply Mem. [Dkt. # 21] ("FEC Reply"). The Court heard oral argument on plaintiff's motion on July 17, 2014. After the hearing, the Court ordered defendants to submit a supplemental pleading "itemizing and quantifying all of the legal expenses included in any of the bills submitted . . . by Kelly & Jacobson and Sutherland, Asbill, and Brennan" that defendants maintained were permissible. July 17, 2014 Minute Order. Defendants submitted their pleading on August 15, 2014, and the FEC responded on August 29, 2014. Defs.' Pleading Itemizing & Quantifying Legal Expenses [Dkt. # 24] ("Defs.' Supp. Mem."); FEC's Resp. to Defs.' Pleading [Dkt. # 25] ("FEC Resp.").

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the

non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

The Court finds that there are no genuine issues of material fact in dispute in this case, and that defendants are liable as a matter of law for converting campaign funds to personal use in violation of section 30114(b) of the FECA. Defendants admitted all of the material facts with respect to their liability in their answer to the complaint, and the Court has already concluded that those facts amount to a violation of the federal campaign finance law. The Court has wide discretion to fashion a remedy in this case, and it will order defendant Craig to pay $242,535 to the United States Department of the Treasury. This amount is comprised of a disgorgement of $197,535, the amount of campaign funds that were unlawfully converted to personal use, plus a penalty of $45,000, which the Court finds necessary and appropriate to punish defendants' misconduct and to deter future misconduct by others. The Court will also issue the declaratory relief that the FEC seeks, but it finds that injunctive relief is not appropriate in this case.

## I.      Defendants violated 52 U.S.C. § 30114(b).

In its previous opinion in this case, the Court found that, accepting the allegations in the complaint as true, the FEC had shown that defendants had violated the FECA's ban on

converting campaign funds to personal use.[4] *See Craig*, 933 F. Supp. 2d at 116–119. The Court "reject[ed] defendants' assertion that the expenditures were permitted under the Act" because it found that legal expenses incurred in withdrawing a plea to personal criminal conduct in the airport could not be characterized as "ordinary and necessary expenses in connection with Senator Craig's duties as an office holder." *Id.* at 113. Therefore, "the campaign funds were converted to Senator Craig's personal use as that term is defined in the Act." *Id.* In addition, the Court found that defendants could not find safe harbor in prior FEC opinions since they had "misstate[d] the holding of those opinions, minimize[d] the key distinctions between those cases and [their own], and disregard[ed] clear admonitory language" in the advisory opinion on which they relied most heavily. *Id.*

After the court issued its opinion denying defendants' motion to dismiss, defendants answered and admitted the critical facts. *Compare* Compl. ¶¶ 12–31 (setting forth the facts section of the complaint), *with* Answer ¶¶ 12–31 (admitting all of the factual allegations contained in the corresponding paragraphs of the complaint but maintaining Senator Craig's innocence as a matter of law). In particular, defendants admitted that "the Sutherland law firm received at least $139,952 for providing legal services to Mr. Craig in connection with his efforts to withdraw his guilty plea," and that "[t]he Kelly law firm received approximately $77,032 from the Craig Committee for providing legal services to Mr. Craig in connection with efforts to withdraw his guilty plea." Compl. ¶¶ 19–20; Answer ¶¶ 19–20. Thus, defendants have now admitted to utilizing campaign funds in a manner that the Court has already found to be a

---

4        Section 30114(b) prohibits individuals from converting campaign funds to personal use. 52 U.S.C. § 30114(b)(1). The statute specifies that a contribution to a campaign fund "shall be considered to be converted to personal use if the contribution . . . is used to fulfill any commitment . . . or expense of a person that would exist irrespective of the candidate's election campaign or the individual's duties as a holder of Federal office." *Id.* at § 30114(b)(2).

violation of the personal use ban of the FECA. *See Craig*, 933 F. Supp. 2d at 113; *see also* Defs.' Opp. at 2 ("Although defendants maintain that they did not violate the [FECA's] personal use ban, they recognize that the Court's order denying their motion to dismiss essentially held to the contrary."). On that basis, alone, the Court could grant summary judgment to the FEC.

Nevertheless, defendants contend that the FEC's motion should be denied because "material facts . . . remain in doubt." Defs.' Opp. at 2. First, defendants take issue with the Commission's failure, in their view, "to provide a full and accurate depiction of facts material to this matter." *Id.* at 4. Defendants submit that the FEC has not taken the following facts into account: the date on which Senator Craig retained counsel; Senator Craig's reliance on the arresting officer's assurance that he would not "call media"; Senator Craig's state of mind immediately after his arrest; and Senator Craig's dispute with the *Idaho Statesman* newspaper. *Id.* at 4–6; *see also* Defs.' Statement of Material Facts in Dispute [Dkt. # 19-1] ¶¶ 1–15. But even if all of these alleged facts are true, they do nothing to alter the Court's conclusion that defendants' expenditure of campaign funds in connection with the Minnesota matter violated the FECA's personal use ban. *See Craig*, 933 F. Supp. 2d at 118 ("Neither the charge nor the underlying conduct had anything to do with [Senator Craig's] performance of his official duties, so the legal expenses they generated were not incurred in connection with those duties."). These facts may illuminate *why* Senator Craig did what he did, but they do not change *what* he did: the Senator's arrest was personal and the attendant legal expenditures were not incurred in connection with his official duties, even if he either elected to plead guilty or to change course with his public image in mind.

Defendants also claim that there is an issue of material fact with respect to defendants' good-faith reliance on an FEC Advisory Opinion. Defs.' Opp. at 7, 9–11, citing FEC AO 2006-

35 (Kolbe), 2007 WL 419188 (Jan. 26, 2007). But the Court has already concluded that any reliance by defendants on the Kolbe opinion does not relieve them of liability because the Kolbe opinion does not actually support their claims. *Craig*, 933 F. Supp. 2d at 124 ("[D]efendants' suggestion that the [Kolbe] Advisory Opinion stands for something other than what it said is unsupported."). Although the question of defendants' good faith may still be relevant to the question of punishment and the Court's determination of the remedy it will impose, *see infra* section III.B.1, it does not alter the Court's finding that defendants violated section 30114(b).

Next, defendants argue that the Court cannot grant summary judgment for the FEC because there is a question of material fact as to the total amount of funds defendants converted to personal use. Defs.' Opp. at 12–13. The Court agrees that the FEC has failed to pinpoint the precise dollar amount that defendants unlawfully converted, but that is not a material fact that precludes summary judgment. There is no question that defendants unlawfully converted funds to personal use. Thus, there is no material fact in dispute on the question of defendants' liability. Rather, the dispute centers on the amount of that liability, which the Court will address further below.[5]

---

[5] The Court also notes that the lack of clarity surrounding the expenditures in this case is attributable to defendants' own actions. Defendants claim, with justification, that some of their legal expenditures qualify for payment with campaign funds under two FEC Advisory Opinions. Defs.' Opp. at 12–13, citing FEC AO 2008-7 (Vitter), 2008 WL 4265321, at *4–5 (Sept. 9, 2008), *and* FEC AO 1998-1 (Hilliard), 1998 WL 108618, at *4 (Feb. 27, 1998). But these opinions also clearly place the onus on defendants to obtain "billing documentation" that "provide[s] sufficient details as to the precise legal services rendered" so that there are "adequate records to determine which amounts are lawfully payable from campaign funds." Hilliard, 1998 WL 108618, at *5; *see also* Vitter, 2008 WL 4265321, at *5 (outlining the requirement to "maintain appropriate documentation"). Defendants did not obtain this detailed documentation, or at least they have yet to provide it to the FEC or the Court, even after repeated requests that they do so. So, they have no grounds to complain about the FEC's over-inclusiveness or lack of precision, and they did little to carry their burden to establish the amount of the legal expenses that qualified for at least partial payment with campaign funds.

Finally, defendants argue that a recently-released FEC Advisory Opinion indicates that they should not be found liable in this case. Defs.' Opp. at 15, citing FEC AO 2013-11 (Miller), 2013 WL 6022101 (Oct. 31, 2013). But this opinion has no bearing on defendants' case. The Advisory Opinion concerns Joe Miller, a former candidate for U.S. Senate in Alaska. During Miller's campaign, certain media outlets sued to obtain personnel records related to his previous public employment. *Id.* at *1. The court found that Miller's "right to privacy . . . [was] outweighed by the public's significant interest in the background of a public figure that is running for U.S. Senate," and ordered the release of the records. *Id.* Miller then requested an Advisory Opinion from the FEC as to whether his campaign committee could use campaign funds to post the cash deposit required to appeal the ruling, "and/or to pay the judgment should his appeal be unsuccessful." *Id.* at *2. The FEC determined that it was lawful for Miller to use campaign funds in this manner because the underlying lawsuit and the verdict would not have arisen but for Miller's status as a candidate for office. *Id.* at *3. As the FEC explained: "[T]he Alaska media outlets' suit to obtain Miller's personnel records, as well as the court's order granting that relief, directly related to his federal campaign." *Id.*

Defendants claim that "[m]uch like Miller's decision to fight disclosure of personal material that could harm his campaign, Senator Craig's challenge to his plea stemmed from his desire to counter allegations that he believed would be damaging to his public stature as a United States Senator and his viability as a future candidate." Defs.' Opp. at 15–16. But the Miller ruling was not based on the fact that Miller had his public profile in mind; it was based on the fact that the lawsuit in which the fees were incurred was occasioned by his status as a candidate for office. As the FEC put it, "the lawsuit would not have existed irrespective of Miller's campaign," 2013 WL 6022101, at *2, and that is simply not the case for the criminal proceedings

in Minnesota. Moreover, since the Miller Advisory Opinion was not issued until October 2013, there can be no argument that defendants relied on it in good faith to justify expenditures that began in 2007.

Thus, the Court finds that defendants have not identified any material facts in dispute as to their liability. The Court therefore holds that defendants violated section 30114(b) of the FECA by converting campaign funds to the personal use of Senator Craig.

## II. Defendants converted $197,535 to personal use in violation of the FECA.

Although the FEC has proven that defendants violated the FECA, neither the FEC nor defendants have established the precise amount of funds that defendants unlawfully converted. Defendants admitted in their answer that they paid $216,984 in campaign funds to the Sutherland and Kelly law firms for "legal services" related to the Minnesota guilty plea. *See* Answer ¶¶ 19–20; *see also* Compl. ¶¶ 19–20. But they contend that $46,464 of that amount was permissible under FEC Advisory Opinions that provide that spending on legal services related to media and ethics issues can be exempt from the personal use ban. *See* Defs.' Supp. Mem. at 1–4, 18. In response, the FEC argues that defendants have not carried their burden to establish that any portion of the $216,984 was permissibly spent, and it urges the Court to find that the full amount

was converted to personal use, or, in the alternative, to apply a flat discount rate of 10 percent, resulting in a reduction of only $10,856. FEC Resp. at 10–13.[6]

The Court finds that while defendants have established that some portion of the $216,984 in campaign funds was permissibly spent, their estimate of that lawful portion is over-inclusive. But the FEC's approach fares no better: it is under-inclusive, imprecise, and disconnected from its legal underpinnings. Therefore, the Court has undertaken its own line-by-line analysis of defendants' legal invoices, and it concludes – to the extent it is possible to derive a dollar figure – that $19,449 of the $216,984 spent was a permissible use of campaign funds under the principles set forth in the FEC's Hilliard and Vitter Advisory Opinions. *See* Appendix A (detailing the Court's calculations); *see also* Ex. 1 to FEC Resp. [Dkt. # 25-1] (the relevant invoices).

The Hilliard and Vitter opinions establish that certain legal expenses devoted to media relations or responding to ethics inquiries are partially or fully payable with campaign funds. These opinions are based upon the principle that these sorts of legal expenses would not ordinarily be incurred if the client were not a candidate or federal officeholder. *See* Vitter, 2008 WL 4265321, at *3–4; Hilliard, 1998 WL 108618, at *4. In the Hilliard opinion, the FEC stated

---

6       It is important to note that the FEC has already excluded significant portions of the campaign funds defendants spent in connection with the Minnesota matter from the $216,984 figure, apparently in keeping with the principles articulated in the Hilliard and Vitter Advisory Opinions. Specifically, the $216,984 the Commission seeks to recoup does not include the more than $100,000 defendants paid to Impact Strategies, a public relations firm, nor does it include the campaign funds paid to the Brand Law Group in connection with its representation of Senator Craig in the Senate Ethics Committee inquiry. *See* FEC Reply at 11 n.10 (noting the exclusion of the funds paid to Impact Strategies); Ex. 12 to FEC Reply [Dkt. # 21-1] at 5 (stating that defendants retained the Brand Law Group to respond to the Senate Ethics Committee inquiry); *see also* Hr'g Tr. at 7 (explaining that the FEC excluded all payments to Impact Strategies and the Brand Law Group). So the order of disgorgement imposed in this opinion does not include those expenditures.

that "any legal expense that relates directly and exclusively to dealing with the press . . . would qualify for 100% payment with campaign funds." 1998 WL 108618, at *4, quoting FEC Advisory Opinion 1997-12.[7] The Vitter opinion explains that "a candidate's campaign committee [may] pay legal fees incurred in preparing press releases, appearing at press conferences, meeting or talking with reporters, reviewing and monitoring media allegations, responding to media requests for comment, and conferring with the candidate or officeholder regarding media allegations." Vitter, 2008 WL 4265321, at *4 n.2. It also states that campaign funds may be used to pay legal fees and expenses incurred in responding to a Senate Ethics Committee inquiry, even when the alleged wrongdoing is "unrelated to candidacy and the duties of an officeholder." *Id.* at *3. Finally, both opinions make it clear that the party claiming that its use of campaign funds is permissible has the burden to obtain and retain records that show precisely which expenditures qualified for payment with campaign funds. *See* Hilliard, 1998 WL 108618, at *5 (stating that a campaign committee is required to obtain "billing documentation" from its attorneys that "provide[s] sufficient details as to the precise legal

---

7      In full, the Hilliard Advisory Opinion provides that:

   1) any legal expense that relates directly and exclusively to dealing with the press, such as preparing a press release, appearing at a press conference, or meeting or talking with reporters, would qualify for 100% payment with campaign funds because [the person is] a candidate or Federal officeholder;

   2) any legal expense that relates directly to allegations arising from campaign or officeholder activity would qualify for 100% payment with campaign funds;

   3) 50% of any legal expense not covered by 1 above that does not directly relate to allegations arising from campaign or officeholder activity can be paid for with campaign funds because [the person is] a candidate or Federal officeholder and [is] providing substantive responses to the press (beyond *pro forma* "no comment" statements).

1998 WL 108618, at *4, quoting FEC Advisory Opinion 1997-12 (alteration in original).

services rendered" so that there are "adequate records to determine which amounts [were] lawfully payable from campaign funds"); *see also* Vitter, 2008 WL 4265321, at *5 (outlining the requirement to "maintain appropriate documentation").

There is no question that the invoices that defendants submitted to the FEC and to the Court include charges for legal services related to both public relations and the Senate Ethics Committee inquiry. *See, e.g.*, Ex. 13 to Defs.' Opp. [Dkt. # 19-15] at "Craig 36" ("Research and review draft Press Release."); *id.* at "Craig 59" ("Teleconference regarding Senator ethics issues; discussion with ethics counsel."). But defendants' legal invoices utilize a "block" billing style, where multiple tasks performed are grouped together within undifferentiated blocks of time. *See, e.g.*, Ex. 1 to FEC Resp. at "Craig 34" (reflecting charges for 5.10 hours of work described as follows: "Revise motion to withdraw guilty plea and supporting affidavit. Discuss same with B. Martin and K. Verdi. Various calls with Senate staff . . . [and] with T. Kelly regarding legal issues associated with motion. Various calls with J. Smith and staff regarding publicity issues associated with motion."). Thus, defendants did not fulfill their obligation to retain "adequate records" so that the Court or the FEC can "determine which amounts [were] lawfully payable from campaign funds." Hilliard, 1998 WL 108618, at *5.[8]

Still, the Court gave defendants one more chance to make this showing. After hearing oral argument on the FEC's motion for summary judgment, the Court ordered defendants to submit a supplemental pleading "itemizing and quantifying all of the legal expenses included in any of the bills submitted . . . by Kelly & Jacobson and Sutherland, Asbill and Brennan that they

---

[8]     Moreover, although the FEC expressly asked defendants to identify campaign funds used to pay legal fees related to media inquiries, defendants declined to do so. *See* FEC Reply at 11; *see also* Ex. 13 to FEC Reply [Dkt. # 21-2] at 3 (FEC questionnaire asking defendants to "[s]tate the total amount of Craig for U.S. Senate funds that were disbursed to pay legal fees . . . to respond to media inquiries"); Ex. 14 to FEC Reply [Dkt. # 21-3] at 1 (letter from defendants' counsel stating that defendants "decline to respond directly to [the FEC's] questions").

contend were permissible under [the Hilliard and Vitter] FEC Advisory Opinions." July 17, 2014 Minute Order. The Court further instructed that "[d]efendants' submission should separately identify each entry by date and by attorney and indicate the amount of time involved and the specific dollar amount they claim constituted an appropriate use of campaign funds." *Id.* Defendants submitted a pleading on August 15, 2014, and the FEC submitted its response on August 29, 2014. *See* Defs.' Supp. Mem.; FEC Resp.

The Court finds that defendants have still failed to establish what portion of their legal bills was permissibly paid with campaign funds under the standards articulated in the Hilliard and Vitter opinions. Rather than complying with the Court's instruction to identify the specific amounts of time spent on activities that might constitute an appropriate use of campaign funds, defendants simply discounted entries containing a mix of exempt and non-exempt activities by a flat and unduly generous 50 or 25 percent. For instance, defendants applied a 50 percent discount to 7.5 hours billed by the Sutherland firm for the following:

> Attend to finalizing motion to withdraw guilty plea and affidavit. Additional research regarding same. Discuss same . . . . Various calls with Senate staff regarding legal issues associated with motion to withdraw guilty plea. Various calls with [public relations consultant Judy] Smith regarding legal and publicity issues associated with motion to withdraw guilty plea . . . .

*See* Defs.' Supp. Mem. at 7. There is no apparent factual basis for applying the 50 percent discount to this entire entry; defendants should have applied any discount only to the portion of the time that was spent on the calls with the public relations consultant concerning "legal and publicity issues." In another instance, defendants discounted by 50 percent the 9.9 hours of legal work by the Sutherland firm described in the following block entry:

> Numerous conference recalls [sic] regarding political and legal issues regarding Minneapolis incident. Confer with local counsel regarding Minneapolis proceedings. Review police report and other documents regarding Minneapolis proceedings.

*See id*. at 6. But the only portion of that entry that is even arguably media or ethics related is the first sentence about the conference calls; the remaining two sentences of the entry describe work that is purely legal.[9] Defendants' submission is replete with entries like these, and it falls far short of compliance with the Court order entered for their own benefit.[10] The Court therefore rejects defendants' contention that $46,464 of the campaign funds disbursed to the two law firms was exempt from the personal use ban.[11]

The FEC argues that in light of defendants' failure to document the expenditures that should be exempt from the personal use ban, the Court should either consider the full $216,984 to have been converted to personal use, or apply a flat discounting rate of 10 percent. FEC Resp.

---

[9] Defendants themselves acknowledged the mixed nature of these billing entries in their pleading by highlighting only certain sentences of the entries in yellow. *See* Defs.' Supp. Mem. at 5–17.

[10] *See, e.g.*, Defs.' Supp. Mem. at 12 (applying 50 percent discount to 2.10 hours billed by Kelly & Jacobson for the following: "Attend to various public relations issues. Research procedures for filing notice of appeal. Discuss same with T. Kelly."); *id.* at 16 (applying a 25 percent discount rate to the following billing entry from Kelly & Jacobson: "Redraft and finalize oral argument; Telephone conferences with counsel for the defense; Review of cases; Preparation for oral argument with counsel for the defense; Court – Appellate Hearing; Debrief with co-counsel; Post-hearing press conference.").

[11] Defendants also contend that legal fees associated with "the attorneys' consultations with staff members in Senator Craig's office, a meeting with another United States Senator, addressing a Senate Committee on Appropriations issue and addressing FEC disclosure concerns" qualified for payment with campaign funds because these activities constituted "consultations with the Senator and his advisors" under the Vitter Advisory Opinion. Defs.' Supp. Mem. at 2; *see also id*. at 5–17 (reflecting numerous deductions for "political" expenses). But the Vitter opinion exempts only those "consultations" that involved "Ethics Counsel" and "a public relations professional." *See* 2008 WL 4265321, at *3 (authorizing the use of campaign funds to "pay legal fees for Subpoena Counsel's consultations with Ethics Counsel"); *id.* at *4 (authorizing the use of campaign funds to pay "legal fees and expenses incurred by Subpoena Counsel in press relations . . . including . . . consultations with a public relations professional"). Defendants' claim that it was permissible to use campaign funds to pay for legal expenses broadly related to "political" issues is an unwarranted expansion of the principles established in the Vitter opinion for which defendants have offered no legal authority.

at 10–12.  The FEC's proposed approach would result in a discount of zero or $10,856.  *Id.* at 13.

But although defendants' legal invoices are not sufficiently specific, and although defendants

have been maddeningly cavalier in responding to both the FEC's and the Court's inquiries, the

Court is bound to follow the law, and the bills are not so vague that the Court cannot do a better

job than that in calculating the exempt amount.

The Court undertook its own evaluation of the invoices provided by the parties, and it

determined that of the $216,984 at issue here, defendants permissibly spent approximately

$19,449 in campaign funds on media or ethics related legal services.  *See* Appendix A.  The

Court's review of the invoices from the Sutherland and Kelly law firms revealed forty-nine

entries that included at least some legal work related to public relations or ethics matters.  The

Court found that fourteen of these entries described work that was fully payable with campaign

funds and that the remaining thirty-five entries billed for a mix of tasks that were only partially

exempt from the personal use ban.  Given the undifferentiated nature of the data, the Court used

its best judgment to estimate the amount of time spent on the exempt activities, multiplied those

hours by the relevant attorneys' rates, and deducted that amount from the full $216,984 that

defendants have admitted they paid to the Kelly and Sutherland firms.  Through this process, the

Court determined that defendants spent $19,449 on legal services related to media or ethics

concerns, and that defendants converted the remaining $197,535 to personal use in violation of

the FECA.[12]  A chart setting forth the Court's calculations in detail is available as Appendix A to

this Memorandum Opinion.

---

12      Any imprecision in the math is attributable to the quality of the information provided by
the defendants.

**III.  The Court will order Senator Craig to pay $242,535 to the U.S. Department of the Treasury and will issue a declaration that defendants violated section 30114(b).**

Now that the Court has found that defendants converted $197,535 in campaign funds to personal use, it must determine the appropriate remedy for defendants' violation of the FECA. The Court's judgment in this case will be the first of its kind; it appears that no other court has been asked to determine the remedy for a violation of the particular section of the FECA involved here.

The FEC asks the Court to:  (1) order Senator Craig to disgorge the full amount of funds converted to personal use; (2) levy a $70,000 civil penalty against Senator Craig; (3) levy a $70,000 civil penalty against the Craig Committee; (4) issue a declaration that defendants violated the Act; and (5) order a permanent injunction against all defendants that prohibits them from violating the Act in the future.  FEC Mot. at 14.  Defendants contend that the FEC's request for both a disgorgement and civil penalties is excessive and unwarranted, and that injunctive relief is not appropriate in this case.[13]  Defs.' Opp. at 2, 4.  In an exercise of its broad discretion to fashion a remedy for a violation of the FECA, the Court will order Senator Craig to pay $242,535 to the U.S. Treasury, which is the sum of a disgorgement of $197,535 and a penalty of $45,000.  The Court will also issue the declaratory relief that the FEC requests.  But the Court does not find that injunctive relief is appropriate in this case, nor will it order the Craig Committee to pay a penalty.

---

13      Defendants do not, however, oppose the FEC's request for declaratory relief.  *See* Defs.' Opp. at 16.

*A. The Court has broad discretion to fashion a remedy under the FECA.*

The FECA provides that a court

> may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of [$7,500][14] or an amount equal to any contribution or expenditure involved in such violation, upon a proper showing that the person involved has committed, or is about to commit (if the relief sought is a permanent or temporary injunction or a restraining order), a violation of this Act . . . .

52 U.S.C. § 30109(a)(6)(B). Despite defendants' claim that "no authority justifies [the FEC's] request for both disgorgement *and* sizable civil penalties," Defs.' Opp. at 2, the plain language of the Act accords the Court the discretion to call for disgorgement (an "other order"), a penalty, the declaration, and the injunctions that the FEC seeks.[15]

Moreover, the cases addressing violations of other provisions of FECA all suggest that the Court has broad discretion to fashion a remedy that is appropriate to the particular circumstances of this case. *See, e.g.*, *FEC v. Furgatch*, 869 F.2d 1256, 1258, 1262, 1264 (9th Cir. 1989) (imposing a penalty of $25,000 where the defendant willfully and knowingly failed to report and disclose $25,008 in independent expenditures, and suggesting that a temporary injunction would be appropriate because the defendant was likely to commit further violations); *FEC v. Ted Haley Cong. Comm.*, 852 F.2d 1111, 1115–17 (9th Cir. 1988) (deferring to the FEC's interpretation of the FECA but affirming the district court's decision not to impose approximately $85,000 in civil penalties because the defendants had acted in good faith); *FEC v. Comm. of 100 Democrats*, 844 F. Supp. 1, 7–8 (D.D.C. 1993) (holding that the defendants' willful violation of two FEC conciliation agreements warranted civil penalties, an order to repay

---

14      As of July 24, 2013, this amount was increased from $5,000 to $7,500 to adjust for inflation. 11 C.F.R. § 111.24(a)(1).

15      Notably, at the hearing on the FEC's motion, counsel for defendants conceded that the Court "ha[s] discretion to impose the penalty that [it] see[s] fit." Hr'g Tr. at 39.

$3,500, and an injunction against future violations); *FEC v. Kalogianis*, No. 8:06-cv-68-T-23EAJ, 2007 WL 4247795, at *6–8 (M.D. Fla. Nov. 30, 2007) (declining to award the maximum penalty or a permanent injunction for the defendant's reporting failures and then-unlawful acceptance of corporate contributions where the defendant had acted in good faith, any injury to the public was "remote and circumscribed," and there was "no indication . . . that [the defendant was] likely to violate the Act again"); *FEC v. Friends of Jane Harman*, 59 F. Supp. 2d 1046, 1057, 1059 (C.D. Cal. 1999) (declining to award a penalty, disgorgement, or injunction where the case "involve[d] a detailed analysis of complex statutes and regulations," the defendants' violations were not "substantial nor obvious," the Harman campaign no longer existed, and Representative Harman was no longer in office).

In addition, several FEC conciliation agreements provide for relief similar to the relief the FEC requests in this case; that is, some combination of penalties, disgorgement, refunds, and injunctions. *See, e.g.*, Istook Conciliation Agreement at 5–7 (Sept. 25, 2008)[16] (assessing a civil penalty of $14,600, requiring the disgorgement of excessive contributions and the refund of funds converted to personal use, and ordering defendants to "cease and desist" violations of the FECA); Kalyn Free for Congress Conciliation Agreement at 7 (Sept. 23, 2008)[17] (assessing a civil penalty of $10,000, requiring a refund by the candidate to the campaign committee, and ordering defendants to "cease and desist" violations of the FECA); Meeks for Congress Conciliation Agreement at 6–7 (Feb. 4, 2008)[18] (assessing a civil penalty of $63,000 against the campaign committee, requiring a refund and disgorgement of other funds, and ordering

---

16      *Available at* http://eqs.fec.gov/eqsdocsMUR/28044212385.pdf.

17      *Available at* http://eqs.fec.gov/eqsdocsMUR/28044212013.pdf.

18      *Available at* http://eqs.fec.gov/eqsdocsMUR/000EC959.pdf.

defendants to "cease and desist" violations of the FECA); Campbell for Senate Conciliation Agreement at 3–4 (Oct. 31, 2003)[19] (assessing a civil penalty of $79,000, requiring a refund of up to $104,434 in excess contributions, and ordering defendants to "cease and desist" violations of the FECA).

Thus, based on the language of the FECA, the case law, and the FEC's own conciliation agreements, the Court concludes that it has broad discretion to impose a remedy that it deems appropriate under the specific circumstances of this case.

B. *The Court will order Senator Craig to pay $242,535 to the U.S. Department of the Treasury.*

The Court will require defendant Craig to pay $242,535, which is comprised of a disgorgement of the $197,535 the Court has determined that defendants converted to personal use, plus a penalty of $45,000. The $242,535 is to be paid to the U.S. Department of the Treasury.

The Court finds that the disgorgement order is necessary to avoid the unjust enrichment of Senator Craig, and to "deprive the wrongdoer of his ill-gotten gain." *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994). Moreover, even defendants do not dispute that they should be required to repay an amount equal to the funds they converted to personal use. *See* Defs.' Opp. at 16 ("If the Court does find a violation of the personal use ban, then . . . the penalty should be no greater than the amount the Commission can establish was improperly spent *solely* on legal issues relating to the Minnesota case."). Therefore, the Court finds that a disgorgement is warranted in this case.

The Court further finds that a penalty over and above the disgorgement is also appropriate given the seriousness of the violation here. Although the D.C. Circuit has not

---

19     *Available at* http://eqs.fec.gov/eqsdocsMUR/000006E2.pdf.

articulated any standards to guide the Court's discretion in imposing a penalty, courts in this district and elsewhere have turned to the factors articulated by the Ninth Circuit in *Furgatch*. *See* 869 F.2d at 1258; *see also Comm. of 100 Democrats*, 844 F. Supp. at 7 (applying *Furgatch* factors); *FEC v. Am. Fed. of State, Cnty., & Mun. Employees—P.E.O.P.L.E. Qualified*, No. 88-3208 (RCL), 1991 WL 241892, at *2 (D.D.C. Oct. 31, 1991) (same); *Kalogianis*, 2007 WL 4247795, at *6 (same). The Court will do the same.

In *Furgatch*, the Ninth Circuit looked to the following factors to determine whether a civil penalty was appropriate: "(1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the responsible federal agency." 869 F.2d at 1258, citing *United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 993 (11th Cir. 1984). The FEC also asks the Court to consider the need to deter and punish serious violations of the FECA. *See* FEC Mem. at 18. The Court finds that all of these factors and considerations are relevant and, taking them together, that a penalty is appropriate in this case.

1. The good or bad faith of defendants.

The facts and circumstances of this case do not suggest that defendants have acted in particularly good or particularly bad faith. Defendants reiterate the claim that they relied in good faith on the FEC's Kolbe for Congress Advisory Opinion. Defs.' Opp. at 2, 23–24. Defendants also contend that they tried in good faith to comply with the requirements of FECA, noting in particular that their unlawful expenditures were authorized by counsel and disclosed to the FEC. *See* Defs.' Opp. at 2–3. And defendants argue that when the Senate Ethics Committee authorized Craig to set up a legal defense fund and trust, it "necessarily acknowledged that

Senator Craig's legal expenditures 'relate to or arise by virtue of the service of the Member.'" *Id.* at 3.[20]

Defendants' arguments are largely unavailing. First, the Court has already held that any reliance by defendants on the Kolbe decision was misplaced. *Craig*, 933 F. Supp. 2d at 113. At the motion to dismiss stage, defendants claimed their reliance on the Kolbe opinion exempted them from sanctions under the FECA. *See id.* at 120; *see also* 52 U.S.C. § 30108(c)(1)(B)–(c)(2) (stating that an individual who relies in good faith upon an FEC advisory opinion involving activity that "is indistinguishable in all its material aspects" from his or her own activity "shall not, as a result of any such act, be subject to any sanction provided by th[e] Act"). The Court observed that the Kolbe opinion was distinguishable, and, more important for these purposes, that defendants had ignored its "clear admonitory language." *Craig*, 933 F. Supp. 2d at 113. The Court also rejected defendants' argument that the record underlying the Kolbe opinion supported their claims. *Id.* at 122–24.

Now, defendants again point to the record underlying the Kolbe opinion as evidence that they relied on that opinion in good faith. Defs.' Opp. at 10–11. While it may be true that there is "[n]o bar . . . on [defendants'] use of the [Kolbe] record to establish good faith reliance" at the penalty stage of the case, Defs.' Opp. at 11, the Court has already concluded that the Kolbe record does not support defendants' arguments. *See Craig*, 933 F. Supp. 2d at 124. Furthermore, defendants' purported evidence of their longstanding reliance on the Kolbe opinion – a letter from Senator Craig's counsel to the Senate Ethics Committee in November, 2007 –

---

20    Defendants further contend that the issue of good faith is a question of fact that "is ordinarily a question for the jury" and that summary judgment is inappropriate at this time. Defs.' Opp. at 9, quoting *Landrum v. Moats*, 576 F.2d 1320, 1329 (8th Cir. 1978). But the Court has already determined as a matter of law that defendants violated section 30114(b), and the question of their good or bad faith goes only to the remedy that the Court will impose.

only indicates that defendants relied on the Kolbe opinion as authority for spending campaign funds *on representation before the Senate Ethics Committee*, which is not included in the $197,535 the Court has found defendants wrongfully converted to personal use. *See* Defs.' Opp. at 9; *see also* Ex. 6 to Defs.' Opp. [Dkt. # 19-8] at 6–9. Any reliance on the Kolbe opinion to authorize that spending is therefore irrelevant to the question of what penalty the Court should impose.

It is true, though, that defendants reported the expenditures at issue in this case to the FEC as required by law, and that the Senate Ethics Committee permitted Senator Craig to establish a legal defense fund and trust. But as with the Kolbe Advisory Opinion, defendants disregard the stern admonition contained in the Senate Ethics Committee's letter of approval: "the Committee's approval of the Fund and of the trust agreement does not indicate approval of your continuation of the proceedings in *State of Minnesota v. Larry Edwin Craig*." Ex. 9 to Defs.' Opp. at 2. The letter further states: "The Committee also reminds you that it has not approved your use of campaign funds for the payment of legal expenses in connection with this proceeding, noting in its Public Letter of Admonition that '[i]t appears that some portion of these expenses may not be deemed to have been incurred in connection with your official duties.'" *Id.* at 3. Given these express admonitions, it is difficult to understand how defendants can claim that the Senate Ethics Committee "acknowledged that Senator Craig's legal expenditures 'relate to or arise by virtue of the service of the Member.'" Defs.' Opp. at 3.

It is undisputed that defendants sought advice from counsel as to whether they could lawfully expend campaign funds in connection with Senator Craig's legal matters in Minnesota, and that counsel took the position that the expenditures were authorized. *See* Ex. 5 to FEC Mot. [Dkt. # 16-5] at 1 (letter from counsel to Senator Craig dated October 4, 2007 stating, "it is our

conclusion that you may utilize campaign funds to pay for all of your legal expenses relating to this matter").  Throughout their opposition brief, defendants repeatedly claim that their reliance on the advice of counsel indicates that they acted in good faith.  *See, e.g.*, Defs.' Opp. at 2 ("Senator Craig sought the advice of counsel and made the expenditures only after receiving authorization from counsel."); *id.* at 7 ("Based on the legal advice, defendants were confident that the use of campaign funds for these expenditures was legal and customary.  Indeed, they would not have made the committee expenditures had they not received authorization from counsel."); *id.* at 19 (citing reliance on advice of counsel as evidence of defendants' "good faith efforts to comply with the Act"); *id.* at 20 (same); *id.* at 23 (same).

But whether or not defendants would have made the expenditures at issue in this case without counsel's approval, defendants have been on notice since at least February 13, 2008 that their expenditures might not comport with the law.  *See* Ex. 7 to Defs.' Opp. at 1–2 (public letter of admonition from Senate Ethics Committee dated Feb. 13, 2008 stating "[i]t appears that some portion of these expenses may not be deemed to have been incurred in connection with your official duties, either by the Committee or by the Federal Election Commission").  Defendants persisted in expending campaign funds on the Minnesota lawsuits for several more months, despite this warning.  *See, e.g.*, Ex. 1 to FEC Mot. at "Craig 75" (legal invoice from the Kelly law firm for legal services provided between April 1, 2008 and September 15, 2008).  And defendants decided to forego what would have been a significant demonstration of good faith and declined to request an advisory opinion from the FEC about their spending before disbursing the funds.  FEC Mem. at 26.

In sum, the Court finds that the evidence of defendants' good or bad faith in this case points in both directions:  defendants ignored clear admonitions against their use of campaign

funds and declined to seek an advisory opinion from the FEC, but they also relied on the advice of counsel and disclosed all of their spending. Thus, the Court concludes that the factor that takes defendants' "faith" into consideration was largely neutral, and it neither aggravates nor mitigates the penalty the Court will impose.

2. <u>The injury to the public, the necessity of vindicating the FEC's authority, and the need to deter and punish violations of the FECA.</u>

The Court finds that these factors weigh in favor of imposing a penalty in this case. First, although the injury to the public caused by defendants' misappropriation of campaign funds is difficult to discern, "there is always harm to the public when FECA is violated." *P.E.O.P.L.E. Qualified*, 1991 WL 241892, at *2. It is also reasonable to conclude that defendants' actions caused harm to the contributors to the Craig Committee, who presumably intended that their donations be used for lawful, campaign-related purposes. Moreover, a penalty here would certainly vindicate the authority of the FEC and strengthen its ability to enforce the FECA's personal use ban in the future.

In addition, the FEC argues that a penalty is necessary to deter similar violations and to punish defendants, noting that the purpose of a civil penalty is "to punish culpable individuals," not just to "restore the status quo." FEC Reply at 13, quoting *Tull v. United States*, 481 U.S. 412, 422 (1987). Defendants counter that there is no need for deterrence or additional punishment in this case because they, and especially Senator Craig, have already paid a high price for their actions. Defs.' Opp. at 20–21. But defendants' view of deterrence is too narrow: a penalty would deter not only future misconduct by these defendants, but also the misappropriation of campaign funds by others. Therefore, the Court finds that these considerations all weigh in favor of imposing a penalty in this case.

3. The defendants' ability to pay.

Despite defendants' protestations to the contrary in their opposition brief, defendants' counsel acknowledged at oral argument that Senator Craig has the ability to pay the full $216,984 disgorgement plus the $70,000 penalty that the FEC seeks. Hr'g Tr. at 48–49[21] ("It would not be our position that [Senator Craig] could not afford to pay."). Therefore, there is no question that Senator Craig can also pay the reduced total that the Court will impose. But defendant the Craig Committee has "now spent virtually all its funds," and would have no ability to pay its own penalty. *See* FEC Mem. at 17 n.12.

4. The Court's analysis.

The Court finds that all of the *Furgatch* factors are either neutral or weigh in favor of imposing a penalty. This is not a case like *Furgatch*, where the defendant plainly acted in bad faith and refused to report the unlawful expenditures, which warranted a penalty equal to the amount of the violation. *See* 869 F.2d at 1259. On the other hand, this is also not a case like *Ted Haley*, where the court assessed no penalty because the statute and regulations were unclear, the defendants acted in good faith, and the defendants quickly remedied their unintentional violations. *See* 852 F.2d at 1116–17. Some penalty, therefore, is called for.

But the Court does not agree that defendants' violation warrants the full $140,000 penalties the FEC seeks on top of an order of disgorgement. The FEC states that it requested penalties in the amount of $70,000 for defendants Craig and the Craig Committee because the sum must be sufficient to deter and punish violations of section 30114(b) without being overly punitive. *See* FEC Mem. at 18. At oral argument, counsel for the FEC noted that penalties that

_____

21      All citations to the transcript of the hearing on the FEC's motion for summary judgment are to the unofficial transcript.

are too low are ineffective, since they "threaten[ ] to become something equivalent to interest on a loan payment for the immediate use of campaign funds."  Hr'g Tr. at 16.

This argument has some force, but in the court's view, the proposed $140,000 penalty would be excessive given all of the facts and circumstances, including the amount that was diverted.  The Court notes that the total penalty requested here exceeds the assessment in most of the conciliation agreements that the FEC cites in its pleadings.  *See, e.g.*, Campbell for Senate Conciliation Agreement at 3–4 (Oct. 31, 2003) (assessing civil penalty of $79,000 where violation was not willful or knowing and requiring refund of up to $104,434 in excess contributions); Meeks for Congress Conciliation Agreement at 8 (Feb. 4, 2008) (assessing civil penalty of $63,000 against campaign committee and ordering refund and disgorgement of other funds).  *But see* America Coming Together Conciliation Agreement at 11–12 (August 24, 2007)[22] (assessing civil penalty of $775,000 where organization had misreported and misspent "millions of dollars" in funds but had agreed to wind down its affairs).  Therefore, in an exercise of the Court's discretion, and in consideration of all the factors presented in this case, the Court will order a penalty in the amount of $45,000, which is between 20 and 25 percent of the amount diverted to Senator Craig's personal use.  The Court finds this civil penalty to be sufficient but not greater than necessary and it will be added to the $197,535 disgorgement for a total order of $242,535.

Furthermore, the Court will not order that any funds be disgorged to the Craig Committee,[23] nor will it impose a penalty on the Craig Committee, as the FEC requests.  At oral

---

22      *Available at* http://eqs.fec.gov/eqsdocs/000061A1.pdf.

23      The parties agreed that any disgorged funds should be repaid to the Craig Committee. FEC Mem. at 17; Defs.' Opp. at 24 n.19.  But the FEC proposed in the alternative that the funds be paid to the U.S. Department of the Treasury.  FEC Mem. at 17 n.12.

argument, the FEC acknowledged that the Craig Committee is essentially defunct; Senator Craig has no plans to run for office again, and he is the Committee's only staff member. Hr'g Tr. at 14; *see also id.* at 19 (reflecting FEC counsel's statement that "the Committee at this point seems to be a shell"). So a disgorgement from Senator Craig to the Committee would essentially move the funds from one pocket to another, and then he would be solely responsible for the proper disposition of the funds. Moreover, counsel for the FEC was "not sure" whether it was possible to identify and repay any of the donors whose funds defendants converted to personal use on some sort of pro rata basis. *Id.* at 11. And, again, without the disgorgement, the Craig Committee has essentially no money. *See* FEC Mem. at 17 n.12. So if the Senator repaid the Committee and it was ordered to pay a penalty, the outcome would be the same as under the terms of the Court's order.

Under these circumstances, where the Craig Committee is little more than an alter-ego for Senator Craig himself, the Court finds that any disgorgement of funds to the Committee would be little more than an empty gesture and a logistical headache. So, the Court will simply order Senator Craig to pay both the $197,535 disgorgement and the $45,000 penalty to the U.S. Department of the Treasury.

*C.  The Court will issue declaratory relief.*

The FEC asks the Court to declare that defendants violated the FECA by converting campaign funds to personal use. Defendants do not object to this request beyond their general contention that they did not break the law. As the Court has already determined that defendants did, indeed, violate section 30114(b) by converting campaign funds to the personal use of Senator Craig, the Court will issue the declaration that the FEC seeks.

*D.  The Court will not impose a permanent injunction.*

The FEC seeks a permanent injunction precluding defendants from repeating the unlawful conduct involved in this case.  FEC Mem. at 30.  "An injunction is appropriate 'if there is a reasonable likelihood that the wrong will be repeated.'"  *P.E.O.P.L.E. Qualified*, 1991 WL 241892, at *1, quoting *SEC v. Mano Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972); *see also Friends of Jane Harman*, 59 F. Supp. 2d at 1059 ("Injunctive relief is appropriate only when there is a likelihood of future violations.").  Senator Craig is no longer an officeholder, and the FEC has produced no evidence that defendants are likely to violate the FECA in the future.  Therefore, injunctive relief is unwarranted in this case.

## CONCLUSION

The Court finds that defendants are liable as a matter of law for violating the FECA's ban on converting campaign funds to personal use.  The Court will therefore order Senator Craig to pay $242,535 to the U.S. Department of the Treasury, including a disgorgement of $197,535, the funds defendants unlawfully converted, plus a penalty of $45,000.  The Court will also issue a declaration that defendants violated section 30114(b) by converting campaign funds to the personal use of Senator Craig.  The Court will not, however, issue a permanent injunction in this case, nor will it order any relief against the Craig Committee.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2014

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| Sutherland, Asbill, & Brennan | 9/28/ 2007 | K.H. Sinclair | ***Attend to public relations issues regarding motion to withdraw guilty plea. Call with C. Garrett (Impact Strategies) regarding same. Review draft q&a regarding same.)*** | 1.10 | 1.10 | $355 | $390.50 | Craig 31[1] |
| Sutherland, Asbill, & Brennan | 9/29/ 2007 | K.H. Sinclair | ***Attend to public relations issues*** related to ACLU involvement in motion to withdraw guilty plea. ***Call to M. Ware regarding same.*** | 0.20 | 0.20 | $355 | $71.00 | Craig 31 |
| Sutherland, Asbill, & Brennan | 9/17/ 2007 | K.H. Sinclair | Confer with local counsel regarding upcoming hearing. ***Miscellaneous calls with press staff*** and staff of Senator Craig regarding legal and ***media issues*** pertaining to motion to | 2.10 | 0.50 | $355 | $177.50 | Craig 32 |

<hr>

1       The relevant legal invoices are numbered "Craig 30" to "Craig 90." *See* Ex. 1 to FEC Resp.

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| | | | withdraw guilty plea.  Review ACLU amicus brief.[2] | | | | | |
| Sutherland, Asbill, & Brennan | 9/18/ 2007 | K.H. Sinclair | Various calls with M. Ware, ***J. Smith***,[3] T. Kelly regarding upcoming hearing on motion to withdraw guilty plea.  Confer with L. Craig regarding same.  Review ACLU amicus brief.  Attend to miscellaneous legal and ***medial*** [sic] ***issues*** regarding same. | 1.10 | 0.50 | $355 | $177.50 | Craig 32 |

2      The American Civil Liberties Union ("ACLU") filed briefs of *amicus curiae* in support of Senator Craig's efforts to withdraw his guilty plea, and the invoices reflect that his lawyers devoted some time to reviewing those submissions.  Defs.' Supp. Mem. at 2.  Defendants argue that legal expenditures relating to the ACLU's filings should be payable with campaign funds because, if Senator Craig had not been an officeholder, there would not have been public interest in the case, and the ACLU would not have been prompted to become involved.  *Id.*  The FEC did not contest defendants' use of campaign funds for expenses related to the ACLU pleadings.  *See, e.g.*, FEC Resp. at 13 (indicating the FEC's view that ACLU-related expenses were not "personal use" by highlighting in yellow the portion of a billing entry that refers to the ACLU); *id.* at 15 (same); *id.* at 16 (same).  But the ACLU's pleadings addressed only the claimed overbreadth of the criminal statute to which the Senator entered his guilty plea, and privacy concerns raised by prosecuting individuals for personal conduct within the confines of a restroom stall.  *See* Br. for ACLU, *et al.*, as *Amici Curiae* in Supp. of Def. Craig, *State of Minnesota v. Craig*, No. 07043231, 2007 WL 2892651 (Minn. Dist. Ct. Oct. 4, 2007).  None of this had anything to do with the Senator's status as an officeholder, and the defense lawyers' review of the amicus briefs was simply part of their representation of Craig in connection with what the Court has already concluded was a personal matter.  Those expenses were not incurred in connection with Senator Craig's duties as an officeholder, and neither Hilliard nor Vitter – which were limited to lawyers' media and ethics efforts – goes so far as to cover this purely legal work.

3      J. Smith is Judy Smith, a media relations consultant with Impact Strategies.  *See* Defs.' Supp. Mem. at 4.  The Court has deemed entries reflecting Ms. Smith's involvement to be at least partially exempt from the personal use ban under the principles set forth in the Hilliard and Vitter Advisory Opinions.

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|----------|------|--------------|---------------------------------------------------|-------------|--------------|-------------|---------------|------|
| Sutherland, Asbill, & Brennan | 9/20/ 2007 | K.H. Sinclair | Telephone call with L. Craig regarding upcoming hearing and factual details surrounding conversations with prosecutors. Call with M. Ware regarding case status. Meet with L. Craig, M. Ware regarding case status. Brief Senator A. Specter regarding case status. Travel to and from same. Various calls with T. Kelly, ***J. Smith*** regarding procedural issues. Review Motion to strike ACLU amicus brief. | 5.20 | 1.00 | $355 | $355.00 | Craig 32 |
| Sutherland, Asbill, & Brennan | 9/21/ 2007 | K.H. Sinclair | Review motion to strike ACLU amicus brief. Draft waiver of appearance. Discuss same with T. Kelly, L. Craig. ***Discuss various publicity issues with J. Smith, C. Garrett.*** Discuss motion to strike ACLU brief with B. Martin. | 2.10 | 0.50 | $355 | $177.50 | Craig 32 |
| Sutherland, Asbill, & Brennan | 9/24/ 2007 | K.H. Sinclair | Prepare for hearing on motion to withdraw guilty plea. Various calls with ***J. Smith***, T. Kelly, M. Ware, L. Craig regarding upcoming hearing. Confer with B. Martin regarding motion. Review government response to motion to withdraw guilty plea. Review case law regarding same. | 4.60 | 0.50 | $355 | $177.50 | Craig 32 |
| Sutherland, Asbill, & Brennan | 9/9/ 2007 | K.H. Sinclair | Finalize motion. Discuss same with B. Martin. ***Research on ethics and procedural rules regarding media.*** Discussion with L. Craig regarding motion. Calls with M. Ware regarding motion. Discussion of final edits to motion with T. Kelly. | 7.50 | 2.00 | $355 | $710.00 | Craig 33 |

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|----------|------|--------------|--------------------------------------------------|-------------|--------------|-------------|---------------|------|
| Sutherland, Asbill, & Brennan | 9/10/ 2007 | K.H. Sinclair | Various calls with **J. Smith**, M. Ware, L. Craig, T. Kelly regarding case status and strategy. Attend to issues relating to filing of motion to withdraw guilty plea. Review rules regarding same. | 2.30 | 0.50 | $355 | $177.50 | Craig 33 |
| Sutherland, Asbill, & Brennan | 9/11/ 2007 | K.H. Sinclair | Various calls with M. Ware, L. Craig, J. Smith, T. Kelly, B. Martin regarding legal and **media issues** related to motion to withdraw guilty plea. | 1.60 | 0.50 | $355 | $177.50 | Craig 33 |
| Sutherland, Asbill, & Brennan | 9/12/ 2007 | K.H. Sinclair | Various calls with **J. Smith**, M. Ware, B. Martin, T. Kelly regarding case filing. Review draft of ACLU brief. Attend to issues related to scheduling hearing. | 2.20 | 0.50 | $355 | $177.50 | Craig 33 |
| Sutherland, Asbill, & Brennan | 9/13/ 2007 | K.H. Sinclair | Various calls with T. Kelly, J. Smith regarding legal and **media issues** related to motion to withdraw guilty plea and upcoming hearing. Review ACLU arguments related to constitutional law. | 1.40 | 0.50 | $355 | $177.50 | Craig 33 |
| Sutherland, Asbill, & Brennan | 9/14/ 2007 | K.H. Sinclair | Various calls with M. Ware, J. Smith, B. Martin, T. Kelly regarding upcoming hearing on motion to withdraw guilty plea and **related media issues**. Review media documents and revise same. Transmit same to M. Ware and D. Whiting. | 3.00 | 1.00 | $355 | $355.00 | Craig 33 |
| Sutherland, Asbill, & Brennan | 9/4/ 2007 | K.H. Sinclair | Consult with client regarding case strategy and costs and benefits of motion to withdraw plea. Research and draft motion to withdraw guilty plea. Discuss same with B. Martin. Various calls with Senate staff regarding **public relations** and legal issues. Various discussions with **J.** | 4.50 | 1.00 | $355 | $355.00 | Craig 34 |

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| | | | ***Smith*** regarding legal issues. | | | | | |
| Sutherland, Asbill, & Brennan | 9/5/ 2007 | K.H. Sinclair | Draft and revise motion to withdraw guilty plea. Discuss same with B. Martin. Various calls to Senate staff regarding legal and political issues associated with motion. ***Various calls with J. Smith regarding publicity issues associated with motion.*** | 10.50 | 2.00 | $355 | $710.00 | Craig 34 |
| Sutherland, Asbill, & Brennan | 9/6/ 2007 | K.H. Sinclair | Attend to finalizing motion to withdraw guilty plea and affidavit. Additional research regarding same. Discuss same with B. Martin and K. Verdi. Various calls with Senate staff regarding legal issues associated with motion to withdraw guilty plea. Various calls with ***J. Smith*** regarding legal and ***publicity issues*** associated with motion to withdraw guilty plea. Various calls with T. Kelly regarding motion to withdraw guilty plea. Review supporting materials for same. | 7.50 | 1.50 | $355 | $532.50 | Craig 34 |
| Sutherland, Asbill, & Brennan | 9/7/ 2007 | K.H. Sinclair | Revise motion to withdraw guilty plea and supporting affidavit. Discuss same with B. Martin and K. Verdi. Various calls with Senate staff regarding legal issues associated with motion. Various calls with T. Kelly regarding legal issues associated with motion. ***Various calls with J. Smith*** and staff ***regarding publicity issues associated with motion.*** | 5.10 | 1.50 | $355 | $532.50 | Craig 34 |

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| Sutherland, Asbill, & Brennan | 8/9/ 2007 | K.H. Sinclair | ***Review response letter from Statesman. Discuss same with B. Martin. Discuss same with J. Smith. Conference call with M. Ware, B. Roberts, S. Smith, S. Potano, W. Hart, D. Whiting. Draft reply letter.*** | 2.40 | 2.40 | $355 | $852.00 | Craig 35 |
| Sutherland, Asbill, & Brennan | 8/10/ 2007 | K.H. Sinclair | ***Draft response letter to Statesman. Discuss same with J. Smith.*** | 1.40 | 1.40 | $355 | $497.00 | Craig 35 |
| Sutherland, Asbill, & Brennan | 8/15/ 2007 | K.H. Sinclair | ***Strategy call with M. Ware, S. Smith, W. Hart, D. Whiting, J. Smith.*** | 0.80 | 0.80 | $355 | $284.00 | Craig 35 |
| Sutherland, Asbill, & Brennan | 8/16/ 2007 | K.H. Sinclair | ***Draft response letter to Statesman. Confer with J. Smith regarding same. Confer with B. Martin regarding same. Transmit same to client.*** | 1.50 | 1.50 | $355 | $532.50 | Craig 35 |
| Sutherland, Asbill, & Brennan | 9/1/ 2007 | K.H. Sinclair | Attend to ***media*** and legal issues surrounding Minneapolis proceedings. ***Attend to senate ethics issues***. Numerous teleconferences with M. Ware, J. Smith, B. Martin regarding same. | 6.80 | 2.50 | $355 | $887.50 | Craig 35 |
| Sutherland, Asbill, & Brennan | 8/27/ 2007 | B. Martin | Teleconference to discuss arrest of Senator Craig and possible legal and ***PR implications of arrest***. | 1.00 | 0.50 | $650 | $325.00 | Craig 36 |
| Sutherland, Asbill, & Brennan | 8/30/ 2007 | B. Martin | Teleconference with Senator Craig, Office of the Prosecution and local counsel. ***Press accounts and PR strategy***. | 0.80 | 0.40 | $650 | $260.00 | Craig 36 |

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| Sutherland, Asbill, & Brennan | 9/1/2007 | B. Martin | ***Research and review draft Press Release***; telephone conversation with client; discuss options, ***prepare and review of press conference; telephone conference with Stan Brand***.[4] | 2.50 | 2.00 | $650 | $1,300.00 | Craig 36 |
| Sutherland, Asbill, & Brennan | 9/26/2007 | B. Martin | Meetings in Minneapolis with trial team, T. Kelly, K. Sinclair and ***PR team*** to prepare for hearing and ***press conference***. Attendance at Motion hearing. | 14.00 | 3.00 | $650 | $1,950.00 | Craig 36 |
| Kelly & Jacobson | 8/28/2007 to 9/26/2007 | J. Katan | Case law research; Supplemental research; Draft correspondence and court documents; ***Field and redirect media calls***. | 8.00 | 2.00 | $110 | $220.00 | Craig 44 |
| Sutherland, Asbill, & Brennan | 10/15/2007 | K.H. Sinclair | Attend to filing notice of appeal. Confer with P. Jacobson regarding same. ***Confer with J. Smith and D. Rene regarding media issues***. Call to L. Craig regarding status of appeal. | 1.80 | 0.80 | $355 | $284.00 | Craig 49 |
| Sutherland, Asbill, & Brennan | 10/19/2007 | K.H. Sinclair | ***Review media goals statement***. Revise statement of case. | 0.60 | 0.30 | $355 | $106.50 | Craig 49 |
| Sutherland, Asbill, & Brennan | 10/5/2007 | K.H. Sinclair | ***Review draft question and answer documents. Confer with J. Smith and Senate staff regarding same***. | 0.70 | 0.70 | $355 | $248.50 | Craig 50 |
| Sutherland, Asbill, & Brennan | 10/6/2007 | K.H. Sinclair | ***Review draft question and answer for poll. Confer with Senate staff regarding same***. | 0.60 | 0.60 | $355 | $213.00 | Craig 50 |

---

[4]     Mr. Brand was Senator Craig's counsel for the Senate Ethics Committee inquiry, and so the Court has deemed entries that reflect his involvement to be at least partially exempt from the personal use ban under the principles set forth in the Hilliard and Vitter Advisory Opinions. *See* Ex. 12 to FEC Reply at 5 (stating that defendants retained the Brand Law Group to respond to the Senate Ethics Committee inquiry).

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| Sutherland, Asbill, & Brennan | 10/7/ 2007 | K.H. Sinclair | ***Review draft question and answer documents. Confer with J. Smith regarding same.*** Attend to scheduling issues. Attend to issues related to upcoming poll. ***Confer with D. Whiting*** regarding same. | 2.10 | 2.10 | $355 | $745.50 | Craig 50 |
| Sutherland, Asbill, & Brennan | 10/8/ 2007 | K.H. Sinclair | Attend conference call with M. Ware, L. Craig, ***J. Smith*** and Senate staff regarding next steps. Discuss notice appeal with T. Kelly. Prepare notice appeal. | 2.70 | 0.50 | $355 | $177.50 | Craig 50 |
| Sutherland, Asbill, & Brennan | 10/ 12/ 2007 | K.H. Sinclair | Attend to filing issues related to notice of appeal with local counsel. Attend to billing issues in relation to FEC disclosure. Confer with T. Kelly regarding notice appeal. Confer with P. Jacobson regarding notice of appeal. ***Confer with J. Smith regarding public relations issues related to notice of appeal.*** | 3.10 | 0.60 | $355 | $213.00 | Craig 50 |
| Sutherland, Asbill, & Brennan | 10/4/ 2007 | B. Martin | Conference call with Senator Craig, K. Sinclair and ***PR team*** to discuss and review Judge's decision. | 1.50 | 0.75 | $650 | $487.50 | Craig 51 |
| Sutherland, Asbill, & Brennan | 10/ 15/ 2007 | B. Martin | ***Review of Press Release for appeal.*** | 0.50 | 0.50 | $650 | $325.00 | Craig 51 |
| Sutherland, Asbill, & Brennan | 10/2/ 2007 | K.H. Sinclair | ***Attend to various public relations issues.*** Research procedures for filing notice of appeal. Discuss same with T. Kelly. | 2.10 | 1.00 | $355 | $355.00 | Craig 51 |
| Sutherland, Asbill, & Brennan | 10/3/ 2007 | K.H. Sinclair | Prepare for issuance of order. Review procedures for filing appeal. Various calls to client, ***J. Smith***, Senate staff regarding scheduling and procedural issues. | 3.10 | 0.30 | $355 | $106.50 | Craig 51 |

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| Sutherland, Asbill, & Brennan | 10/30/2007 | B. Martin | ***Teleconference regarding Senator ethics issues; discussion with ethics counsel.*** | 1.50 | 1.50 | $650 | $975.00 | Craig 59 |
| Sutherland, Asbill, & Brennan | 10/26/2007 | K.H. Sinclair | Review appellate rules. ***Attend to media issues with J. Smith.*** | 1.10 | 0.50 | $355 | $177.50 | Craig 59 |
| Sutherland, Asbill, & Brennan | 10/31/2007 | K.H. Sinclair | ***Call with M. Ware, B. Roberts, D. Whiting regarding Senate Ethics Committee issue. Conference call with M. Ware, B. Roberts, D. Whiting, S. Brand, B. Martin, J. Smith regarding Ethics Committee issues and media relations.*** | 0.70 | 0.70 | $355 | $248.50 | Craig 60 |
| Sutherland, Asbill, & Brennan | 11/14/2007 | K.H. Sinclair | ***Review ethics committee submission. Confer with B. Martin regarding same.*** | 0.30 | 0.30 | $355 | $106.50 | Craig 60 |
| Sutherland, Asbill, & Brennan | 11/29/2007 | K.H. Sinclair | ***Call with M. Ware regarding public relations issues.*** | 0.30 | 0.30 | $355 | $106.50 | Craig 61 |
| Sutherland, Asbill, & Brennan | 11/30/2007 | K.H. Sinclair | Review research on factual basis of guilty plea. Confer with T. Kelly regarding case status and research issues. ***Conference call on public relations issues.*** | 1.30 | 0.80 | $355 | $284.00 | Craig 61 |
| Sutherland, Asbill, & Brennan | 12/19/2007 | K.H. Sinclair | Revise appellate brief. Confer with B. Martin regarding same. Call to Senator's staff regarding legal and political issues related to ***Idaho Statesman***. | 1.30 | 0.80 | $355 | $284.00 | Craig 71 |
| Sutherland, Asbill, & Brennan | 12/20/2007 | K.H. Sinclair | Call to B. Roberts. ***Review draft letter to Idaho Statesman.*** Review revisions to appellate brief. | 0.30 | 0.10 | $355 | $35.50 | Craig 71 |

| Law Firm | Date | Legal Prof'l | Description (*exemptions italicized and bolded*) | Total Hours | Exempt Hours | Hourly Rate | Exempt Amount | Page |
|---|---|---|---|---|---|---|---|---|
| Kelly & Jacobson | 9/8/ 2008 | T. Kelly | Redraft and finalize oral arguments; Telephone conferences with counsel for the defense; Review of cases; Preparation for oral arguments with counsel for the defense; Court - Appellate Hearing; Debrief with co-counsel; ***Post-hearing press conference.*** | 13.00 | 1.00 | $550 | $550.00 | Craig 75 |
| Kelly & Jacobson | 9/27/ 2007 to 11/ 30/ 2007 | T. Kelly | Review Judge Porter's Orders; Review court transcript; Assist in drafting Notice of Appeal & Statement of Case documents; Research relevant case law; Telephone conferences with the prosecuting attorney; Telephone conferences with the Appellate Court Clerk; Review court filings from prosecuting attorney; Review public statements made by client regarding the case; ***Handle calls from sources wanting factual information relevant to the case***; Review of ACLU court filings; Review Appellate Court Orders; Multiple telephone conferences and email correspondence with counsel for the defense. | 7.50 | 1.50 | $550 | $825.00 | Craig 79 |
| Kelly & Jacobson | 9/27/ 2007 to 11/ 30/ 2007 | J. Katan | Draft correspondence and court documents; ***Field and redirect media calls***; Facilitate filing of Appellate Court documents. | 1.00 | 0.50 | $110 | $55.00 | Craig 87 |
| **TOTAL** | | | | | | | **$19,449** | |